Paul Joseph Blazevich, *pro se*
Emerita Cruz Joya, *pro se*
Eric Peter Lafon, *pro se*
George Charles Budenz II, *pro se*

Plaintiffs, *in propriis personis*

Mailing address for all Plaintiffs:
c/o Paul Blazevich
Post Office Box 121986
San Diego, California 92112

FILED
Aug 10 2026
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY s/ TC DEPUTY

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

**PAUL JOSEPH BLAZEVICH; EMERITA CRUZ JOYA; GEORGE CHARLES BUDENZ II; ERIC PETER LAFON,**

Plaintiffs,

versus

**CITY OF SAN DIEGO,** a municipal corporation;
**COUNTY OF SAN DIEGO,** a political subdivision;
**SUMMER SABRAW STEPHAN,** in her official capacity;
**SCOTT MICHAEL WAHL,** in his individual and official capacities;
**RAMIRO O. RODRIGUEZ,** in his individual capacity;
**GEOFFREY A. ULOVEC,** in his individual capacity;
**JOSEPH R. CHARLOT,** in his individual capacity;
**JARRETT T. DUNCAN,** in his individual capacity;
**MATTHEW T. KNUTSON,** in his individual capacity; ;
**TYLER W. CHRISTMAN,** in his individual capacity;
**DEBORAH A. CLEM,** in her individual capacity;
**ASHLEY N. ARVELO,** in her individual capacity;

Case No.: '26CV4571 AGS DEB

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

1. **VIOLATION OF THE EQUAL PROTECTION CLAUSE** (U.S. Const., Amend. XIV; 42 U.S.C. § 1983)
2. **DEPRIVATION OF DUE PROCESS** (U.S. Const., Amend. XIV; 42 U.S.C. § 1983)
3. **UNREASONABLE SEIZURE** (U.S. Const., Amend. IV; 42 U.S.C. § 1983)
4. **VIOLATION OF FIRST AMENDMENT RIGHTS** (U.S. Const., Amend. I; 42 U.S.C. § 1983)
5. **FAILURE TO INTERVENE** (42 U.S.C. § 1983)
6. **MUNICIPAL LIABILITY** (*Monell* Claim; 42 U.S.C. § 1983)
7. **VIOLATIONS OF THE BANE ACT** (Cal. Civil Code § 52.1)
8. **INTERFERENCE WITH INALIENABLE RIGHTS TO PROTECT PROPERTY, AND PURSUE SAFETY** (Cal. Const., Art. I, Sec. 1—Equitable Relief Only)
9. **FORCIBLE DETAINER** (Cal. Code Civ. Proc. § 1160)

(Caption continued on next page.)

**BRANDON MORENO,**
in his individual capacity;
**SCOTT A. RAYNOR,**
in his individual capacity;
**ISAI CASTILLO,**
in his individual capacity;
**SHAYAN ESAMBOLCHI,**
in his individual capacity;
**LIAM R. COATS,**
in his individual capacity;
**S. CARDENAS,**
in his individual capacity;
**HENRY INGRAM,** Badge No. SD1994,
in his individual capacity; and
**DOES-1** through **20,** inclusive;

Defendants.

**10. CONVERSION**
(Cal. Common Law)

**11. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
(Cal. Common Law)

**12. NEGLIGENCE—AFFIRMATIVE MISFEASANCE; ALTERNATIVELY, SPECIAL RELATIONSHIP AND NEGLIGENT UNDERTAKING**
(Cal. Gov't Code §§ 820(a), 815.2(a))

**13. BREACH OF MANDATORY DUTY**
(Cal. Government Code § 815.6)

**14. PRIVATE NUISANCE**
(Cal. Civil Code §§ 3479, 3481)

**15. PUBLIC NUISANCE**
(Cal. Civil Code §§ 3479, 3480)

**16. TAXPAYER CLAIM TO RESTRAIN ILLEGAL EXPENDITURES**
(Cal. Code Civil Procedure 526a)

**17. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
(Cal. Common Law)

JURY TRIAL DEMANDED

## I. INTRODUCTION

On the following page, Plaintiffs provide a satirical "announcement," inspired by Judge Alex Kozinski's dissent in *United States v. Ramirez-Lopez*, 315 F.3d 1143 (9th Cir. 2003),[1] in which Judge Kozinski used satire to underscore what he viewed as a denial of due process. Plaintiffs, in the interest of judicial economy, use a similar technique here to distill more than 300 pages of pleadings and exhibits into a single-page summary that identifies the central allegations and issues presented by this case.

[1] *See United States v. Ramirez-Lopez*, 315 F.3d 1143, 1159–62 (9th Cir. 2003) (Kozinski, J., dissenting), opinion withdrawn and appeal dismissed following dismissal of indictment, 327 F.3d 829 (9th Cir. 2003).

**ATTENTION CRIMINALS!**

# IT'S OPEN SEASON ON LANDLORDS IN SAN DIEGO!

**Announcing the San Diego Police Department's "strong policy" of not enforcing in cases involving a landlord and a tenant—which San Diego police implement by treating crimes committed against residential landlords as *purely civil matters!***

***COMMIT CRIMES UNDER SAN DIEGO POLICE PROTECTION! NO SEASON LIMITS!***

**FREQUENTLY ASKED QUESTIONS:**

**Q:** Do I have to be a tenant in order to commit crimes against San Diego's residential landlords without consequence?

**A:** No, not at all! The San Diego Police Department (SDPD) requires neither a tenant nor that a tenancy exist before its officers will refuse to enforce the law. The only triggering condition is that the victim is a San Diego residential landlord!

**Q:** This policy, at most, is a departmental policy that restricts SDPD officers from making arrests under Penal Code § 836. What would prevent a landlord from making an arrest authorized by Penal Code § 837—*i.e.,* a citizen's arrest?

**A:** Great question! Answer: San Diego police! A landlord may still make an arrest, but the SDPD will instantly come to the criminal's rescue, by handcuffing ***the landlord*** and threatening the landlord with arrest if the landlord "bothers" the arrestee again—*thereby preventing the criminal from being taken before a magistrate, and enabling the criminal to continue with his or her crimes against the San Diego residential landlord under the protection of San Diego's Police!*

**Q:** What crimes can be committed against San Diego residential landlords under the SDPD's protection?

**A:** As demonstrated in multiple recent cases, almost any crime, including, but not limited to, "serious felonies" that qualify as "strikes" under California's Three Strikes Law. These crimes include First-Degree Burglary, Extortion, and, *inter alia,* Witness Intimidation. (*Caveat: While presently untested, the crime of Murder may not apply.*)

**Q:** Can't residential landlords ask the District Attorney's Office to initiate proceedings under Gov't Code § 26501?

**A:** Absolutely! In a recent case, a landlord did exactly that, *repeatedly*—and was told that the D.A.'s office has policy to take no action absent a police report containing a request from a police officer to prosecute. Thus, landlords can ask all they want, but the D.A.'s office has chosen to abdicate its independent charging decisions to police!

**Q:** What if residential landlords ask for help from the Mayor who, as San Diego's chief executive officer, is in charge?

**A:** Nothing. In San Diego, residential landlords can ask—but doing so appears to be an exercise in futility. In a recent case, residential landlords repeatedly sought the Mayor's help, only to be spun like a top and sent right back to the SDPD! In doing so, the Mayor ratified what some now refer to as San Diego's "**Big Beautiful Non-Enforcement Pill.**"

**Q:** Can you recommend any go-to strategies to commit crimes without consequence that work every time?

**A:** Absolutely! Here's one: First, have mail delivered to the property in the intruder's own name—no alias required. Next, when the mail arrives, break into the home, retrieve it, and place a bag of the intruder's clothes inside. After the landlord discovers the burglary, calls 911, and SDPD officers arrive, simply say, "I live here," and hand the officers the mail. Because SDPD operates under the legally baseless notion that mailed correspondence "establishes residency," that is, create a legal right to possession—which it plainly does not under California law—and because SDPD does not enforce the law when the victim is a residential landlord, the San Diego police will declare it exclusively a "civil matter," dispossess the owner(s) of his/her/their own home, give possession to the burglar, and then threaten the owner with arrest if the owner attempts a citizen's arrest or tries to retake possession. ***The burglar can then live in the home rent-free and liquidate the owner's personal property for spending money, without any fear of penal consequences—protected by the City of San Diego's Police Department from arrest and interference by the owner, and shielded by the County of San Diego District Attorney's Office from prosecution under its "No-Action-Without-a-Police-Referral" policy!!!***

**Q:** Wow. That is amazing! What do you mean by "No Season Limits"?

**A:** Another great question—so glad you asked! By way of example, SDPD officers recently protected 19 burglars' while they stole from elderly and disabled victims *until they lost their home*—a residential triplex—at a foreclosure auction, which also wiped out most of those victims' retirement incomes as well. Thus, the only limit is what the victim(s) own!

## II. FOUNDATIONAL PRINCIPLES OF LAW, GOVERNANCE, AND CONSTITUTIONAL FRAMEWORK

### The Rule of Law

The rule of law is the principle that, in order to govern fairly, public power must be exercised under, and constrained by, publicly promulgated, duly enacted, prospective, and equally applied rules; interpreted and adjudicated by independent, neutral courts; and carried into effect objectively according to law—neither enforced by the subjective views of individuals nor by the status of those to whom the rules are applied.

The rule of law mandates that like cases be treated alike, that both private individuals and public officials comply with the law, and that anyone who violates the law be held to the same standards of accountability.

### *Nemo Est Supra Legem*

In the United States, *nemo est supra legem* ("no one is above the law") is a fundamental legal maxim that expresses equal justice: from the ordinary citizen, to highest officeholder, everyone must follow the law, and departures from it have consequences, including civil liability and criminal penalties.[2,3,4,5]

Grounded in these foundational commitments, Plaintiffs bring this action to vindicate rights secured both by the United States Constitution and federal civil-rights statutes, and to obtain relief on related claims under California law.

---

[2] U.S. Const. art. II, § 3 (The Executive Branch "shall take Care that the Laws be faithfully executed.").

[3] U.S. Const. art. VI, cl. 2 ("The Constitution…shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby…").

[4] U.S. Const. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.").

[5] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) ("The government of the United States has been emphatically termed a government of laws, and not of men.").

## III. NATURE OF THE ACTION

1. This action challenges two municipal policies that operate together. The first is a policy of the City of San Diego, implemented through the San Diego Police Department, of treating crimes committed against San Diego residential landlords at their homes and rental properties as if those crimes were exclusively "civil matters." Officers extend that same characterization to the crimes underlying residential landlords' private arrests, and use it to obstruct landlords who attempt to make, and who have made, private arrests authorized by California law. The second is a policy of the County of San Diego, implemented through the District Attorney's Office, of refusing to consider a criminal complaint from a private person absent a police report containing a peace officer's request to prosecute — a referral that the Police Department's "civil matter" classification ensures will never issue. The combined effect is to leave residential landlords in San Diego simultaneously (i) without police protection, (ii) without the ability to protect themselves and their property by making the private arrests the Legislature authorized them to perform, and (iii) without any means of having their complaints of public offenses committed against them considered by the District Attorney's Office for prosecution — while those who commit crimes against them face no prospect of investigation, arrest, or prosecution and victimize them with impunity.

2. At all times relevant to this Complaint, each Plaintiff was a residential landlord in San Diego, owning or managing residential rental property there. Plaintiff Lafon continues to own such property, and Plaintiffs Blazevich and Cruz Joya continue to manage residential rental property in San Diego. The San Diego Police Department has applied these policies to each Plaintiff, whether the Plaintiff owned or managed the property involved. The Department declines to investigate or take enforcement action concerning crimes committed against residential landlords, including Plaintiffs, that would receive an ordinary law-enforcement response if committed against persons other than residential landlords. Those crimes include serious and violent felonies. The Department instead characterizes and records the incidents as exclusively "civil matters." None of the persons whose conduct

Plaintiffs reported held a tenancy at the property that person entered, and no landlord-tenant relationship existed that could render the reported conduct a civil dispute.

3. Denied police protection, Plaintiff Blazevich exercised his private arrest authority under California law and summoned officers to take custody, as the law entitled him to do. San Diego Police Department officers refused custody, refused to acknowledge that any crime or arrest had occurred, and did not follow California's statutorily required post-private-arrest procedures. Officers repeatedly threatened to arrest Blazevich if he attempted to take his arrestees before a magistrate himself, even though California law required him to do so, and Blazevich submitted to that show of authority on every occasion. No officer released any of Blazevich's arrestees by any statutorily authorized means, performed the duties California law imposes on peace officers following a private arrest, or made any record that an arrest had occurred.

4. Because the Police Department classified Plaintiffs' reports as "civil matters," no officer referred any offense against Plaintiffs for prosecution, and the District Attorney's Office declined to consider the complaints Plaintiffs submitted directly — including statement of the charges following BLAZEVICH's private arrests and supporting affidavits.

5. Plaintiffs Blazevich and Cruz Joya were repeatedly dispossessed of and displaced from their home. Persons not only unlawfully entered unlawfully occupied two of the three units in the residential triplex owned by Blazevich, Cruz Joya, and Budenz, but also exposed Plaintiffs to threats and violence. Each time Blazevich arrested an unlawful occupant, San Diego Police Department officers refused custody and threatened to arrest him if he took the arrestee before a magistrate, and the unlawful occupations continued. Rental income from those units ceased and, as a result, the mortgage went unpaid. The triplex — the personal residence of Blazevich and Cruz Joya and a principal source of retirement income for Blazevich, Cruz Joya, and Budenz — was lost to foreclosure sale. Plaintiffs also lost personal property. Plaintiffs sue under 42 U.S.C. section 1983, and Blazevich, Cruz Joya, and Budenz additionally sue under California law. Plaintiffs seek damages and declaratory and injunctive relief.

## IV. PARTIES

12. Plaintiff **PAUL JOSEPH BLAZEVICH** ("BLAZEVICH") is a United States citizen residing in the City of San Diego, County of San Diego, California. BLAZEVICH is an elder within the meaning of the California Elder Abuse and Dependent Adult Civil Protection Act, California Welfare and Institutions Code section 15610.27; an individual with a disability within the meaning of 42 U.S.C. § 12102(1), namely a neurological disorder that causes excessive daytime sleepiness, sudden sleep attacks, difficulty concentrating and articulating thoughts, and other symptoms that substantially limit one or more major life activities, including sleeping, concentrating, speaking, and driving; and a "qualified individual" under 42 U.S.C. § 12131(2). As a result, BLAZEVICH requires reasonable modifications.

13. Plaintiff **EMERITA CRUZ JOYA** ("CRUZ JOYA") is a United States citizen residing in the City of San Diego, County of San Diego, California. CRUZ JOYA is the wife of BLAZEVICH and is also an elder as defined by California Welfare and Institutions Code section 15610.27. At all relevant times, CRUZ JOYA has been undergoing treatment for a serious, progressive, and life-threatening medical condition that significantly impairs her physical health and daily functioning. Her condition renders her particularly vulnerable to stress and external disruption.

14. Plaintiff **GEORGE CHARLES BUDENZ II** ("BUDENZ") is a United States citizen residing in the City of Menifee, County of Riverside, California. BUDENZ is an elder as defined by the California Elder Abuse and Dependent Adult Civil Protection Act, Cal. Welf. & Inst. Code § 15610.27. He is also a former U.S. Naval aviator and a combat veteran of the Vietnam War, and he received a commendation medal for his service in the first Gulf War. While in the Navy, he served as an assistant naval attaché at various U.S. embassies in South America and later as senior naval attaché in Indonesia and the Philippines; he was subsequently detailed to the U.S. Department of State as Chief of Operations in Bosnia and Herzegovina, and retired with the rank of Commander. As a result of his military service, BUDENZ suffers from Post-Traumatic Stress Disorder (PTSD) and

disabilities caused by his exposure to Agent Orange, a tactical herbicide used during the Vietnam War. His PTSD causes difficulties sleeping, aggravated by chronic pain from skin cancer caused by his exposure to Agent Orange. These conditions substantially limit one or more of his major life activities. Accordingly, BUDENZ is an individual with a disability under 42 U.S.C. § 12102(1) and a "qualified individual" under 42 U.S.C. § 12131(2).

15. Plaintiff **ERIC PETER LAFON** ("LAFON") is a United States citizen and owns real property in the City of San Diego, County of San Diego, California. BLAZEVICH, CRUZ JOYA, BUDENZ, and LAFON are hereinafter collectively referred to herein as "PLAINTIFFS."

16. Defendant **CITY OF SAN DIEGO** ("CITY") is a municipal corporation and charter city organized under California law. The San Diego Police Department ("SDPD") is a department of the CITY and is not a separate legal entity. The CITY employs the individually named CITY employees alleged herein, including sworn SDPD peace officers. The CITY is a "person" subject to suit under 42 U.S.C. § 1983 and is subject to municipal liability for constitutional injuries caused by its official policies, longstanding practices or customs, decisions or ratifications by officials with final policymaking authority, or deliberately indifferent failures to train or supervise, as alleged herein. As to the California-law claims asserted against the CITY, liability is alleged only to the extent authorized by California law.

17. Defendant **COUNTY OF SAN DIEGO** ("COUNTY") is a political subdivision of the State of California organized under California law. The San Diego County District Attorney's Office is an office of county government, although the governmental capacity in which the DISTRICT ATTORNEY acts may depend upon the particular function at issue. The COUNTY is named as a Defendant only on the Claims for Relief expressly asserted against it herein. To the extent Plaintiffs seek prospective relief concerning the challenged District Attorney's Office complaint-intake policy in circumstances in which the DISTRICT ATTORNEY is determined to act on behalf of the State rather than the COUNTY, that relief is sought against the DISTRICT ATTORNEY in her official capacity as

expressly alleged herein; no damages or personal liability are sought against the DISTRICT ATTORNEY.

18. Defendant **SUMMER SABRAW STEPHAN** is the duly elected District Attorney for the County of San Diego ("DISTRICT ATTORNEY"). The DISTRICT ATTORNEY is sued solely in her official capacity for prospective declaratory and injunctive relief, based on her official authority over, and specific connection to, the administration, enforcement, supervision, and implementation of the District Attorney's Office policies, practices, customs, and decision rules challenged herein, including complaint-intake and gatekeeping practices alleged to foreclose private-person access to statutory criminal-process pathways. No damages or personal liability are sought against the DISTRICT ATTORNEY. To the extent the challenged policy or practice is determined to be official policy attributable to the COUNTY for purposes of municipal liability, PLAINTIFFS pursue their municipal-liability claim against the COUNTY. In the alternative, and to the extent the DISTRICT ATTORNEY is determined to act on behalf of the State of California with respect to the challenged policy or practice, PLAINTIFFS seek only prospective declaratory and injunctive relief against the DISTRICT ATTORNEY in her official capacity, with any order running against her office and binding her successors. At all relevant times, the DISTRICT ATTORNEY acted under color of state law.

19. Defendant **SCOTT MICHAEL WAHL** is an individual employed by the CITY as its Chief of Police ("CHIEF"). The CHIEF is sued in his official capacity for prospective declaratory and injunctive relief. The CHIEF oversees SDPD operations and supervises subordinate officers. At all relevant times, the CHIEF acted under color of state law and within the course and scope of his employment. He is not sued solely by virtue of his title; rather, as alleged herein, he personally participated in, directed, implemented, ratified, and/or was deliberately indifferent to the unconstitutional policies, practices, and customs that violated PLAINTIFFS' rights.

20. Defendant **RAMIRO O. RODRIGUEZ** ("RODRIGUEZ") is an individual who, at all relevant times, was a sworn peace officer employed by the CITY, assigned to the

SDPD (Badge No. SD5857), and held the rank of Lieutenant. RODRIGUEZ is sued in his individual capacity for damages based on acts and omissions taken under color of state law.

21. Defendant **GEOFFREY ULOVEC** ("ULOVEC") is an individual who, at all relevant times, was a sworn peace officer employed by the CITY, assigned to the SDPD (Badge No. SD6767), and held the rank of Sergeant. ULOVEC is sued in his individual capacity for damages based on acts and omissions taken under color of state law.

22. Defendant **JOSEPH R. CHARLOT** ("CHARLOT") is an individual who, at all relevant times, was a sworn peace officer employed by the CITY, assigned to the SDPD (Badge No. SD7552), and held the rank of Sergeant. CHARLOT is sued in his individual capacity for damages based on acts and omissions taken under color of state law.

23. Defendant **JARRETT T. DUNCAN** ("DUNCAN") is an individual who, at all relevant times, was a sworn peace officer employed by the CITY, assigned to the SDPD (Badge No. SD6961), and held the rank of Sergeant. DUNCAN is sued in his individual capacity for damages based on acts and omissions taken under color of state law.

24. Defendant **TYLER W. CHRISTMAN** ("CHRISTMAN") is an individual who, at all relevant times, was a sworn peace officer employed by the CITY, assigned to the SDPD (Badge No. SD7711), and held the rank of Sergeant. CHRISTMAN is sued in his individual capacity for damages based on acts and omissions taken under color of state law.

25. Defendant **MATTHEW KNUTSON** ("KNUTSON") is an individual who, at all relevant times, was a sworn peace officer employed by the CITY, assigned to the SDPD (Badge No. SD6692), and held the rank of Sergeant. KNUTSON is sued in his individual capacity for damages based on acts and omissions taken under color of state law.

26. Defendant **ASHLEY N. ARVELO** ("ARVELO") is an individual who, at all relevant times, was a sworn peace officer employed by the CITY, assigned to the SDPD (Badge No. SD7702), and served as a Detective. ARVELO is sued in her individual capacity for damages based on acts and omissions taken under color of state law.

27. Defendant **S. CARDENAS** ("CARDENAS"), whose first name is currently unknown to PLAINTIFFS, is an individual who, at all relevant times, was a sworn peace

officer employed by the CITY and assigned to the SDPD. CARDENAS is sued in his individual capacity for damages based on acts and omissions taken under color of state law. At all relevant times, CARDENAS was supervised by ULOVEC, CHARLOT, and DUNCAN. PLAINTIFFS will seek leave to amend this Complaint to state CARDENAS's first name and badge number once it has been ascertained.

28. Defendant **BRANDON MORENO** ("MORENO"), is an individual who, at all relevant times, was a sworn peace officer employed by the CITY and assigned to the SDPD. MORENO is sued in his individual capacity for damages based on acts and omissions taken under color of state law.

29. Defendant **SCOTT A. RAYNOR** ("RAYNOR"), is an individual who, at all relevant times, was a sworn peace officer employed by the CITY and assigned to the SDPD (Badge No. SD7359). RAYNOR is sued in his individual capacity for damages based on acts and omissions taken under color of state law.

30. Defendant **ISAI CASTILLO** ("CASTILLO") is an individual who, at all relevant times, was a sworn peace officer employed by the CITY and assigned to the SDPD. CASTILLO is sued in his individual capacity for damages based on acts and omissions taken under color of state law.

31. Defendant **SHAYAN ESAMBOLCHI** ("ESAMBOLCHI") is an individual who, at all relevant times, was a sworn peace officer employed by the CITY and assigned to the SDPD (Badge No. SD1087). ESAMBOLCHI is sued in his individual capacity for damages based on acts and omissions taken under color of state law.

32. Defendant **LIAM R. COATS** ("COATS") is an individual who, at all relevant times, was a sworn peace officer employed by the CITY and assigned to the SDPD. COATS is sued in his individual capacity for damages based on acts and omissions taken under color of state law.

33. Defendant **HENRY INGRAM** is an individual who, at all relevant times, was a sworn peace officer employed by the CITY and assigned to the front desk at SDPD's

Southeastern Division (Badge No. 1994; "INGRAM-1994"). He is sued in his individual capacity for damages based on acts and omissions taken under color of state law.

34. Defendants **DOES 1–20**, inclusive, are individual persons currently or formerly employed by the CITY and/or the COUNTY, whose true names and specific capacities are currently unknown to PLAINTIFFS. PLAINTIFFS will seek leave of court to amend this Complaint and substitute their true names and capacities once ascertained. PLAINTIFFS are informed and believe, and allege thereon, that each of these fictitiously named Defendants is responsible in some manner for the injuries and constitutional deprivations suffered by PLAINTIFFS as further alleged herein.

35. As used herein, "PEACE OFFICER DEFENDANTS" refers collectively to all individually named defendants who are currently or were formerly employed by the CITY in the capacity of peace officers. "INDIVIDUAL CITY DEFENDANTS" refers collectively to the MAYOR and the PEACE OFFICER DEFENDANTS. "CITY DEFENDANTS" refers collectively to the CITY and the INDIVIDUAL CITY DEFENDANTS. "DISTRICT ATTORNEY DEFENDANTS" refers collectively to the DISTRICT ATTORNEY and the above-named Deputy District Attorneys. "COUNTY DEFENDANTS" refers collectively to the COUNTY and the DISTRICT ATTORNEY DEFENDANTS. All references to "DEFENDANTS" refer to the CITY DEFENDANTS and the COUNTY DEFENDANTS.

36. At all relevant times, the INDIVIDUAL CITY DEFENDANTS and the DISTRICT ATTORNEY DEFENDANTS were employees and/or officials of the CITY and COUNTY, respectively, acting under color of state law and within the course and scope of their employment and official duties.

37. PLAINTIFFS' Sixth Claim for Relief for municipal liability under 42 U.S.C. § 1983 seeks to establish the CITY's and/or the COUNTY's liability based solely on (a) official policies or longstanding customs; (b) single decisions or ratifications by officials with final policymaking authority (as determined by state law); or (c) deliberately indifferent failures to train, supervise, or discipline—each of which is attributable to the CITY and/or the COUNTY and was the moving force behind the constitutional injuries alleged herein.

38. As to the state-law claims asserted herein, the CITY and the COUNTY are vicariously liable pursuant to California Government Code § 815.2, under the doctrine of *respondeat superior*, for injuries proximately caused by the acts and omissions of their employees, including the individually named Defendants, committed within the scope of their employment.

## V. JURISDICTION AND VENUE

6. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because Plaintiffs assert claims under 42 U.S.C. § 1983 for violations of rights secured by the United States Constitution and federal law.

7. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' related California-law claims, except as expressly limited elsewhere in this Complaint, because those claims form part of the same case or controversy under Article III as Plaintiffs' federal claims.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in San Diego County, California, and property that is the subject of this action is situated there. San Diego County lies within the Southern District of California.

## VI. GOVERNMENT CLAIMS ACT COMPLIANCE

39. The allegations in this section apply only to the California causes of action for money or damages asserted by the claimants identified below against the CITY OF SAN DIEGO, the COUNTY OF SAN DIEGO, and their employees for acts or omissions within the scope of their public employment. California's claim-presentation requirements do not apply to Plaintiffs' federal causes of action.

40. On January 24, 2025, Plaintiffs BLAZEVICH, CRUZ JOYA, and BUDENZ presented a written claim for damages to the CITY OF SAN DIEGO by hand delivery. The CITY assigned the claim City File No. 39296, and the CITY's records reflect a presentation date of January 30, 2025. The CITY did not act upon the claim within the period prescribed by Government Code section 912.4, and those claimants did not agree in writing to extend

that period. The claim was therefore deemed rejected by operation of law. The CITY did not give the notice prescribed by Government Code section 911.3, subdivision (a), within 45 days after presentation.

41. On March 5, 2026, Plaintiffs BLAZEVICH, CRUZ JOYA, and BUDENZ presented an additional written claim for damages to the CITY OF SAN DIEGO. The CITY assigned the claim City File No. 42467. The CITY did not act upon the claim within the period prescribed by Government Code section 912.4, and those claimants did not agree in writing to extend that period. The claim was therefore deemed rejected by operation of law. The CITY did not give the notice prescribed by Government Code section 911.3, subdivision (a), within 45 days after presentation.

42. On March 5, 2026, Plaintiffs BLAZEVICH, CRUZ JOYA, and BUDENZ presented a written claim for damages to the COUNTY OF SAN DIEGO. The COUNTY assigned the claim Claim No. 2602 and served written notice of rejection on April 14, 2026.

43. As to Plaintiff LAFON, the March 5, 2026 claim was presented by BLAZEVICH, CRUZ JOYA, and BUDENZ on behalf of themselves and the putative class described therein. The claim defined the class to include owners of residential income property whose interests were affected through the challenged SDPD practices, including where an authorized agent acted on the owner's behalf; expressly identified LAFON as the owner of 1920 Woden Street and as a member of the putative class; and specifically presented the April 26, 2025 occurrence, the interference with the pending marketing and sale of LAFON's property, the prospective-purchaser relationships, the conduct of COATS and CHRISTMAN, and the resulting economic losses. LAFON alleges that the March 5, 2026 claim was presented on his behalf as a member of the described class and satisfied the claim-presentation requirement as to the state-law claim for damages he asserts herein. In the alternative, to the extent the omission of LAFON as an individually named claimant constituted a defect or omission in the claim as presented, the CITY did not give a notice of insufficiency identifying that defect or omission within the time prescribed by Government

Code section 910.8, and LAFON asserts the resulting waiver to the extent provided by Government Code section 911.

44. Each California cause of action for money or damages asserted in this Complaint against the CITY, the COUNTY, or their employees is asserted only by a claimant who presented a claim to the respective entity as alleged above and seeks recovery only for occurrences and injuries fairly reflected in a claim that was presented to that entity and was either rejected by the entity or deemed rejected by operation of law before this action was commenced.

## VII. STATEMENT OF THE FACTS

### A. Plaintiffs' Real Properties and Their Interests

45. In 2013, Plaintiffs BLAZEVICH and CRUZ JOYA, together with a business partner, purchased two adjacent residential properties in San Diego: a triplex commonly known as 3859 Birch Street and 1916–1918 Woden Street (the "Triplex"), and a single-family residence at 1920 Woden Street (the "1920 Woden House").

46. BLAZEVICH and CRUZ JOYA acquired and improved the properties to provide housing and retirement income and intended ultimately to occupy the upstairs apartment at 1918 Woden Street (the "Upstairs Apartment") as their retirement residence.

47. After the purchase, BLAZEVICH devoted substantial labor and personal funds to renovating, maintaining, and managing both properties.

48. After Plaintiff BUDENZ expressed a desire to invest with BLAZEVICH and provide financially for his grandson, BLAZEVICH arranged for BUDENZ to invest in the Triplex through the George Charles Budenz II 2016 Trust.

49. During the occurrences alleged in this Complaint, record title to the Triplex was held by BLAZEVICH, CRUZ JOYA, and BUDENZ, as trustee of the George Charles Budenz II 2016 Trust (the "Trust").

50. At approximately the same time as BUDENZ's investment, BLAZEVICH arranged for Plaintiff LAFON, CRUZ JOYA's son, to purchase the adjacent 1920 Woden House.

51. BUDENZ, BLAZEVICH, and CRUZ JOYA agreed that BLAZEVICH would continue renovating and operating the Triplex; rental income would be used to service the secured debt; BLAZEVICH and CRUZ JOYA would ultimately occupy the Upstairs Apartment; and the parties would share the anticipated economic benefit of the property.

52. Under that arrangement, BLAZEVICH and CRUZ JOYA continued contributing labor, money, furnishings, and other property to the Triplex and maintained ownership, residential, possessory, management, and personal-property interests there. BUDENZ, as trustee, maintained the Trust's ownership and economic interest in the Triplex.

53. Although LAFON initially occupied the 1920 Woden House, after he moved elsewhere he authorized BLAZEVICH and CRUZ JOYA to manage it. BLAZEVICH assumed primary responsibility for entering, inspecting, repairing, renting, securing, protecting, and controlling access to the property and was later authorized to market it for sale.

54. Throughout the relevant period, CRUZ JOYA maintained or paid utility, water, sewer, refuse, and other service accounts associated with one or both properties.

55. At all relevant times, one or more Plaintiffs owned, occupied, possessed, managed, or maintained legally cognizable interests in the Triplex or the 1920 Woden House and kept personal property at one or both properties.

56. The properties' rental income and anticipated sale proceeds were material to Plaintiffs' housing and retirement plans, their ability to service secured debt, and their ability to avoid foreclosure.

**B. PAMELA ALEJANDRA GALAZ VALDES**

57. In July 2021, PAMELA ALEJANDRA GALAZ VALDES ("GALAZ VALDES") responded to an advertisement BLAZEVICH had placed for an apartment in downtown San Diego unrelated to the Triplex.

58. GALAZ VALDES made representations concerning her identity, employment, income, business activities, and need for approximately two weeks of temporary housing while conducting business in San Diego.

59. BLAZEVICH agreed instead to rent GALAZ VALDES the apartment at 1916 Woden Street (the "Downstairs Apartment") for no more than three weeks while renovations to the Triplex were being completed.

60. GALAZ VALDES agreed to pay $400 per week, paid the first week's rent, received keys to the Downstairs Apartment, made no further rent payments, and remained beyond the agreed period.

61. By August 2021, BLAZEVICH had substantially completed renovation of the Upstairs Apartment, which he and CRUZ JOYA intended to occupy as their home, and moved their new appliances, bed, furniture, artwork, and other personal property into it.

62. While BLAZEVICH was away retrieving additional belongings, GALAZ VALDES vacated the Downstairs Apartment, entered the separate Upstairs Apartment without permission, placed some of BLAZEVICH's and CRUZ JOYA's belongings outside, and took possession of the Upstairs Apartment.

63. When BLAZEVICH returned, GALAZ VALDES stated, in substance, that she had moved into the Upstairs Apartment because she preferred it and that the COVID-19 eviction moratorium would prevent anyone from removing her.

64. BLAZEVICH contacted SDPD and reported that GALAZ VALDES had vacated the apartment rented to her, entered the separate Upstairs Apartment without permission, displaced his and CRUZ JOYA's belongings, and occupied their intended residence.

65. The responding officer characterized the matter, in substance, as a civil landlord–tenant dispute and declined to assist BLAZEVICH and CRUZ JOYA in restoring possession.

66. A supervising sergeant arrived and approved that disposition.

67. BLAZEVICH asked whether officers would keep the peace while he regained possession of the Upstairs Apartment. The sergeant stated, in substance, that BLAZEVICH would be arrested if he attempted to remove GALAZ VALDES himself.

68. BLAZEVICH understood the sergeant to be threatening an actual arrest and therefore refrained from retaking the Upstairs Apartment.

69. GALAZ VALDES consequently remained in possession of the Upstairs Apartment and personal property located there, and BLAZEVICH and CRUZ JOYA were required to maintain housing elsewhere.

70. In approximately September 2021, GALAZ VALDES stated that she could not pay rent and proposed obtaining assistance through the City's Housing Stability Assistance Program ("HSAP").

71. Because GALAZ VALDES remained in possession and BLAZEVICH had been threatened with arrest if he attempted to restore possession himself, BLAZEVICH agreed to pursue HSAP assistance.

72. BLAZEVICH timely submitted the landlord materials necessary for an HSAP application.

73. GALAZ VALDES did not provide the required tenant authorization, and no rental-assistance funds were paid.

74. BLAZEVICH thereafter retained a licensed private investigator because he suspected that GALAZ VALDES had obtained the original rental and continued accommodations through material misrepresentations.

75. The investigation produced information contradicting material representations GALAZ VALDES had made concerning her identity, employment, income, and business activities.

76. Her nonpayment and failure to complete the HSAP process further caused BLAZEVICH to believe that material representations she had made to obtain and retain accommodations were false when made.

77. After the eviction moratorium ended, BLAZEVICH served GALAZ VALDES with notice terminating her occupancy and provided her with a copy of an unfiled civil complaint alleging fraud.

78. GALAZ VALDES responded, in substance, that if BLAZEVICH pursued the matter in court she would falsely accuse him of a crime so that he would be jailed.

79. During the same conversation, GALAZ VALDES stated, in substance, that she would leave the property "nice" if BLAZEVICH abandoned the contemplated litigation and paid her $20,000. BLAZEVICH refused.

80. By the following morning, the tires on CRUZ JOYA's automobile had been slashed, and the Triplex had sustained more than $10,000 in vandalism damage.

81. BLAZEVICH informed BUDENZ of GALAZ VALDES's statements and demand, the threatened criminal accusation, the vandalism, and the investigative findings.

82. Because BLAZEVICH and BUDENZ feared additional damage to the recently renovated Triplex, they did not pursue the contemplated civil action at that time and instead reported the matter to SDPD.

**C. SDPD's Treatment of Reported Crimes Involving Residential Landlords**

83. BLAZEVICH traveled to SDPD's Southeast Division with a written factual narrative and supporting materials and asked Officer HENRY INGRAM, Badge No. 6567 ("INGRAM-6567"), to prepare a crime report.

84. After BLAZEVICH stated that the matter had begun with a rental, INGRAM-6567 interrupted and stated, in substance, that he would not take a report because it was a civil matter.

85. INGRAM-6567 further stated, in substance, that landlord–tenant matters were civil matters and that SDPD had treated them that way throughout his nearly forty years with the Department.

86. BLAZEVICH returned with written factual and legal materials identifying suspected public offenses, including a claimed violation of Penal Code section 537. INGRAM-6567 declined to review the materials and continued refusing to prepare a report.

87. INGRAM-6567 eventually stated, in substance, that he would take a report if someone from the District Attorney's Office told him that criminal conduct had occurred.

88. BLAZEVICH went to the District Attorney's Office and spoke with STEVE HUTCHINSON ("HUTCHINSON"), who, after hearing BLAZEVICH's account, stated in substance that the facts described criminal conduct and that the matter could be prosecuted upon receipt of a police report.

89. When BLAZEVICH returned and relayed HUTCHINSON's statements, INGRAM-6567 still declined to prepare a report and demanded written confirmation from a prosecutor.

90. HUTCHINSON thereafter told BLAZEVICH, in substance, to advise INGRAM-6567 that BLAZEVICH would complain to Internal Affairs if the officer continued refusing to prepare a report.

91. After BLAZEVICH conveyed that message, INGRAM-6567 directed him to request a patrol officer if he wanted a report.

92. When BLAZEVICH asked whether officers would keep the peace if he instead made a private arrest, INGRAM-6567 stated, in substance, that BLAZEVICH would be the person who ended up in jail.

93. Officer GARCIA ALVARADO thereafter responded to BLAZEVICH's request for a criminal report but initially declined to prepare one.

94. After BLAZEVICH contacted GARCIA ALVARADO's supervisor and described the preceding events, the supervisor directed GARCIA ALVARADO to take a report.

95. GARCIA ALVARADO began obtaining the facts but was required to leave for a higher-priority call. Based on the information he had obtained, he prepared a report identifying the suspected offense as felony theft by false pretenses.

96. Detective MIGUEL GARCIA ("GARCIA") was assigned to investigate the report and thereafter characterized the matter, in substance, as a civil landlord–tenant dispute in which no crime had occurred.

97. BLAZEVICH provided GARCIA additional factual materials and authorities identifying several suspected public offenses.

98. Among other matters, BLAZEVICH directed GARCIA to Penal Code section 537 and its provisions concerning evidence of fraudulent intent.

99. GARCIA responded, in substance, that section 537 did not apply because an "apartment house" required at least seven units.

100. BLAZEVICH thereafter provided GARCIA authorities supporting BLAZEVICH's contrary position that the statute applied to the Triplex.

101. BLAZEVICH asked GARCIA to consult the Deputy City Attorney assigned to the Southeast Division concerning the reported conduct, and GARCIA agreed.

102. GARCIA later closed the investigation on the stated ground, in substance, that the matter was "by nature" civil.

103. GARCIA subsequently told BLAZEVICH, in substance, that the Deputy City Attorney agreed that no crime had occurred.

104. BLAZEVICH contacted the Deputy City Attorney, who informed him that she had not discussed the matter with GARCIA.

105. BLAZEVICH thereafter complained to Internal Affairs Sergeant TRAVIS EASTER ("EASTER"), provided the factual and legal basis for the reported offenses, and was again told that no crime had occurred.

106. BLAZEVICH also provided written notice of the challenged treatment to the San Diego Commission on Police Practices, the MAYOR's Office, and other CITY officials. No corrective action ended the challenged treatment.

107. BLAZEVICH sought assistance from the San Diego County District Attorney's Office. Deputy District Attorney SCOTT PIRRELLO ("PIRRELLO") informed him by email, in substance, that the Office would not act because SDPD had not determined that a crime had occurred.

108. BLAZEVICH also appealed the matter through SDPD command. At the direction of then-Assistant Chief SCOTT WAHL, Sergeant KAYLA EVANS ("EVANS") contacted BLAZEVICH and maintained that no crime had occurred.

109. BLAZEVICH asked EVANS whether SDPD officers would keep the peace if he made a private arrest based on the facts and authorities he had supplied.

110. EVANS stated, in substance, that if BLAZEVICH attempted such an arrest SDPD officers would arrest him and take him to jail and that he should stop bothering SDPD about the matter.

111. BLAZEVICH thereafter sent EVANS written requests asking for the factual or legal basis for the threatened arrest. EVANS did not respond.

112. During the same general period, BLAZEVICH's cellular telephone was stolen. Location information generated by the telephone placed it inside the Upstairs Apartment then occupied by GALAZ VALDES.

113. BLAZEVICH provided Lieutenant JASON WEEDEN ("WEEDEN") written information concerning GALAZ VALDES's conduct, the previously reported offenses, and the theft of the telephone.

114. WEEDEN initially stated, in substance, that no crime had occurred.

115. BLAZEVICH challenged that conclusion by referring WEEDEN to the factual and statutory materials he had previously provided SDPD.

116. WEEDEN then stated, in substance, that SDPD maintained a "strong policy" of not enforcing criminal laws in landlord–tenant matters and implemented that policy by treating such matters as civil.

117. BLAZEVICH explained that GALAZ VALDES had vacated the apartment she had rented before entering the separate Upstairs Apartment. WEEDEN responded, in substance, that the circumstances were "close enough" to a landlord–tenant matter that SDPD would not enforce.

118. BLAZEVICH also asked whether SDPD would decline to act upon the unrelated theft of his cellular telephone. WEEDEN responded, in substance, that "it's the same thing."

119. WEEDEN's statements communicated that SDPD would apply the same treatment even when the reported offense involved a separate residence or criminal conduct independent of any genuine tenancy dispute.

120. BLAZEVICH asked WEEDEN whether officers would keep the peace if he made a private arrest. WEEDEN repeatedly advised him not to make one.

121. When BLAZEVICH asked directly whether he would be arrested for making a private arrest, WEEDEN did not answer directly and continued attempting to dissuade him.

122. No SDPD official with whom BLAZEVICH communicated identified an individualized factual basis for the repeated threatened arrests if BLAZEVICH attempted the private-arrest and post-arrest procedures he had described.

123. GALAZ VALDES's continued occupation deprived BLAZEVICH and CRUZ JOYA of their intended residence and deprived the owners of the Triplex of the use and economic benefit of the Upstairs Apartment.

124. BLAZEVICH and CRUZ JOYA incurred additional housing and property-related expenses while rent and other expected income from the Triplex remained impaired.

125. The resulting income loss and increased expenses contributed to arrearages on debt secured by the Triplex and the lender's initiation of default proceedings.

126. BLAZEVICH obtained approval for private financing sufficient to cure the arrearage, but the lender conditioned funding on removal of GALAZ VALDES and restoration of Plaintiffs' possession and control of the Triplex.

**D. BLAZEVICH's March 2023 Private Arrest of GALAZ VALDES**

127. After EASTER stated in a later conversation that SDPD would not make an arrest concerning GALAZ VALDES, BLAZEVICH decided to make a private arrest himself.

128. Before doing so, BLAZEVICH prepared a written notice of private arrest, sworn factual affidavit, statement identifying the suspected offenses, and memorandum concerning the private-arrest and post-arrest process he intended to invoke.

129. BLAZEVICH provided those materials in advance to SDPD command, Internal Affairs, the Southeast Division, supervisory personnel responsible for the area, and SDPD headquarters so that responding personnel would know the factual basis for the arrest and his intended transfer of custody.

130. On March 14, 2023, BLAZEVICH informed GALAZ VALDES that she was under private arrest, called SDPD, and requested that an officer take custody of her.

131. Officer STEPHEN HICKOX ("HICKOX") responded. BLAZEVICH informed HICKOX of the private arrest, provided the written materials, identified GALAZ VALDES inside the Upstairs Apartment, and requested that HICKOX take her into custody.

132. HICKOX reviewed the materials in his patrol vehicle and thereafter informed BLAZEVICH, in substance, that Internal Affairs Sergeant JACOB MOSTELLER ("MOSTELLER") had instructed him not to take GALAZ VALDES into custody. HICKOX advised BLAZEVICH to contact SDPD again during daytime hours.

133. Attempting to maintain the existing arrest until an officer would accept custody, BLAZEVICH remained outside the Upstairs Apartment overnight.

134. The following morning, Officers LUIS AYALA ("AYALA") and CHARLOTTE INMAN HESS ("HESS") responded. BLAZEVICH again stated that GALAZ VALDES was under private arrest and requested that they accept custody.

135. AYALA and HESS declined to review the written arrest materials. AYALA stated, in substance, "You can write anything."

136. Rather than accepting GALAZ VALDES, AYALA handcuffed BLAZEVICH, removed him from the property, and confined him in the caged compartment of the patrol vehicle while GALAZ VALDES remained unrestrained.

137. During the encounter, the officers obtained BLAZEVICH's identifying information and, on information and belief, communicated with GALAZ VALDES concerning obtaining a stay-away order against him.

138. While BLAZEVICH remained handcuffed and confined, AYALA told him he would be released but stated, in substance, that officers would return and arrest him if he "bothered" GALAZ VALDES again.

139. AYALA and HESS then departed, leaving GALAZ VALDES in possession of the Upstairs Apartment.

140. BLAZEVICH complained to Internal Affairs about the encounter, but no corrective action altered the disposition or the threatened-arrest directive.

**E. District Attorney Intake and Continuing Loss of the Upstairs Apartment**

141. On the next business day following the private-arrest incident, BLAZEVICH went to the San Diego County District Attorney's Office and met with Deputy District Attorney JILL LINDBERG ("LINDBERG").

142. BLAZEVICH described the private arrest and the SDPD encounter, provided his notice of arrest, sworn affidavit, statement of charges, and supporting materials, and requested that the Office consider the matter and seek appropriate judicial process.

143. LINDBERG informed BLAZEVICH, in substance, that the District Attorney's Office would not act on a complaint submitted by a private person unless it was accompanied by a police report containing a peace officer's request for prosecution.

144. Shortly after AYALA and HESS terminated BLAZEVICH's custody of GALAZ VALDES, GALAZ VALDES obtained a temporary stay-away order that further restricted BLAZEVICH's access to the Triplex.

145. GALAZ VALDES's continuing occupation prevented BLAZEVICH from satisfying the private lender's condition that possession first be restored, and the financing needed to cure the secured debt did not fund.

146. The continuing loss of possession, rental income, and use of the Triplex contributed to the financial circumstances that ultimately led BLAZEVICH to seek Chapter 13 protection on August 8, 2024.

**F. April 2024 Entries and Private Arrests at the 1920 Woden House**

147. During early 2024, the 1920 Woden House was vacant and under renovation, and neither LAFON nor his authorized managers had permitted anyone to reside there.

148. Between March and April 2024, neighbors and BLAZEVICH observed repeated forced or unauthorized entries through doors and windows.

149. On several occasions, BLAZEVICH found damaged locks or doors, missing tools and other property, consumed food, and evidence that persons had entered and used the house and its services.

150. On April 17, 2024, after another reported entry, BLAZEVICH encountered a man inside after the rear door had been forced and discovered additional property missing or damaged.

151. On April 18, a neighbor reported that a woman was moving belongings into the house through the compromised entrance.

152. BLAZEVICH entered and encountered a woman later identified as SEGARRA. She had no key, lease from LAFON, rent receipt, or contact information for anyone authorized to rent the property.

153. SEGARRA claimed that she had paid approximately $1,000 to another person but identified no transaction with LAFON or BLAZEVICH.

154. Based on the forced entry, missing property, prior entries, and absence of authorization, BLAZEVICH informed SEGARRA that he was placing her under private arrest.

155. BLAZEVICH called SDPD, reported the arrest and its factual basis, and requested that responding officers accept custody.

156. Sergeant TYLER CHRISTMAN ("CHRISTMAN") responded and was informed that the house was vacant, the door had been forced, property was missing, SEGARRA lacked permission and tenancy documents, and BLAZEVICH had placed her under arrest for suspected burglary and trespass.

157. CHRISTMAN treated the incident as a civil occupancy matter and declined to accept custody or direct another officer to do so.

158. The officers' presence, commands, and the prior threatened-arrest directives communicated to BLAZEVICH that he would not be permitted to continue restraining or personally transport SEGARRA.

159. With the requested transfer of custody unavailable and believing that officers would prevent him from personally continuing the arrest process, BLAZEVICH allowed SEGARRA twenty-four hours to remove the property she claimed.

160. BLAZEVICH did not give SEGARRA permission to reside at the house or return after that removal period.

161. On April 19, SEGARRA remained at the property and produced a handwritten document she claimed was a lease, although she had denied possessing a lease the previous day.

162. BLAZEVICH again informed SEGARRA and responding officers that he was placing her under private arrest and again requested that officers accept custody.

163. Sergeant JARRETT DUNCAN ("DUNCAN") arrived as the supervising officer and received the material facts concerning the forced entry, previous arrest, absence of authorization, and SEGARRA's changed account.

164. BLAZEVICH offered DUNCAN written and oral information supporting the arrest and requested that officers accept custody or permit BLAZEVICH to continue the process of taking his arrestee before a magistrate.

165. DUNCAN declined to review the written materials, declined to accept custody, and maintained the officers' disposition preventing BLAZEVICH from transporting, retaking, or continuing to restrain SEGARRA.

166. DUNCAN had supervisory authority over the encounter and an opportunity to direct a different disposition before the officers departed.

167. BLAZEVICH removed belongings that had been placed in the house, but the damaged rear door could not be securely locked.

168. The officers departed without accepting custody or changing the disposition restricting BLAZEVICH's continued control of the arrestee.

169. Shortly afterward, GALINDO returned with a large pit bull and attempted to force open the compromised door while BLAZEVICH was inside.

170. GALINDO threatened, in substance, to have the dog attack BLAZEVICH, and the dog pushed its nose through the partially opened doorway.

171. GALINDO stated, in substance, that BLAZEVICH could do nothing to stop her and her associates from returning.

172. BLAZEVICH called for assistance, but GALINDO left before an officer arrived.

**G. WALDON's Initial Entries and Conduct at the Triplex**

173. During the relevant period, PAUL LOWE ("LOWE") occupied the Downstairs Apartment under an arrangement by which BLAZEVICH had agreed to provide LOWE rent-free housing for life in connection with a proposed real-estate transaction involving LOWE's former property.

174. DAMION LAMONT WALDON ("WALDON") is LOWE's grandson and had previously heard BLAZEVICH discuss SDPD's obstruction with, and refusal to process, private arrests.

175. LOWE's live-in girlfriend and caregiver, ELVINA ELIAS ("ELIAS"), later informed BLAZEVICH that WALDON had entered the Downstairs Apartment without permission and taken money from her. BLAZEVICH reported the entry and theft to SDPD, identified WALDON, and informed the responding officers that he wanted to effect a private arrest.

176. Responding officers treated the matter as civil and left WALDON at liberty.

177. After WALDON borrowed ELIAS's automobile and failed to return it for an extended period, additional property disappeared from the Downstairs Apartment and ELIAS believed WALDON had copied her keys. At her request, BLAZEVICH changed the apartment locks.

178. WALDON thereafter again entered the Downstairs Apartment while ELIAS was away and in front of another of LOWE's caregivers, took food belonging to LOWE and ELIAS and left with it.

**H. BLAZEVICH's August 12, 2024 Private Arrest of DUTRA**

179. In 2024, BLAZEVICH hired JIMMI BLAINE DUTRA ("DUTRA") to perform cleaning and yard work at 3859 Birch Street and permitted him limited access solely for that purpose.

180. When BLAZEVICH returned, the assigned work had not been performed and food, alcohol, tools, and other property belonging to BLAZEVICH and CRUZ JOYA had been consumed or removed.

181. BLAZEVICH terminated DUTRA's employment, instructed him not to return, secured the residence, and left.

182. In early August 2024, shortly before BLAZEVICH intended to retake custody of GALAZ VALDES and proceed with presentment notwithstanding SDPD's prior refusal to accept custody, neighbors informed him that GALAZ VALDES had left.

183. On August 8, 2024, BLAZEVICH filed a Chapter 13 petition that stayed an imminent foreclosure sale. BLAZEVICH and CRUZ JOYA intended thereafter to complete their move into the Upstairs Apartment.

184. On August 11, BLAZEVICH went to the property to begin moving belongings and found the rear-door glass at 3859 Birch Street broken and a woman identifying herself as DUTRA's girlfriend inside.

185. BLAZEVICH informed her that neither she nor DUTRA had permission to enter or remain. DUTRA later arrived, and BLAZEVICH expressly told him that he would be arrested if he returned.

186. BLAZEVICH discovered additional missing property, repaired the broken rear-door glass, secured the residence, and left.

187. On August 12, BLAZEVICH returned and found the rear-door glass broken again and DUTRA inside the residence.

188. BLAZEVICH informed DUTRA that he was under private arrest for suspected burglary. Because BLAZEVICH had forgotten his cellular telephone, he stated that he would use a neighbor's telephone to call police.

189. Without BLAZEVICH's knowledge, DUTRA called 911 and represented, in substance, that someone had broken the rear-door glass of a residence DUTRA claimed as his and was entering it.

190. When officers arrived, BLAZEVICH used his keys to unlock the perimeter gate and admit them.

191. BLAZEVICH informed the officers that he had privately arrested DUTRA, tendered DUTRA to them, and requested that they accept custody and process the arrest.

192. DUTRA claimed that he had paid rent and had lived at the property for approximately three months.

193. BLAZEVICH told the officers that DUTRA was not a tenant, had paid no rent to him, and had no permission to occupy the residence. BLAZEVICH also told them that substantial personal property belonging to him and CRUZ JOYA remained inside the residence and attached garage.

194. The officers observed that BLAZEVICH possessed keys while DUTRA did not, that the rear-door glass had recently been broken, that DUTRA had little or no furniture in the four-bedroom residence, and that electrical service had been disconnected.

195. BLAZEVICH again stated that DUTRA was under private arrest and requested that the officers accept custody.

196. Officer S. CARDENAS ("CARDENAS") stated, in substance, that DUTRA had "established residency."

197. CARDENAS assumed control of the encounter, separated BLAZEVICH from DUTRA, and prevented BLAZEVICH from continuing to restrain, remove, or transport DUTRA.

198. CARDENAS refused the requested transfer of custody. At BLAZEVICH's request, CARDENAS placed him in telephone contact with supervising Sergeant GEOFFREY ULOVEC ("ULOVEC").

199. While the responding officers remained at the scene, BLAZEVICH informed ULOVEC of the private arrest, the circumstances supporting it, CARDENAS's conduct, the officers' refusal to accept custody, and the immediate consequences for Plaintiffs' possession and foreclosure risk.

200. ULOVEC had supervisory authority and an opportunity to direct the officers at the scene before the disposition was completed but declined to order a different course.

201. The officers thereafter departed while DUTRA remained inside 3859 Birch Street and BLAZEVICH remained unable to restore control of the residence.

202. After the officers departed, DUTRA threatened, in substance, to accuse BLAZEVICH falsely of a crime if BLAZEVICH attempted to remove him.

203. BLAZEVICH prepared a written complaint, sworn affidavit, statement of charges, and supporting materials describing the private arrest and the custody-and-presentment process he sought to complete.

204. BLAZEVICH sent those materials to ULOVEC while DUTRA's possession and the resulting deprivation remained ongoing.

205. ULOVEC did not direct corrective action after receiving the materials.

206. Sergeant JOSEPH CHARLOT ("CHARLOT") thereafter responded to BLAZEVICH's request for further supervisory assistance while DUTRA remained in possession.

207. BLAZEVICH informed CHARLOT that CARDENAS had displaced his custody of DUTRA, that DUTRA remained inside the residence, and that the continuing loss of possession threatened Plaintiffs with catastrophic property and financial loss.

208. BLAZEVICH also provided CHARLOT the written complaint, affidavit, statement of charges, and supporting materials and informed CHARLOT that, because

SDPD would not accept custody, BLAZEVICH intended to retake DUTRA and take him before a magistrate with a written complaint stating the charges.

209. CHARLOT characterized the matter, in substance, as "by nature" civil despite the reported forced entry, theft, vandalism, private arrest, and absence of any rental agreement.

210. CHARLOT stated, in substance, that BLAZEVICH would be arrested for battery and false imprisonment if he retook custody of DUTRA or attempted to restore control. BLAZEVICH submitted to the threat and did not undertake the contemplated magisterial presentment.

211. In a September 17, 2024 report, CHARLOT memorialized the disposition and threatened arrest and recorded BLAZEVICH's statement, in substance, that he would lose his house and everything he had worked for during his life if DUTRA was not taken into custody.

212. On September 18, 2024, DUNCAN reviewed CHARLOT's report and signed his approval while DUTRA's possession and CHARLOT's threatened-arrest directive remained operative.

213. DUNCAN did not decline approval, direct correction of the disposition, withdraw the threatened-arrest directive, or otherwise permit BLAZEVICH to restore custody and control.

214. DUTRA thereafter allowed his girlfriend, WALDON, THOMAS GILMANTI ("GILMANTI"), STEPHEN FRANCESCO ESCHAVES ("ESCHAVES"), and other persons to enter or occupy 3859 Birch Street.

215. DUTRA also permitted a person known as "BOBBY" to park a motor home at the property and connect it to the property's utility services without CRUZ JOYA's permission.

216. BOBBY thereafter discharged sewage from the motor home into the street.

217. Plaintiffs are informed and believe that DUTRA received rent or other consideration from at least some of the persons whom he permitted to occupy or use the property and its utilities.

218. BLAZEVICH and CRUZ JOYA had substantial personal property inside the residence and attached garage, including household goods, furnishings, family photographs and other personal effects, tools, computer equipment and data, records, construction materials, and other belongings.

219. The continuing occupation and threatened-arrest directive prevented BLAZEVICH from safely recovering or controlling substantial portions of that property. Because BLAZEVICH and CRUZ JOYA could not retrieve most of their possessions, the Upstairs Apartment contained only limited furnishings, and they continued maintaining other housing for safety.

220. The continued occupation impaired the rental and property income required for the Chapter 13 plan. The bankruptcy case was dismissed, foreclosure proceedings resumed, and, on information and belief, DUTRA or persons associated with him thereafter removed, disposed of, or otherwise caused the loss of substantial portions of BLAZEVICH's and CRUZ JOYA's remaining personal property.

**I. WALDON's January 2025 Break-In and February 2025 Private Arrest**

221. In January 2025, BLAZEVICH returned to the Upstairs Apartment at 1918 Woden Street and found the door slightly ajar and indications that someone had entered.

222. BLAZEVICH called police. Officers entered the residence but found no one inside.

223. BLAZEVICH discovered that clothing, a computer, backup hard drive, printer, and other property belonging to him and CRUZ JOYA were missing and that another person's clothing and belongings had been moved into the residence.

224. BLAZEVICH removed the belongings that were not his from the residence.

225. Among those belongings, BLAZEVICH found mail addressed to WALDON and an older San Diego Chargers hat, which caused him to believe WALDON had participated in the unauthorized entry and removal of property.

226. In February 2025, neighbors informed BLAZEVICH that WALDON was again entering the Upstairs Apartment.

227. BLAZEVICH called 911 and went to the property.

228. Officers BRANDON MORENO ("MORENO") and Sergeant SCOTT RAYNOR ("RAYNOR") responded. BLAZEVICH described the January entry and missing property, identified WALDON, informed the officers that he was effecting a private arrest, and requested that they take WALDON into custody.

229. BLAZEVICH explained that any claimed presence by WALDON at 3859 Birch Street did not authorize WALDON to enter the separate Upstairs Apartment at 1918 Woden Street, which was BLAZEVICH's and CRUZ JOYA's residence.

230. MORENO and RAYNOR declined to take WALDON into custody or perform the requested delegated taking.

231. During the encounter, MORENO displayed file-stamped documents relating to a restraining-order proceeding brought by WALDON against BLAZEVICH.

232. BLAZEVICH did not have his reading glasses, the officers did not permit him to retain the documents, and he photographed them.

233. From the officers' presentation of the documents, BLAZEVICH understood that an operative temporary restraining order prohibited him from remaining at or entering his residence.

234. In reliance on that understanding, BLAZEVICH refrained from entering and restoring possession.

235. After later enlarging and reviewing the photographs, BLAZEVICH discovered that the papers were application or service materials and that no temporary restraining order had issued.

236. MORENO and RAYNOR had meanwhile departed, leaving WALDON at liberty and BLAZEVICH unable to restore practical control of the residence.

237. WALDON later filed a sworn declaration stating that he and persons he described as his roommates had entered, cleaned, and intended to rent the Upstairs Apartment to another family.

238. WALDON identified DUTRA and GILMANTI as his roommates and identified 3859 Birch Street as his address.

239. The Upstairs Apartment was not vacant or available for WALDON to rent; it was BLAZEVICH's and CRUZ JOYA's residence and contained their property.

240. A neighbor also reported seeing WALDON, DUTRA, and another associated person enter the Upstairs Apartment.

241. Within days, neighbors again reported WALDON entering the residence.

242. BLAZEVICH called 911, stated that he intended to arrest WALDON, and went to the property to meet responding officers.

243. Officers ISAI CASTILLO ("CASTILLO") and SHAYAN ESAMBOLCHI ("ESAMBOLCHI") responded and received BLAZEVICH's account of the entries, prior private arrest, court papers, and requested custody transfer.

244. BLAZEVICH requested that CASTILLO and ESAMBOLCHI take WALDON and DUTRA into custody.

245. CASTILLO acknowledged that he knew WALDON.

246. CASTILLO nevertheless refused the requested custody because, in substance, WALDON had "established residency."

247. BLAZEVICH again explained that any purported residency at 3859 Birch Street did not authorize WALDON to enter the separate Upstairs Apartment at 1918 Woden Street.

248. BLAZEVICH told the officers that the continued occupation by DUTRA and WALDON was impairing the bankruptcy plan and threatening loss of the Triplex through foreclosure.

249. ESAMBOLCHI was present for and received the same information but did not accept custody or provide a different disposition.

250. When BLAZEVICH stated that the officers' conduct would be challenged in litigation, ESAMBOLCHI gestured dismissively and responded, in substance, "Whatever."

251. DUTRA, WALDON, and associated persons continued entering or occupying the properties and using, removing, or interfering with Plaintiffs' property and services.

252. SDPD thus continued applying an asserted-residency or civil-matter rationale even when BLAZEVICH identified unauthorized entry into a separate residence and circumstances independent of any claimed tenancy at 3859 Birch Street.

**J. The April 11, 2025 SWAT Incident and ARVELO**

253. DUTRA allowed ESCHAVES and other persons to use or occupy 3859 Birch Street without Plaintiffs' permission.

254. On April 11, 2025, ESCHAVES became the subject of an armed standoff with SDPD while inside the residence.

255. SDPD established inner and outer perimeters, restricted access to the area, deployed specialized personnel and an armored vehicle, and maintained operations around the property for approximately seven hours.

256. BLAZEVICH went to the area but was kept outside the police perimeter and could not inspect or secure the residence or property inside.

257. SWAT personnel used an explosive breaching or diversionary device inside the residence and ultimately took ESCHAVES into custody.

258. Afterward, BLAZEVICH observed that substantially all property previously stored in the attached garage had been moved and, on information and belief, much of it had been stolen, disposed of, or otherwise lost.

259. BLAZEVICH then spoke with Detective ASHLEY ARVELO ("ARVELO") and informed her that he had previously privately arrested DUTRA and WALDON and wanted SDPD to accept custody of them.

260. BLAZEVICH described the prior arrests, reported offenses, supporting materials, and the custody-and-presentment process he had repeatedly attempted to complete.

261. BLAZEVICH also continued reporting offenses committed by DUTRA, WALDON, and other persons occupying the property and requested official processing of those reports.

262. ARVELO refused to accept custody of DUTRA or WALDON or cause another officer to do so.

263. BLAZEVICH stated that after police operations ended he intended to retake custody of DUTRA and WALDON and, if warranted by the circumstances, privately arrest another unauthorized occupant.

264. ARVELO repeatedly characterized BLAZEVICH's continued reports, requests, and proposed conduct, in substance, as "causing a disturbance."

265. ARVELO stated, in substance, that BLAZEVICH would be arrested if he retook custody of DUTRA or WALDON or attempted another private arrest.

266. BLAZEVICH understood ARVELO to be threatening actual police action and therefore refrained from retaking custody, entering occupied portions of the property, continuing the identified arrest efforts, and pursuing the further governmental or judicial processing he otherwise intended to seek.

267. BLAZEVICH complained about ARVELO's conduct. Her supervisor reviewed her body-worn-camera recording and informed BLAZEVICH, in substance, that ARVELO had handled the incident correctly.

268. No supervisor withdrew ARVELO's threatened-arrest directive or provided a different procedure for completing the previously reported private arrests.

269. ARVELO had been informed that the continuing unauthorized occupation exposed Plaintiffs to additional loss of possession, theft, vandalism, lost income, bankruptcy and foreclosure consequences, and dangerous confrontations with the occupants.

**K. The April 26, 2025 Private Arrests at the 1920 Woden House**

270. After LAFON moved out of state, he authorized BLAZEVICH to market the 1920 Woden House for sale, and Plaintiffs intended that anticipated sale proceeds be used in part to address the Triplex default.

271. In April 2025, three real-estate professionals representing prospective purchasers contacted BLAZEVICH concerning walk-throughs or inspections before submitting or finalizing potential purchase offers.

272. Real-estate professional JEXSI GREY ("GREY") scheduled a showing for April 26, 2025.

273. When BLAZEVICH arrived for the showing, he saw a silver Mercedes in the rear driveway and found that the back door had again been pried open.

274. BLAZEVICH positioned CRUZ JOYA's white automobile so that the Mercedes could not leave before officers arrived.

275. BLAZEVICH called 911 and reported the entry.

276. GREY arrived with another person for the scheduled showing and began recording after learning that persons had entered the property.

277. Officers LIAM COATS ("COATS") and HENRY INGRAM, Badge No. 1994 ("INGRAM-1994"), responded.

278. BLAZEVICH informed them that GALINDO and a male accomplice had entered without permission and that he had privately arrested both persons.

279. BLAZEVICH tendered GALINDO and her male accomplice to the officers and repeatedly requested that the officers accept custody and process the arrests.

280. COATS had previously heard BLAZEVICH explain the private-arrest custody and presentment process during earlier encounters involving the Triplex.

281. COATS and INGRAM-1994 refused to accept custody, and BLAZEVICH requested a supervisor.

282. CHRISTMAN responded and received the material facts concerning the forced entry, prior entries, ownership of the property, the private arrests, and BLAZEVICH's requested transfer of custody.

283. BLAZEVICH again described the factual basis for the arrests and the private-arrest process he was attempting to complete and repeatedly requested that CHRISTMAN direct the officers to accept custody.

284. CHRISTMAN had received substantially similar information concerning unauthorized entry and BLAZEVICH's private-arrest efforts at the same property during the April 2024 incident.

285. CHRISTMAN nevertheless declined to accept custody or direct COATS or INGRAM-1994 to do so.

286. GALINDO produced a California identification card bearing the 1920 Woden address.

287. GALINDO claimed that she had lived at the property for months and that an attorney was pursuing litigation against BLAZEVICH concerning her asserted occupancy.

288. BLAZEVICH disputed that account and identified three nearby witnesses who, he stated, could confirm that GALINDO had not been residing at the property.

289. COATS did not interview those witnesses.

290. COATS instead announced, in substance, that GALINDO had "established residency."

291. BLAZEVICH informed COATS and CHRISTMAN that GREY and the other visitor were present for a scheduled sales showing and that restoration of control was necessary for the pending marketing and sale process.

292. After BLAZEVICH continued reporting the entry, explaining the arrests, and requesting official processing, COATS ordered him to move CRUZ JOYA's automobile and stated, in substance, that the automobile would be towed and impounded unless he moved it and permitted GALINDO and her accomplice to leave.

293. CHRISTMAN was present as the supervising sergeant, knew the circumstances, heard or was informed of COATS's threat, possessed authority to countermand it, and did not do so.

294. INGRAM-1994 likewise remained present, knew of the arrests and COATS's threatened seizure, and did not object or take action to prevent the threatened towing and compelled release.

295. Because COATS was acting as an on-scene officer with apparent authority to cause the towing and impoundment he threatened, BLAZEVICH believed he was required to comply.

296. BLAZEVICH moved CRUZ JOYA's automobile.

297. GALINDO and her male accomplice then drove away, ending the physical restraint by which BLAZEVICH had maintained custody and preventing him from completing the custody-and-presentment process he had requested.

298. BLAZEVICH ceased his continuing efforts at that encounter to obtain official processing of the arrests because of COATS's threatened seizure and CHRISTMAN's approval or acquiescence in that disposition.

299. GALINDO thereafter returned with additional persons, and persons associated with her entered or occupied the property, used the house and utilities, defeated or interfered with security measures, and removed, displaced, or damaged tools and other property.

300. One or more prospective purchasers thereafter suspended, withdrew, or declined to finalize their interest, and the continued loss of control delayed marketing and increased carrying, repair, security, and related expenses.

301. Before compelling BLAZEVICH to move the automobile and permit the arrestees to leave, COATS and CHRISTMAN knew that an active sales showing was occurring and that BLAZEVICH was attempting to restore control so that LAFON's pending sale efforts could proceed.

**L. August 2025 Foreclosure, September 2025 Events, CLEM, and RODRIGUEZ**

302. By August 2025, the continued occupations and resulting impairment of rental and property income had prevented confirmation of a feasible Chapter 13 plan, and foreclosure proceedings had resumed.

303. In August 2025, the Triplex was sold at a nonjudicial foreclosure sale. The foreclosure terminated BLAZEVICH's, CRUZ JOYA's, and the Trust's record ownership interests in the Triplex, deprived BLAZEVICH and CRUZ JOYA of their housing there, and deprived the respective titleholders of their equity, income-producing property, and related economic interests.

304. On or about September 2, 2025, BLAZEVICH received information that persons were entering the Upstairs Apartment. The SDPD incident information generated from his report described a woman matching GALINDO's description among the persons entering the residence.

305. BLAZEVICH called 911, reported an entry into his residence, and stated that although he could not immediately reach the property, he intended to make a private arrest if responding officers did not make an arrest on their own authority.

306. Dispatch initially caused BLAZEVICH to understand that officers would respond.

307. Sergeant MATTHEW KNUTSON ("KNUTSON") thereafter cancelled or withdrew the officer response without informing BLAZEVICH before he arrived.

308. From the dispatch information, KNUTSON knew that BLAZEVICH was traveling to a residence where he had reported multiple intruders and that BLAZEVICH intended to confront the occupants and make a private arrest if officers did not act on their own authority.

309. BLAZEVICH reached the residence expecting officers to be present, but no officers were there.

310. When BLAZEVICH contacted SDPD again, a dispatcher informed him that KNUTSON had withdrawn the call and stated that she would ask KNUTSON to return BLAZEVICH's call. KNUTSON did not do so.

311. BLAZEVICH entered the Upstairs Apartment and encountered SEGARRA, two adult males, and two adult females inside.

312. SEGARRA and two of the other occupants threatened BLAZEVICH. While restraining a pit bull, SEGARRA stated, in substance, that she had rented the residence from a person claiming to own it and that BLAZEVICH had better leave before he was hurt. Fearing physical injury, BLAZEVICH left.

313. BLAZEVICH subsequently verified that GALINDO had also entered the Upstairs Apartment during the September 2, 2025 burglary by SEGARRA, GALINDO, and associated persons. Based on information later available to him, SEGARRA and other persons continued occupying or using the Upstairs Apartment, while GALINDO and associated persons continued occupying or using the adjacent 1920 Woden House.

314. On September 6, 2025, CLEM contacted BLAZEVICH concerning his Internal Affairs complaint regarding KNUTSON's cancelled response and the related course of conduct.

315. BLAZEVICH informed CLEM that he had arrived expecting responding officers and had instead encountered and been threatened by multiple persons inside his residence. He also complained that SDPD officers had repeatedly refused to accept custody of his private arrestees and threatened him when he attempted to continue those arrests or obtain further official processing.

316. In that context, BLAZEVICH asked whether officers would arrest him if he made another private arrest concerning persons burglarizing his residence. CLEM confirmed, in substance, that they would and rejected BLAZEVICH's complaint of misconduct.

317. Later in 2025, after GALINDO's September 2025 entry, WALDON broke into the detached garage at the 1920 Woden House and purported to rent it to two women as living quarters. The garage had no certificate of occupancy authorizing its residential use.

318. After the foreclosure, BUDENZ, acting as trustee of the George Charles Budenz II 2016 Trust, executed written assignments transferring specified accrued claims and related rights of the Trust to BUDENZ individually, BLAZEVICH, and CRUZ JOYA.

319. On January 8, 2026, Internal Affairs notified BLAZEVICH that it had found no misconduct warranting corrective action concerning the challenged disposition.

320. In early 2026, BLAZEVICH sent the CHIEF, Internal Affairs, SDPD supervisors, and other officials updated written materials identifying persons he had privately arrested, their locations, the reported offenses, and the continuing property and safety risks.

321. BLAZEVICH expressly requested that SDPD accept custody of persons already privately arrested or perform the physical taking he was delegating to summoned officers.

322. The CHIEF and other notified command personnel did not establish a procedure by which the identified private arrests would be accepted or completed.

323. A nonparty officer who reviewed portions of BLAZEVICH's materials understood the requested procedure and referred the matter for supervisory attention.

324. Lieutenant RAMIRO RODRIGUEZ ("RODRIGUEZ") thereafter spoke with BLAZEVICH and received the material facts, written submissions, and requested custody or delegated taking.

325. RODRIGUEZ repeatedly stated, in substance, that he was bound by SDPD policy and therefore would not take or direct the requested action.

326. BLAZEVICH explained that his request concerned persons already privately arrested or physical acts delegated by a private arrestor and was different from asking officers independently to exercise discretionary arrest authority.

327. RODRIGUEZ continued relying on departmental policy and declined to direct acceptance or completion of the identified arrests.

328. BLAZEVICH informed RODRIGUEZ that LOWE and ELIAS remained at the Triplex and that unauthorized occupants remained at the adjacent 1920 Woden House.

329. BLAZEVICH warned that the continuing circumstances would lead to execution of a writ, displacement of LOWE and ELIAS, continued unauthorized occupation of LAFON's property, and additional property and economic loss.

330. RODRIGUEZ stated that he still would not take the requested action. Although he stated that he would consult the Deputy City Attorney assigned to the division and

respond, neither he nor another SDPD official thereafter provided BLAZEVICH a different disposition.

331. A writ of possession was subsequently executed, and LOWE and ELIAS were displaced from the Triplex. DUTRA, WALDON, and other persons whom BLAZEVICH had previously identified or privately arrested thereafter fled or dispersed, and property and evidence associated with the events were lost or became unavailable.

332. Persons associated with the same group nevertheless continued entering or occupying the 1920 Woden House.

**M. The July 2026 Events and Continuing Danger**

333. After foreclosure, the Triplex purchaser employed workers and contractors, including CHRISTOPHER CERVANTES ("CERVANTES"), to inspect, repair, and secure the property.

334. During 2026, BLAZEVICH observed or received reports that SEGARRA, GALINDO, RENE GARCIA, JOHN ROE-5, JOHN ROE-6, and associated persons repeatedly entered or remained at the adjacent 1920 Woden House.

335. CERVANTES reported finding JOHN ROE-6 inside a vacant Triplex apartment after a window had been broken.

336. The apartment contained no furniture, bedding, clothing, food, or other visible indication that JOHN ROE-6 resided there.

337. JOHN ROE-6 had positioned a knife with an exposed blade approximately six inches long behind his arm where it was initially concealed from CERVANTES.

338. When questioned, JOHN ROE-6 displayed the knife and stated, in substance, that he was waiting to stab "the white guy who drives a white car."

339. JOHN ROE-6 further stated, in substance, that he was not a person of many words but a person of action.

340. JOHN ROE-6 remained inside with the knife displayed until CERVANTES stated that police would be called.

341. JOHN ROE-6 then left the Triplex while retaining the knife and entered the adjacent 1920 Woden House before officers arrived.

342. Officers thereafter approached the 1920 Woden House, received no response, and left without taking JOHN ROE-6 into custody.

343. CERVANTES understood the threatened target to be the Triplex purchaser, who is white and regularly arrived in a white automobile, and the purchaser thereafter stopped personally approaching the property.

344. BLAZEVICH is also white, had regularly driven CRUZ JOYA's white automobile to both properties, managed the 1920 Woden House, and had privately arrested persons associated with JOHN ROE-6.

345. BLAZEVICH therefore feared that he was the intended or an alternative target and reduced his physical presence at the properties.

346. CERVANTES later observed JOHN ROE-6 leaving another vacant Triplex unit with keys and was told, in substance, that JOHN ROE-6 had defeated the combination to a lockbox containing those keys. JOHN ROE-6 also stated, in substance, that newly installed security cameras would be knocked down.

347. During another incident, multiple police units pursued a person known as "Oscar" into or toward the 1920 Woden House in connection with reported violent conduct.

348. Plaintiffs are informed and believe that persons using the 1920 Woden House also used it as a refuge or base in connection with recurring entries, burglaries, threats, vandalism, and other activity affecting that property and the immediately adjacent Triplex.

349. The conditions at the properties during the period alleged included dangerous confrontations, threatened use of a pit bull, the JOHN ROE-6 knife incident, unauthorized residential use of the detached garage, property damage, unauthorized utility consumption, sanitation problems, and recurring police activity.

350. Neighbors and persons working at the properties observed or reported portions of that activity and expressed concern about the resulting conditions.

351. In July 2026, a neighbor informed BLAZEVICH that multiple police vehicles were surrounding the 1920 Woden House.

352. Before traveling there, BLAZEVICH called 911 and thereafter spoke by telephone with ARVELO. BLAZEVICH identified persons inside whom he had previously privately arrested, reported additional suspected offenses, requested that ARVELO accept custody of the previous arrestees, and stated that he intended to make additional private arrests if the statutory conditions were satisfied.

353. BLAZEVICH expressly delegated to ARVELO the physical act of taking identified arrestees into custody. ARVELO refused and stated, in substance, that officers would not make the requested arrests and that BLAZEVICH would not be permitted to make them himself.

354. Before the July 2026 incident, BLAZEVICH had transmitted to the CHIEF, RODRIGUEZ, Internal Affairs, and other CITY personnel a draft of this action naming ARVELO, other officers, and the CITY as defendants and had communicated his intent to file it.

355. ARVELO knew of BLAZEVICH's prior complaints and knew that she had been named in the contemplated litigation when she spoke with him.

356. BLAZEVICH thereafter went toward the 1920 Woden House. Officer ASHLEY BENNETT ("BENNETT") intercepted him before he reached it. Officers were then positioned near the property in connection with an effort to locate or detain another person.

357. BENNETT told BLAZEVICH that he could not proceed to the house and that officers would not take its occupants into custody for him. When BLAZEVICH referred to his contemplated action against ARVELO and the CITY, BENNETT acknowledged, in substance, that "everyone" knew about it.

358. In light of ARVELO's earlier threatened-arrest directive, CLEM's confirmation that officers would arrest BLAZEVICH for another private arrest, ARVELO's

July directive, and BENNETT's statements and conduct, BLAZEVICH understood that police authority would be used against him if he proceeded.

359. BLAZEVICH therefore made no further arrest, did not attempt to retake physical custody of previously arrested persons, and abandoned further reporting, requests for official processing, and contemplated judicial-presentment efforts he otherwise intended to pursue during that incident. He undertook no physical action against any occupant at the July 2026 scene.

**N. Recurring Practices, Notice, Continuing Application, and Public Expenditures**

360. From 2021 through July 2026, numerous SDPD officers, detectives, sergeants, lieutenants, Internal Affairs personnel, and command officials responded to materially similar reports involving the Triplex and the 1920 Woden House.

361. Across those incidents, SDPD personnel repeatedly used the same "civil," "landlord–tenant," or "established residency" rationale when addressing reported criminal conduct associated with residential ownership or occupancy.

362. The same rationale was used when the reported conduct involved separate residences, forced entries, theft, vandalism, threats, private arrests, and persons who had never rented the particular premises from Plaintiffs.

363. SDPD personnel repeatedly declined crime reports, investigation, witness interviews, custody processing, or supervisory correction requested by BLAZEVICH in connection with those incidents.

364. Personnel also repeatedly threatened arrest, detention, towing, impoundment, or other police action when BLAZEVICH persisted in reporting suspected offenses, maintaining or attempting to complete private arrests, restoring possession, or seeking supervisory, governmental, or judicial review.

365. In several incidents, officers did more than decline assistance: they separated BLAZEVICH from an arrestee, compelled termination of physical restraints, restricted his movement or access, caused him to move property, or prevented him from continuing efforts to restore control.

366. ULOVEC, CHARLOT, DUNCAN, CHRISTMAN, KNUTSON, CLEM, RODRIGUEZ, and other supervisory personnel received contemporaneous information concerning one or more challenged dispositions and had opportunities to review, approve, maintain, or correct them.

367. WEEDEN expressly described, in substance, a "strong policy" concerning SDPD's treatment of criminal complaints arising in landlord-related circumstances.

368. RODRIGUEZ later stated, in substance, that SDPD policy constrained him from taking the custody or delegated action BLAZEVICH requested.

369. EVANS, acting at WAHL's direction, told BLAZEVICH, in substance, to stop contacting SDPD concerning the GALAZ VALDES matter and stated that he would be taken to jail if he attempted the private arrest he had described.

370. Internal Affairs repeatedly received complaints concerning the same course of conduct, reviewed individual encounters and body-worn-camera recordings, and did not withdraw the recurring threatened-arrest directives or establish a different procedure for the private arrests BLAZEVICH had reported.

371. The Office of the Chief of Police, SDPD command personnel, Internal Affairs, the Mayor's Office, and other CITY officials received repeated written or oral notice of the incidents, the resulting property and personal injuries, and BLAZEVICH's assertion that the conduct was recurring.

372. Substantially similar conduct continued after that notice through July 2026.

373. Reports of suspected offenses arising in ownership or occupancy settings, private arrests, requests for supervisory review, and police encounters involving disputed possession occurred repeatedly during the period alleged.

374. The materially similar dispositions therefore recurred over several years, at two adjacent properties, and through numerous officers and levels of supervision.

375. The District Attorney's Office also repeatedly informed BLAZEVICH that it would not act upon the type of privately submitted complaints at issue here unless a police

agency first supplied a police report and request for prosecution. LINDBERG and PIRRELLO each communicated that requirement to him.

376. No District Attorney employee identified to BLAZEVICH an alternative individualized intake process for a sworn complaint arising from a private arrest when SDPD declined to provide the required police referral.

377. As recently as early August 2026, BLAZEVICH contacted the District Attorney's Office and asked whether the Office continued to require a police referral before acting upon the type of private complaint he had been attempting to submit. He was informed that the requirement remained in effect.

378. Because SDPD repeatedly declined to recognize or process the underlying arrests or provide a request for prosecution, while the District Attorney's Office required such a referral before processing BLAZEVICH's submissions, his sworn complaints and supporting materials did not proceed through the intake process he sought to invoke.

379. LAFON continues to own the 1920 Woden House. BLAZEVICH and CRUZ JOYA remain authorized to perform management functions there on LAFON's behalf, and CRUZ JOYA remains personally responsible for certain utility charges generated at the property.

380. Persons previously identified to CITY personnel as unauthorized occupants or private arrestees have continued to enter or occupy the 1920 Woden House. BLAZEVICH therefore expects to report future entries and offenses, request police and supervisory assistance, and invoke private-arrest procedures when circumstances warrant.

381. The repeated application of the same practices, including the July 2026 events, has left BLAZEVICH, CRUZ JOYA, and LAFON subject to continuing interference with their respective management, possessory, economic, and property-related interests at the 1920 Woden House.

382. The CITY devotes paid officer and supervisory time, dispatch and communications resources, police vehicles and operating resources, reporting systems,

recordkeeping resources, and other tax-supported resources to implementing and maintaining the challenged SDPD practices.

383. Application of those practices has also occasioned additional supervisory contacts and repeated officer responses concerning the same underlying incidents, occupants, and conditions.

384. The COUNTY devotes paid employee and supervisory time and administrative resources to receiving, screening, logging, routing, recording, and processing submissions under the District Attorney intake practice described above. Within one year before commencement of this action, LAFON owned and was assessed and liable for property taxes on 1920 Woden Street within the CITY and COUNTY, and BLAZEVICH and CRUZ JOYA each paid sales or use taxes on taxable purchases within the CITY.

385. The challenged practices, the circumstances at the 1920 Woden House to which those practices continue to apply, and the expenditure of public resources used to implement the challenged practices remain ongoing.

## VIII. DAMAGES

386. Each Plaintiff seeks compensation only for injuries and losses personally sustained and proximately caused by actionable conduct for which that Plaintiff establishes liability against the applicable Defendant or Defendants. To the extent multiple Claims for Relief or multiple Defendants concern the same injury, Plaintiffs seek only a single recovery for that injury.

387. BLAZEVICH and CRUZ JOYA held ownership and economic interests in the Triplex, and BUDENZ, as trustee, held the Trust's ownership and economic interest. Following the assignments alleged above, each assignee asserts only accrued claims and rights validly assigned to that person, to the extent assignable by law, together with injuries personally sustained. They allege that Defendants' actionable conduct caused or contributed to the loss of possession, use, control, income, and economic benefit of that property and ultimately to its loss through foreclosure. Their resulting economic losses include, according to their respective interests, past and prospective rental income reasonably certain to have

been derived from the Triplex; loss of equity and other economic interests in the property; physical damage and deterioration; reasonable repair, restoration, security, mitigation, financing, carrying, default, bankruptcy, and foreclosure-related expenses; impairment of credit standing and creditworthiness and resulting increased borrowing or financing costs and loss or impairment of financing opportunities; and other consequential economic losses, to the extent actually sustained, proximately caused by the actionable conduct alleged, and recoverable without duplication.

388. Before the foreclosure, BLAZEVICH and CRUZ JOYA used the Triplex as their home. They first resided at 3859 Birch Street and, after the police intervention alleged herein resulted in their loss of possession and control of that residence, moved to 1918 Woden Street, where they were subsequently deprived of the possession and use of their home as alleged herein. They suffered resulting loss of residential use and enjoyment, displacement, and reasonable alternate-housing, relocation, moving, transportation, storage, security, and other mitigation expenses, to the extent actually incurred and proximately caused by the actionable conduct alleged.

389. BLAZEVICH and CRUZ JOYA also owned and possessed substantial personal property located at 3859 Birch Street when the affirmative police intervention alleged herein left DUTRA in possession and prevented BLAZEVICH from restoring custody and control. Substantial portions of that property were thereafter lost, removed, damaged, destroyed, or rendered unavailable. Their resulting losses include the value and loss of use of household goods, photographs and other irreplaceable personal effects, tools and equipment, computers, electronic data and records, construction materials, and other personal property identified in the Complaint, together with reasonable costs incurred to locate, recover, restore, reproduce, repair, or replace such property, including reasonable data-recovery expenses.

390. CRUZ JOYA personally paid utility, electricity, water, sewer, and refuse charges associated with the Triplex and 1920 Woden Street during periods in which Plaintiffs were deprived of the possession, use, or economic benefit of those properties. She

seeks recovery of those expenses to the extent actually incurred and proximately caused by the actionable conduct alleged.

391. LAFON owns 1920 Woden Street. He alleges that Defendants' actionable conduct caused or prolonged the loss of possession, access, use, control, and economic benefit of that property. His resulting economic losses include physical property damage and reasonable repair or restoration costs; lost rental or occupancy value; additional carrying, maintenance, security, and mitigation expenses; and loss or diminution of the probable economic benefit of the prospective sale alleged in the Complaint, to the extent actually sustained and proximately caused by the actionable conduct alleged.

392. BUDENZ separately alleges economic losses arising from the equity-line obligation he undertook to fund improvements to the Triplex, including carrying costs, interest, late and default charges, impairment of credit standing and creditworthiness, increased borrowing or financing costs, loss or impairment of financing opportunities, and reasonable mitigation expenses, to the extent actually sustained and proximately caused by actionable conduct for which he establishes a right of recovery.

393. BLAZEVICH alleges actual noneconomic injuries resulting from the actionable conduct directed at him and affecting his home, property, financial and retirement security, and constitutional rights, including fear, anxiety, mental anguish, emotional distress, humiliation, loss of dignity, grief, sleep disturbance, loss of personal security, and loss of enjoyment of life.

394. CRUZ JOYA alleges actual noneconomic and personal injuries resulting from the actionable conduct affecting her home, property, financial and retirement security, and other legally protected interests, including anxiety, emotional distress, humiliation, loss of peace of mind and enjoyment of life, physical pain, and aggravation or worsening of health conditions associated with delayed or disrupted medical care, to the extent proven to have been proximately caused by the actionable conduct alleged.

395. BUDENZ alleges actual noneconomic injuries resulting from actionable conduct affecting his ownership and economic interests in the Triplex and the resulting loss

of financial and retirement security, including anxiety, emotional distress, mental suffering, sleep disturbance, humiliation, loss of peace of mind, and loss of enjoyment of life, to the extent recoverable under the Claims he asserts and proven to have been proximately caused by the actionable conduct alleged.

## IX. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF EQUAL PROTECTION CLAUSE
### U.S. Const. amend. XIV; 42 U.S.C. § 1983

(By PLAINTIFFS against CARDENAS, COATS, MORENO, RAYNOR, CASTILLO, and ESAMBOLCHI, and Sergeants ULOVEC, CHARLOT, DUNCAN, CHRISTMAN, and KNUTSON, and RODRIGUEZ, in their individual capacities, for damages; and by BLAZEVICH against the DISTRICT ATTORNEY, in an official capacity, for prospective declaratory and injunctive relief.)

396. Plaintiffs asserting this Claim incorporate by reference the factual allegations in Sections IV through VIII above to the extent relevant to this Claim for Relief. Allegations contained in other Claims for Relief are not incorporated except where expressly stated.

**A. UNEQUAL ADMINISTRATION OF POLICE SERVICES AND PRIVATE-ARREST PROCEDURES**

397. At the relevant times, PLAINTIFFS owned residential property, operated residential rental property, or acted as authorized residential-property managers. The PEACE OFFICER DEFENDANTS identified above intentionally treated PLAINTIFFS less favorably than similarly situated crime victims, reporting parties, and private arrestors whose requests for police services did not arise in a residential-landlord or asserted-occupancy context.

398. The unequal treatment included classifying reported public offenses as exclusively civil landlord–tenant matters; refusing ordinary police assistance; refusing to accept or assist with private arrests; preventing BLAZEVICH from maintaining custody of, delivering, or seeking presentment of his arrestees; and threatening or otherwise interfering with him when he attempted to invoke those procedures. PLAINTIFFS allege the intentional unequal administration of those services and procedures, not that every failure to comply with state law independently violated the federal Constitution.

399. The discriminatory purpose underlying that treatment is supported by the repeated use of the same civil-matter rationale by SDPD officers and supervisors and by Lieutenant WEEDEN's recorded statement that SDPD maintained a "strong policy" not to enforce criminal laws in landlord–tenant cases. When informed that GALAZ VALDES was no longer a tenant, WEEDEN responded, in substance, that it was "close enough"; when asked whether the theft of BLAZEVICH's cellular telephone would receive the same treatment, WEEDEN responded, in substance, that it was "the same thing." The earlier incidents and statements involving persons not named as damages defendants in this Claim are incorporated as background evidence of discriminatory intent and the continuing operation of the challenged practice.

400. On August 12, 2024, at 3859 Birch Street, CARDENAS refused to accept custody of DUTRA after BLAZEVICH informed the responding officers that he had privately arrested DUTRA for offenses committed at the residence. ULOVEC declined to direct the officers to accept custody. CHARLOT thereafter characterized the matter as "by nature" civil and threatened to arrest BLAZEVICH for battery and false imprisonment if he retook custody of DUTRA. DUNCAN reviewed and approved CHARLOT's report memorializing that threat and disposition. As a result, DUTRA remained in possession of BLAZEVICH's and CRUZ JOYA's residence and personal property.

401. In February 2025, at the Triplex, MORENO and RAYNOR refused BLAZEVICH's request that they take WALDON into custody after BLAZEVICH identified WALDON, informed them of his private arrest, and requested custody transfer. The officers instead displayed an application relating to a requested restraining order in a manner that caused BLAZEVICH to believe an enforceable order prohibited him from remaining at or entering his residence. They then left WALDON at liberty, and BLAZEVICH remained away from his residence until he discovered that no restraining order had been issued.

402. Within days of that incident, at the Triplex, CASTILLO and ESAMBOLCHI refused BLAZEVICH's request that they take WALDON and DUTRA into custody. CASTILLO stated that WALDON had "established residency," even though BLAZEVICH

explained that the arrest concerned WALDON's burglary of BLAZEVICH's and CRUZ JOYA's separate residence at 1918 Woden Street. Both officers departed without accepting custody.

403. On April 26, 2025, at the 1920 Woden House, COATS and CHRISTMAN refused to accept custody of GALINDO and her accomplice after BLAZEVICH informed them that he had privately arrested both persons. COATS, in CHRISTMAN's presence, threatened to tow and impound BLAZEVICH's vehicle unless he moved it and permitted the arrestees to leave. BLAZEVICH complied with the officers' show of authority, and the arrestees departed and thereafter continued occupying the property.

404. In or about September 2025, KNUTSON personally took the affirmative action of withdrawing all officer response to BLAZEVICH's report of a first-degree residential burglary in progress at 1918 Woden Street. KNUTSON acted after receiving notice that multiple suspects were inside the residence, that BLAZEVICH was traveling to the property, and that BLAZEVICH intended to make a private arrest if the officers did not arrest on their own authority. KNUTSON did not inform BLAZEVICH that the response had been cancelled, leaving BLAZEVICH to arrive alone and encounter multiple persons who threatened him. On information and belief, KNUTSON cancelled the response pursuant to the challenged treatment of crimes arising in residential-landlord and asserted-occupancy circumstances.

405. In early 2026, during telephone and written communications concerning identified arrestees at the Triplex and the 1920 Woden House, BLAZEVICH sent RODRIGUEZ materials identifying the arrestees, their locations, the alleged offenses, and the basis for his request that SDPD take them into custody. BLAZEVICH expressly requested that RODRIGUEZ perform or cause the physical act of taking the arrestees into custody. RODRIGUEZ repeatedly stated, in substance, that he was "bound by police policy" and refused to act or cause subordinate officers to act.

406. The foregoing acts, considered together with the incorporated allegations, support a reasonable inference that the identified PEACE OFFICER DEFENDANTS

intentionally applied the challenged treatment because PLAINTIFFS were residential-property owners, residential landlords, or authorized property managers. There was no rational basis for categorically withholding ordinary police or private-arrest services on that ground, particularly when the reported offense was independent of any genuine civil possessory dispute or BLAZEVICH had already effected a private arrest.

407. Each PEACE OFFICER DEFENDANT identified above personally participated through the particular refusal, threat, command, cancellation, approval, or policy-based decision attributed to that Defendant. As a direct and proximate result, BLAZEVICH was prevented or deterred from completing private arrests and suffered constitutional injury and emotional distress; BLAZEVICH and CRUZ JOYA suffered loss of use and control of their residence and personal property and related economic injury; and LAFON suffered loss of use and control of the 1920 Woden House and related economic injury, all according to proof.

**B. UNEQUAL ADMINISTRATION OF DISTRICT ATTORNEY INTAKE PROCEDURES**

408. After SDPD refused to accept custody of persons whom BLAZEVICH had privately arrested, BLAZEVICH prepared and submitted sworn complaints stating the charges, together with supporting affidavits, documentary evidence, and legal authorities, to the District Attorney's Office for intake and consideration.

409. Deputy District Attorney PIRRELLO informed BLAZEVICH that the Office would take no action unless SDPD first determined that a crime had occurred and submitted a police report requesting prosecution. Supervising Deputy District Attorney LINDBERG likewise informed BLAZEVICH that the Office maintained a policy of taking no action on a complaint submitted by a private person unless it was accompanied by a police report and a peace officer's request for prosecution. District Attorney personnel confirmed in September 2025, and August 2026, that the policy remained in effect.

410. On information and belief, under that policy, complaints and reports arising from warrantless arrests made by peace officers are accepted and screened for possible

prosecution, while complaints arising from warrantless arrests made by private persons are categorically excluded unless a peace officer separately submits a report requesting prosecution. Peace officers and private arrestors are similarly situated for the limited purpose of submitting for intake and consideration the complaint stating the charge following a warrantless arrest.

411. The challenged policy denied BLAZEVICH equal access to the District Attorney's intake and charging-review process solely because his complaints arose from private-person arrests and lacked police requests for prosecution. The discrimination was especially arbitrary because BLAZEVICH's complaints were sworn and supported by affidavits and documentary evidence, but were rejected without individualized consideration, while the required police referrals could not be obtained because SDPD had classified the underlying offenses as exclusively civil and refused to process the private arrests.

412. LAFON continues to own the 1920 Woden House, BLAZEVICH continues to manage it, and persons whom BLAZEVICH has privately arrested continue to occupy it. Because the challenged SDPD and District Attorney policies remain operative, BLAZEVICH faces a real and immediate threat that complaints arising from his continuing efforts to complete those private arrests will again be categorically excluded from consideration.

413. BLAZEVICH seeks prospective declaratory and injunctive relief prohibiting the DISTRICT ATTORNEY from categorically rejecting a complaint arising from a private-person arrest solely because it was submitted by a private person and was not accompanied by a police report requesting prosecution. The requested relief would require only neutral receipt and consideration of the submission and would leave all lawful investigative, charging, and prosecutorial discretion undisturbed.

414. PLAINTIFFS seek compensatory and nominal damages against the identified PEACE OFFICER DEFENDANTS, punitive damages against those Defendants to the extent permitted by law, prospective declaratory and injunctive relief against the DISTRICT ATTORNEY as alleged above, and such other relief as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF DUE PROCESS CLAUSE
### U.S. Constitution, Amendment XIV; 42 U.S.C. § 1983

(By PLAINTIFFS, each as to the property interests and injuries personally sustained, against Officers CARDENAS, MORENO, RAYNOR, and COATS; Detective ARVELO; and Sergeants ULOVEC, CHARLOT, DUNCAN, and CHRISTMAN, in their individual capacities, for damages under the Procedural Due Process Clause; and by BLAZEVICH against those same Defendants and Sergeant KNUTSON, in their individual capacities, for damages under the Substantive Due Process Clause.)

415. Plaintiffs asserting this Claim incorporate by reference the factual allegations in Sections IV through VIII above to the extent relevant to this Claim for Relief. Allegations contained in other Claims for Relief are not incorporated except where expressly stated.

**A. PROCEDURAL DUE PROCESS**

416. At the relevant times, BLAZEVICH and CRUZ JOYA possessed ownership, residential, possessory, and personal-property interests in the Triplex, including 3859 Birch Street and 1918 Woden Street. LAFON owned and possessed the 1920 Woden House, which BLAZEVICH was authorized to manage. Each Plaintiff asserts this subsection only as to that Plaintiff's own protected interests.

417. PLAINTIFFS allege that the Defendants identified below affirmatively used police authority—including physical separation, commands, threats of arrest or impoundment, misleading representations concerning legal process, and compelled release of private arrestees—to effectuate or maintain private dispossessions of PLAINTIFFS' real and personal property without constitutionally adequate process.

418. On August 12, 2024, at 3859 Birch Street, CARDENAS took control of the scene, separated BLAZEVICH from DUTRA following BLAZEVICH's private arrest, and left DUTRA in possession of BLAZEVICH's and CRUZ JOYA's residence and the personal property inside it. After receiving contemporaneous notice and BLAZEVICH's request for supervisory correction, ULOVEC affirmed the officers' disposition and declined to correct it.

419. Following the same incident, CHARLOT reinforced and continued the disposition by characterizing the matter as civil and threatening to arrest BLAZEVICH for battery and false imprisonment if he retook custody of DUTRA. While DUTRA remained

in possession and that threat continued to prevent BLAZEVICH from restoring control, DUNCAN signed and approved CHARLOT's report memorializing the officers' conduct and threatened arrest. Through their successive personal acts, CARDENAS, ULOVEC, CHARLOT, and DUNCAN initiated, maintained, reinforced, or knowingly continued the ongoing deprivation.

420. In Feburary 2025, at the Triplex, MORENO and RAYNOR refused BLAZEVICH's delegation of the physical act of taking WALDON into custody following BLAZEVICH's private arrest. They also presented documents relating only to an application for a restraining order in a manner that reasonably conveyed that an enforceable order prohibited BLAZEVICH from remaining at or entering his residence. BLAZEVICH therefore stayed away until he discovered that no restraining order had been issued, while WALDON remained in practical possession of the property.

421. On April 26, 2025, at the 1920 Woden House, COATS and CHRISTMAN refused to accept custody of GALINDOand her accomplice following their private arrests. COATS, in CHRISTMAN's presence, threatened to tow and impound BLAZEVICH's vehicle unless he moved it and permitted the arrestees to leave. CHRISTMAN had supervisory authority and a realistic opportunity to prevent that coercive action but instead approved or acquiesced in it. BLAZEVICH submitted to their authority, moved the vehicle, and permitted the arrestees to depart, after which they and associated persons continued occupying LAFON's property.

422. Following the August 2024 SDPD SWAT operation at 3859 Birch Street, ARVELO refused BLAZEVICH's request that she accept custody of DUTRA and WALDON and threatened to arrest him if he retook custody of them or attempted an additional private arrest. BLAZEVICH submitted to that threat and refrained from retaking custody or restoring possession, while the identified persons remained at liberty and continued occupying PLAINTIFFS' property.

423. None of the foregoing possession-altering actions was authorized by a warrant, writ of possession, restraining order, judgment, hearing, or other judicial process.

The incidents occurred in nonexigent circumstances in which Defendants could have refrained from using police authority to alter or maintain possession for private persons and required the competing claimants to obtain judicial resolution.

424. These were repeated official decisions implementing the challenged SDPD practice alleged in the Statement of Facts, not unforeseeable and unauthorized acts for which predeprivation process was impracticable. Defendants deprived PLAINTIFFS of possession, access, use, and control of their real and personal property without prior notice and an opportunity to be heard before a neutral decisionmaker or any prompt and meaningful postdeprivation process.

425. As a direct and proximate result, PLAINTIFFS suffered loss of possession, access, use, and control of real and personal property; loss of and damage to personal property; lost income and other economic losses; emotional distress; and constitutional injury, all according to proof.

**B. SUBSTANTIVE DUE PROCESS—STATE-CREATED DANGER**

426. BLAZEVICH alleges that the Defendants identified below affirmatively used or continued to use police authority in ways that exposed him to actual and particularized dangers to his bodily integrity and personal security that he otherwise would not have faced in the same manner.

427. On August 12, 2024, at 3859 Birch Street, CARDENAS separated BLAZEVICH from DUTRA and left DUTRA in possession. ULOVEC knowingly continued that disposition after receiving contemporaneous notice and an opportunity to correct it. CHARLOT thereafter threatened to arrest BLAZEVICH if he retook custody, and DUNCAN approved CHARLOT's report while DUTRA remained in possession and the threat remained operative. Their successive actions removed the restraint upon DUTRA, prevented BLAZEVICH from acting without risking arrest, and left him more vulnerable to DUTRA, who threatened BLAZEVICH and permitted WALDON to reside at the property. WALDON thereafter also threatened BLAZEVICH.

428. In January 2025, MORENO and RAYNOR refused the requested delegation concerning WALDON and affirmatively caused BLAZEVICH to believe that a restraining order prohibited him from remaining at or entering his residence when no such order had been issued. Their use of apparent legal process caused BLAZEVICH to remain away, left WALDON in control of the premises, and increased BLAZEVICH's vulnerability to WALDON's subsequent threats and confrontations.

429. On April 19, 2024, at the 1920 Woden House, DUNCAN affirmatively adopted the no-custody disposition concerning SEGARRA and prohibited BLAZEVICH from taking her before a magistrate. DUNCAN acted after being informed of the forced entry, the destruction of the rear-door locking mechanism, SEGARRA's conduct with accomplices, and BLAZEVICH's need to remain at the unsecured residence to restore possession and secure the door. Immediately after the officers departed, GALINDO—who had been present with or assisting SEGARRA—returned with a pit bull, attempted to force open the compromised door, and threatened to have the trained dog attack BLAZEVICH. By foreclosing the available custody and presentment routes while leaving BLAZEVICH exposed at the unsecured property, DUNCAN increased the particularized danger that immediately materialized in that confrontation. (The April 19, 2024 occurrence is alleged solely as background evidence concerning notice, pattern, foreseeability, and the development or implementation of the challenged practices, and is not asserted as an independent basis for damages under this Claim.)

430. On April 26, 2025, at the same property, COATS, with CHRISTMAN's approval or acquiescence, threatened to tow and impound BLAZEVICH's vehicle unless he removed the physical barrier preventing GALINDO and her accomplice from leaving following their private arrests. Their command compelled BLAZEVICH to release the identified arrestees, communicated that police authority would be used against him if he continued restraining them, and enabled those persons and their associates to remain at or return to the property, thereby exposing BLAZEVICH to renewed confrontations, threats, and a particularized risk of violence.

431. Following the April 11, 2025 SWAT operation, ARVELO affirmatively threatened to arrest BLAZEVICH if he retook custody of DUTRA and WALDON or attempted to arrest additional offenders. In July 2026, while that threat-backed prohibition remained operative, BLAZEVICH informed ARVELO that previously arrested persons and additional offenders were inside the 1920 Woden House and expressly delegated to her the physical act of taking them into custody. ARVELO again refused.

432. The persons identified to ARVELO included JOHN ROE-6, who had entered the immediately adjacent Triplex with a concealed knife and announced that he was waiting to stab "the white guy who drives a white car." Although the circumstances most strongly identified RADY as the intended victim, BLAZEVICH is also white, regularly drove CRUZ JOYA's white automobile to both properties, managed the 1920 Woden House, and had arrested JOHN ROE-6's associates. BLAZEVICH therefore reasonably feared that he was the intended or an alternative target. ARVELO's earlier threat and continued enforcement of the same no-custody disposition left JOHN ROE-6 and the other identified offenders at liberty while deterring BLAZEVICH from safely approaching either property or acting without risking arrest.

433. In early September 2025, KNUTSON affirmatively withdrew all officer response to BLAZEVICH's report of a residential burglary in progress at 1918 Woden Street after receiving notice that multiple suspects were inside the residence, that BLAZEVICH was traveling there to meet responding officers, and that he intended to make a private arrest if the officers did not arrest on their own authority. KNUTSON did not inform BLAZEVICH that the response had been cancelled.

434. Relying upon the active call and expected police response, BLAZEVICH arrived alone and encountered multiple persons inside the residence. GALINDO and two males threatened him while GALINDO restrained a pit bull and warned him to leave before he was hurt. By cancelling the response without warning, KNUTSON affirmatively exposed BLAZEVICH to an immediate, actual, and particularized danger that he would not otherwise have faced in the same manner.

435. Each Defendant identified in this subsection acted in nonexigent circumstances allowing time to deliberate and knew or was placed on notice of the identified offenders, BLAZEVICH's intended conduct, and the foreseeable risk of threats or violent confrontation. Despite that knowledge and available lawful alternatives, each acted with deliberate indifference to a known or obvious danger to BLAZEVICH's bodily integrity and personal security.

436. As a direct and proximate result, BLAZEVICH was subjected or exposed to threats, a threatened attack by a pit bull, the risk of stabbing or other violence, dangerous confrontations with identified offenders, compelled retreat from the properties, fear, anxiety, emotional distress, loss of personal security, and other injuries according to proof.

437. PLAINTIFFS seek compensatory and nominal damages against the Defendants responsible for the procedural-due-process violations alleged above. BLAZEVICH seeks compensatory and nominal damages against the Defendants responsible for the substantive-due-process violation. PLAINTIFFS further seek punitive damages against each Defendant whose conduct is proven to have been malicious, oppressive, or in reckless disregard of federally protected rights, together with such other relief as set forth in the Prayer for Relief.

## THIRD CLAIM FOR RELIEF
## UNREASONABLE SEIZURE
### U.S. Constitution, Amendment IV; 42 U.S.C. § 1983

(By PLAINTIFFS, each only as to his or her own property and possessory interests, against Officers CARDENAS and COATS; ARVELO; and Sergeants ULOVEC, CHARLOT, DUNCAN, and CHRISTMAN, in their individual capacities, for damages.)

438. Plaintiffs asserting this Claim incorporate by reference the factual allegations in Sections IV through III above to the extent relevant to this Claim for Relief. Allegations contained in other Claims for Relief are not incorporated except where expressly stated.

439. PLAINTIFFS incorporate by reference the preceding allegations to the extent relevant to this Claim for Relief.

440. At all times relevant to this Claim for Relief, through the trustee's sale in August 2025, BLAZEVICH and CRUZ JOYA held record ownership interests in the

Triplex, and BUDENZ, as trustee of the George Charles Budenz II 2016 Trust, held the Trust's record ownership interest. After the foreclosure, BUDENZ, as trustee, executed an assignment to BUDENZ individually, BLAZEVICH, and CRUZ JOYA. alleged above. BUDENZ, BLAZEVICH, and CRUZ JOYA asserts in this action only claims and rights that that personally held or that were validly assigned to them.

441. Each private arrest alleged below was made by BLAZEVICH under circumstances that authorized a private arrest under Penal Code section 837, and Penal Code section 847(a) thereafter required him, without unnecessary delay, to take the arrestee before a magistrate or deliver the arrestee to a peace officer. Independently of those statutes, PLAINTIFFS held the ownership, residential, and possessory interests alleged above, including the right to exclude others from their property. None of the persons whose continued presence or possession Defendants facilitated or preserved at 3859 Birch Street or 1920 Woden Street held any lawful possessory right as against the respective PLAINTIFFS.

442. On August 12, 2024, BLAZEVICH had privately arrested DUTRA at 3859 Birch Street and was exercising custody over him when CARDENAS arrived. CARDENAS assumed control of the scene and exercised police authority to refuse custody of DUTRA and to prohibit BLAZEVICH from retaining or resuming custody, thereby terminating BLAZEVICH's control over DUTRA and leaving DUTRA in possession of PLAINTIFFS' residence and personal property. BLAZEVICH sought supervisory review from ULOVEC and explained the material circumstances, including that DUTRA held no tenancy or other possessory right. With knowledge of those circumstances, ULOVEC approved and maintained CARDENAS's disposition. When BLAZEVICH thereafter sought review from CHARLOT, CHARLOT threatened to arrest him for battery and false imprisonment if BLAZEVICH retook custody of DUTRA. BLAZEVICH refrained because of that threat, and DUTRA remained in possession.

443. CHARLOT memorialized that disposition and continuing threat in his September 17, 2024 report, in which CHARLOT recorded that BLAZEVICH would be arrested if he retook custody of DUTRA, and recorded BLAZEVICH's statement that he

was "going to lose [his] house and everything [he had] worked for — for [his] entire life" if DUTRA was not promptly taken into custody. On September 18, 2024, DUNCAN, a sergeant, reviewed that report and signed his approval, which he was not required to give. With knowledge from the report of the continuing threat, of the resulting restriction on BLAZEVICH's efforts to restore PLAINTIFFS' possession and control, and of BLAZEVICH's stated risk of losing his home, DUNCAN approved and maintained the disposition rather than declining approval, directing correction, or referring the matter for further review.

444. Following the April 11, 2025 SDPD SWAT operation at 3859 Birch Street, where DUTRA, WALDON, and others were then residing without the owners' permission, ARVELO threatened to arrest BLAZEVICH if he retook custody of DUTRA or WALDON or made a further private arrest. Because of that threat, BLAZEVICH refrained from retaking custody, entering the occupied portions of the premises, or taking other action he otherwise intended to take to exclude those persons and restore PLAINTIFFS' possession and control. DUTRA, WALDON, and others consequently continued to occupy and exercise control over 3859 Birch Street. ARVELO, as alleged above, thereafter continued to direct that BLAZEVICH would not be permitted to make private arrests at PLAINTIFFS' properties.

445. On April 26, 2025, at the 1920 Woden House, BLAZEVICH had privately arrested GALINDO and her male accomplice. COATS and CHRISTMAN refused to accept custody of the arrestees, refused BLAZEVICH's request that they take the privately arrested persons into custody on his behalf, and terminated BLAZEVICH's custody over them. COATS, in CHRISTMAN's presence and with his approval, then threatened to tow and impound CRUZ JOYA's automobile unless BLAZEVICH moved it and permitted GALINDO and her accomplice to leave. BLAZEVICH moved the automobile because of that threat. COATS and CHRISTMAN thereby compelled BLAZEVICH to move CRUZ JOYA's automobile from where he had positioned it, interfered with BLAZEVICH's and CRUZ JOYA's possession and use of the automobile, removed the physical barrier

preventing GALINDO and her accomplice from departing, and used police authority to assist them in retaining or resuming possession and control of LAFON's property. GALINDO and her accomplice thereafter returned and resumed occupation of 1920 Woden Street, and BLAZEVICH refrained from making a further private arrest because Defendants' conduct earlier that day had shown him that any arrestee would again be released.

446. Before the respective interferences alleged above, BLAZEVICH informed CARDENAS, ULOVEC, and CHARLOT of the circumstances of DUTRA's arrest and explained the California statutes governing private arrests and disposition of an arrestee; each declined to act in accordance with them. ARVELO, COATS, and CHRISTMAN were likewise informed of the circumstances of the private arrests preceding their respective actions.

447. Defendants did not merely stand by to keep the peace or maintain a neutral presence. They affirmatively exercised police authority to prevent PLAINTIFFS from exercising lawful control over their property and caused BLAZEVICH to refrain from conduct he otherwise intended to undertake to exclude those persons from PLAINTIFFS' property and restore PLAINTIFFS' possession and control. The resulting interference was not merely the continued presence of private persons; Defendants used the threat of state force against PLAINTIFFS or their authorized agent to preserve or facilitate those private persons' possession and control, with knowledge that PLAINTIFFS would thereby be deprived of their property for an indefinite period.

448. No interference alleged above was undertaken pursuant to a warrant, writ of possession, restraining order, judgment or other judicial order adjudicating possession, consent, exigent circumstances, or other lawful governmental justification. Each Defendant's conduct caused, reinforced, or maintained meaningful governmental interference with one or more PLAINTIFFS' possessory interests. Under the circumstances alleged, those interferences were objectively unreasonable and constituted seizures of property in violation of the Fourth Amendment.

449. As a direct and proximate result of Defendants' respective unconstitutional seizures, PLAINTIFFS suffered loss of possession, access, use, and control of real and personal property; loss of and damage to personal property; economic and consequential losses; and constitutional injury, according to proof.

450. PLAINTIFFS seek compensatory and nominal damages against each responsible Defendant, punitive damages against each Defendant whose conduct is proven to have been malicious, oppressive, or in reckless disregard of federally protected rights, and such other relief as set forth in the Prayer for Relief, without duplicative recovery for injuries alleged under other Claims for Relief.

## FOURTH CLAIM FOR RELIEF
## VIOLATIONS OF FIRST AMENDMENT RIGHTS
### U.S. Constitution, Amendment I; 42 U.S.C. § 1983

(By Plaintiff BLAZEVICH against Sergeant CHARLOT, Detective ARVELO, Officer COATS, and Sergeant CHRISTMAN, in their individual capacities, for damages.)

451. BLAZEVICH incorporates incorporate by reference the factual allegations in Sections IV through VIII above to the extent relevant to this Claim for Relief. Allegations contained in other Claims for Relief are not incorporated except where expressly stated. by reference the preceding allegations to the extent relevant to this Claim for Relief.

452. At the relevant times, BLAZEVICH engaged in activity protected by the First Amendment by orally and in writing reporting suspected public offenses; complaining to officers, supervisors, and the SDPD Internal Affairs Unit about officers' conduct, including their refusals to accept custody of persons he had privately arrested and their threatened-arrest practice; submitting or attempting to present notices of private arrest, statements of charges, sworn complaints, affidavits, and supporting materials; requesting governmental review and action upon those matters; seeking to present complaints to a magistrate; and, before the July 2026 incident alleged below, transmitting to the Chief of Police, Lieutenant RODRIGUEZ, and Internal Affairs a draft of this action naming ARVELO, other officers, and the CITY as defendants, together with notice of his intent to file it. Defendants responded to that protected reporting, complaining, requesting, and petitioning with

threatened governmental sanctions and exercises of police authority intended to retaliate against and deter its continuation.

453. Following BLAZEVICH's private arrest of DUTRA at 3859 Birch Street on August 12, 2024, and SDPD's refusal to accept custody, BLAZEVICH continued to report DUTRA's conduct, challenged that refusal, and sought governmental and judicial consideration of the matter. In or about August or September 2024, BLAZEVICH prepared a felony complaint under Penal Code section 806 with a supporting affidavit and informed CHARLOT that, because SDPD would not accept custody, he intended to retake custody of DUTRA and take DUTRA before a magistrate with that complaint. In direct response to those continuing efforts, CHARLOT threatened to arrest BLAZEVICH for battery and false imprisonment if he did so. BLAZEVICH submitted to the threat, never presented the section 806 complaint to a magistrate, and ceased his continuing efforts to retake custody of DUTRA for magisterial presentment and to obtain governmental or judicial consideration of the matter.

454. Following the SDPD SWAT operation at 3859 Birch Street on April 11, 2025, BLAZEVICH reported to ARVELO offenses committed by DUTRA, WALDON, and others occupying 3859 Birch Street; requested that ARVELO accept custody of the individuals BLAZEVICH had arrested; delegated to ARVELO the task of taking into custody the offenders BLAZEVICH had identified but had not arrested; and continued to request official processing of those matters. ARVELO repeatedly characterized BLAZEVICH's continued reports and requests as "caus[ing] a disturbance" and threatened to arrest BLAZEVICH if he persisted, including if he retook custody or effected another private arrest in furtherance of those efforts. BLAZEVICH submitted to those threats and curtailed his continuing reports, requests, and efforts to obtain governmental or judicial consideration.

455. Fifteen days later, on April 26, 2025, at the 1920 Woden House, BLAZEVICH reported a burglary, informed COATS and CHRISTMAN that he had privately arrested GALINDO and her accomplice, stated the factual and legal basis for the arrests, and repeatedly requested that the officers accept custody and process the arrests. In

response to BLAZEVICH's continued reports and requests, COATS threatened to tow and impound BLAZEVICH's vehicle unless he moved it and permitted the arrestees to leave. CHRISTMAN, COATS's supervising sergeant, was present throughout the encounter, heard and understood BLAZEVICH's reports, statement of arrest, factual and legal basis, and repeated requests for official processing, and approved and acquiesced in COATS's threatened impoundment and in the resulting compelled termination of BLAZEVICH's custody of his arrestees and of his magisterial presentment efforts. BLAZEVICH submitted to the threatened seizure of his vehicle, moved it, permitted the arrestees to depart, and ceased his efforts to obtain official processing of the arrests.

456. On September 6, 2025, during a recorded Internal Affairs call concerning BLAZEVICH's detailed complaint regarding the conduct alleged herein, BLAZEVICH complained, among other things, that SDPD officers had repeatedly refused to accept custody of persons he had privately arrested and had threatened to arrest him when he attempted to proceed with those arrests or obtain further official processing. In that context, BLAZEVICH asked Sergeant CLEM of the Internal Affairs Unit whether officers would arrest him if he privately arrested persons burglarizing his residence, and CLEM confirmed, in substance, that they would. CLEM rejected BLAZEVICH's allegations of misconduct and closed the complaint with a finding that no misconduct had occurred. CLEM's rejection of the misconduct complaint, together with CLEM's confirmation of the threatened arrest, communicated through SDPD Internal Affairs that the threatened governmental consequence would continue if BLAZEVICH persisted in the reporting, complaining, and petitioning activity that was the subject of his complaint. That response informed BLAZEVICH's understanding of the July 2026 telephone directive alleged below.

457. In July 2026, BLAZEVICH was informed of an incident at the 1920 Woden House, which he was authorized to possess and manage. Before traveling there, BLAZEVICH spoke by telephone with ARVELO. BLAZEVICH reported that persons were then unlawfully inside the property; stated that he had previously privately arrested certain of those persons and requested that ARVELO accept custody of them; stated facts giving him

reasonable cause to believe that the occupants had committed burglary and other crimes; requested that officers take the remaining occupants into custody; and stated that he intended to arrest under Penal Code section 837 those not already arrested, identifying them by description and location because their names were then unknown to him. ARVELO stated that officers would not make the arrests and that BLAZEVICH would not be permitted to make them either. ARVELO gave that directive by telephone before BLAZEVICH arrived at the property, and it was therefore based upon no conduct by BLAZEVICH at the scene. ARVELO then knew of BLAZEVICH's protected complaints and petitioning activity, and knew that ARVELO had been named as a defendant in the draft complaint BLAZEVICH had previously transmitted to CITY officials.

458. When BLAZEVICH nonetheless traveled to the 1920 Woden House, Officer BENNETT intercepted him before he reached it. Officers were then posted at the property to prevent the departure of a person for whom they were seeking an arrest warrant. BENNETT told BLAZEVICH that he could not proceed to the house and that officers would not take the occupants into custody for him. When BLAZEVICH referred to his contemplated action against ARVELO and the CITY, BENNETT acknowledged, in substance, that "everyone" knew about it. BENNETT's statements corroborated that BLAZEVICH's protected complaints and contemplated litigation against ARVELO and the CITY were known among the officers involved in the July 2026 encounter, and confirmed at the scene the prohibition ARVELO had communicated by telephone.

459. In light of ARVELO's earlier threatened-arrest directive following the SWAT operation, the Internal Affairs disposition of BLAZEVICH's misconduct complaint on September 6, 2025, BENNETT's statement that officers would not take the occupants into custody, and SDPD officers' repeated threats to arrest BLAZEVICH if he persisted with a private arrest or with post-private-arrest processing, BLAZEVICH understood the July 2026 telephone directive to mean that officers would arrest him or otherwise exercise police authority against him if he proceeded. BLAZEVICH submitted, made no further arrest, took no further step to obtain custody or magisterial presentment of the persons he had previously

arrested, and abandoned the further reporting, requests for official processing, and contemplated judicial presentment he otherwise intended to pursue.

460. No Defendant had probable cause to believe that BLAZEVICH had committed or was about to commit battery, false imprisonment, or any other public offense, in the July 2026 encounter or in any other encounter alleged in this Complaint. BLAZEVICH did not touch or lay hands upon any arrestee, and in the July 2026 encounter BLAZEVICH made no further arrest and took no physical action of any kind.

461. In each of the encounters alleged above, BLAZEVICH explained to the respective Defendants the factual basis for the matters he was reporting and the private-arrest, peace-officer-custody, and presentment procedures he was attempting to invoke; identified the governing statutes; and, on the occasions alleged, provided or offered written materials concerning those matters. Each Defendant therefore knew of the protected activity alleged as to that Defendant when engaging in the challenged conduct. CHARLOT acted during and in direct response to BLAZEVICH's continuing reports, complaints, and requests following the DUTRA arrest. ARVELO acted during and in direct response to those following the SWAT operation, and again in July 2026 with knowledge of BLAZEVICH's protected complaints and of the draft complaint naming ARVELO as a defendant. COATS and CHRISTMAN acted during and in direct response to those made during the April 26, 2025 encounter at the 1920 Woden House. In light of the chronology, Defendants' statements, their contemporaneous knowledge of the protected activity, and the circumstances alleged above, BLAZEVICH's protected activity was a substantial or motivating factor in each Defendant's challenged conduct.

462. Each Defendant's retaliatory motive was a but-for cause of the adverse action alleged against that Defendant, in that the challenged threat, directive, or approval would not have occurred in the absence of that retaliatory motive.

463. Defendants' threatened arrests, threatened seizure of property, directives backed by police authority, approval of those measures, and use of them to terminate or deter BLAZEVICH's continuing reports, complaints, requests, and petitioning would chill a person

of ordinary firmness from continuing to report suspected crimes, complain about official conduct, seek supervisory or Internal Affairs review, request governmental action, or seek judicial consideration.

464. Defendants' conduct in fact caused BLAZEVICH to abandon, curtail, delay, or alter protected activity because of the threatened governmental consequences of persisting, including his intended presentation to a magistrate of the Penal Code section 806 complaint concerning DUTRA, his continuing reports and requests following the SWAT operation and during the April 26, 2025 encounter, and his further reporting, requests for official processing, and contemplated judicial presentment concerning the July 2026 incident. By taking adverse action against BLAZEVICH because of his protected speech and petitioning activity, Defendants retaliated against him for exercising rights secured by the Free Speech and Petition Clauses of the First Amendment and deprived him of those rights within the meaning of 42 U.S.C. § 1983.

465. As a direct and proximate result of Defendants' conduct, BLAZEVICH suffered chilling and deterrence of protected First Amendment activity; interference with and deterrence of his efforts to seek governmental and judicial consideration; fear, anxiety, emotional distress, time and expense; and constitutional injury, according to proof.

466. BLAZEVICH seeks compensatory and nominal damages against each responsible Defendant, punitive damages against each Defendant whose conduct is proven to have been motivated by evil motive or intent or to have involved reckless or callous indifference to BLAZEVICH's federally protected rights, and such other relief as set forth in the Prayer for Relief.

## FIFTH CLAIM FOR RELIEF
## FAILURE TO INTERVENE
## 42 U.S.C. § 1983

(By BLAZEVICH, CRUZ JOYA, and BUDENZ against Sergeant ULOVEC as to the August 12, 2024 conduct at 3859 Birch Street, and by BLAZEVICH and LAFON against Officer INGRAM-1994 and Sergeant CHRISTMAN as to the April 26, 2025 conduct at 1920 Woden Street, each only as to the constitutional violations and injuries personally sustained, in Defendants' individual capacities, for damages.)

467. Plaintiffs asserting this Claim incorporate by reference the factual allegations in Sections IV through VIII above to the extent relevant to this Claim for Relief. Allegations contained in other Claims for Relief are not incorporated except where expressly stated.

468. Each Defendant named in this Claim, through his own conduct, knowingly failed to intercede to prevent or terminate an ongoing constitutional violation by another officer despite knowing the material circumstances and having sufficient time and a realistic opportunity to intercede. Each Defendant's failure to intercede caused or contributed to the continuation of the constitutional deprivation and resulting injury.

469. On August 12, 2024, at 3859 Birch Street, BLAZEVICH privately arrested DUTRA and requested that the responding officers accept custody. CARDENAS separated BLAZEVICH from DUTRA, refused the requested transfer of custody, and maintained a disposition leaving DUTRA in possession of the premises and personal property within them. While CARDENAS and the other responding officers remained at the scene and before that disposition was completed, CARDENAS placed BLAZEVICH in telephone contact with ULOVEC through CARDENAS's cellular telephone. BLAZEVICH informed ULOVEC of the private arrest, the circumstances supporting it, CARDENAS's conduct, the officers' refusal to accept custody, and the resulting interference with PLAINTIFFS' possession, and requested supervisory intervention. ULOVEC, as the supervising sergeant communicating directly with the scene, had authority and a realistic opportunity to direct the officers to cease the challenged conduct before they departed. ULOVEC declined to intervene, and the officers departed while DUTRA remained in possession.

470. On April 26, 2025, at the 1920 Woden House, BLAZEVICH privately arrested GALINDO and her male accomplice and requested that the responding officers accept custody. COATS and INGRAM-1994 responded, and CHRISTMAN attended as their supervising sergeant. BLAZEVICH explained to the officers the circumstances on which he based the private arrests and requested that the officers accept custody. COATS refused the requested transfer and, in the presence and hearing of INGRAM-1994 and

CHRISTMAN, threatened to tow and impound the automobile BLAZEVICH was lawfully using unless BLAZEVICH moved it and permitted the arrestees to leave.

471. COATS's threatened seizure remained operative until BLAZEVICH complied. Before he did so, INGRAM-1994 and CHRISTMAN had heard BLAZEVICH's explanation and COATS's threat, knew the circumstances material to the challenged conduct, and had sufficient time and a realistic opportunity to intercede. INGRAM-1994 neither objected to nor acted to prevent COATS's threatened action. BLAZEVICH repeatedly requested supervisory intervention from CHRISTMAN, who had authority to countermand COATS but refused to do so or otherwise terminate the challenged disposition. BLAZEVICH thereafter moved the automobile in submission to the threat, GALINDO and her accomplice departed, and they thereafter returned to and occupied the property.

472. PLAINTIFFS plead this Claim as to ULOVEC and CHRISTMAN in the alternative to their allegations that either directly participated in the same constitutional deprivation. Liability under this Claim is based upon each Defendant's own knowing failure to act while an identified constitutional violation was ongoing and while he had a realistic opportunity to intercede, and not upon rank, supervisory status alone, or *respondeat superior*.

473. As a direct and proximate result of ULOVEC's conduct alleged above, BLAZEVICH, CRUZ JOYA, and BUDENZ suffered the continuation or aggravation of the constitutional, property, economic, and consequential injuries arising from the August 12, 2024 violations alleged in the Second and Third Claims for Relief, each only as to the injuries personally sustained.

474. As a direct and proximate result of INGRAM-1994's and CHRISTMAN's conduct alleged above, BLAZEVICH and LAFON suffered the continuation or aggravation of the constitutional, property, economic, and consequential injuries arising from the April 26, 2025 violations alleged in the Second and Third Claims for Relief, each only as to the

injuries personally sustained. BLAZEVICH additionally suffered emotional distress and exposure to threats and physical danger.

475. PLAINTIFFS seek compensatory and nominal damages against each responsible Defendant, punitive damages against each Defendant whose conduct is proven to have been motivated by evil motive or intent or to have involved reckless or callous indifference to federally protected rights, and such other relief as set forth in the Prayer for Relief, without duplicative recovery.

## SIXTH CLAIM FOR RELIEF

## MUNICIPAL LIABILITY FOR UNCONSTITUTIONAL POLICIES, PRACTICES, OR CUSTOMS; DELIBERATE INDIFFERENCE; AND FAILURE TO TRAIN AND SUPERVISE

## 42 U.S.C. § 1983—*Monell* Claim

(By Plaintiffs BLAZEVICH, CRUZ JOYA, LAFON, and BUDENZ against Defendant CITY OF SAN DIEGO for damages, and by Plaintiffs BLAZEVICH, CRUZ JOYA, and LAFON against Defendant CITY OF SAN DIEGO for prospective declaratory and injunctive relief.)

476. Plaintiffs asserting this Claim incorporate by reference the factual allegations in Sections IV through VIII above to the extent relevant to this Claim for Relief. Allegations contained in other Claims for Relief are not incorporated except where expressly stated.

477. As alleged in the First through Fourth Claims for Relief, CITY personnel violated Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments. PLAINTIFFS allege that those violations resulted from the CITY's own policies, longstanding practices or customs, deliberately indifferent omissions, and, alternatively, failures to train and supervise.

### A. POLICY, PRACTICE, OR CUSTOM

478. At all relevant times, the CITY maintained or permitted a policy, practice, or custom under which SDPD personnel, when responding to reported criminal conduct arising in residential ownership, occupancy, or landlord-related circumstances:

a. categorically characterized reported criminal conduct as civil or landlord-tenant matters without applying the same criminal-law standards used for other victims;

b. withheld police reports, investigation, custody processing, and other police services provided to similarly situated victims;

c. refused to recognize or process private arrests and interfered with private arrestors' efforts to transfer custody to officers or present arrestees before a magistrate;

d. threatened arrest, detention, towing, impoundment, or other governmental action against persons who persisted in reporting crimes, maintaining custody of private arrestees, submitting complaints, or seeking governmental or judicial review;

e. used police commands, threats, and other assertions of authority to interfere with Plaintiffs' possession and control of property, compel the release of identified private arrestees, and prevent Plaintiffs from securing property against persons having no lawful possessory right; and

f. through affirmative acts, including interfering with BLAZEVICH's maintenance or transfer of custody of identified private arrestees, unlawfully terminating his lawful custody of those arrestees, compelling their release, preventing him from securing property against persons having no lawful possessory right, and directing him to leave or cease his efforts as alleged herein, placed BLAZEVICH in actual and particularized dangers of private violence that he otherwise would not have faced, with deliberate indifference to known or obvious risks.

479. 488. The federal constitutional violations alleged herein arise from the CITY's intentional unequal treatment; affirmative deprivation of protected property and possessory interests without constitutionally adequate process; affirmative creation of danger; unreasonable seizures of persons and property; and retaliation against constitutionally protected reporting and petitioning, as respectively alleged in the First through Fourth Claims for Relief. The California private-arrest statutes and procedures provide the legal and factual context in which the challenged CITY conduct occurred and in which those constitutional violations were effected.

480. As alleged in the First Claim for Relief, the differential treatment imposed by the challenged policy, practice, or custom turns on the victim's status as a residential landlord, rather than on the reported facts of the offense and is not rationally related to any legitimate governmental interest.

481. The existence of the challenged policy or custom is supported by substantially similar conduct repeatedly undertaken by numerous SDPD officers, detectives, sergeants, and lieutenants from 2021 through 2026 at the Triplex and the 1920 Woden House; supervisory

review and approval of challenged dispositions; recurrence after extensive oral and written notice to SDPD command personnel; and statements by SDPD supervisors concerning the policy.

482. During a recorded conversation, Lieutenant WEEDEN stated that the SDPD has a "strong policy" not to enforce in cases involving a landlord and a tenant," and explained that SDPD implements that policy by treating crimes committed against residential landlords as exclusively "civil matters." Lieutenant RODRIGUEZ later stated, in substance, that he was bound by SDPD policy when refusing to act upon BLAZEVICH's complaints and written materials. Those statements and the repeated conduct alleged herein support a reasonable inference that the constitutional violations resulted from CITY policy or settled custom rather than isolated employee error.

483. To the extent any incidents alleged in this Complaint are determined to fall outside the limitations period applicable to damages, they are additionally alleged as evidence of the existence, duration, frequency, and consistency of the challenged policy or custom and of the CITY's notice thereof.

**B. COMMAND-LEVEL NOTICE AND DELIBERATE CONTINUATION**

484. PLAINTIFFS, through BLAZEVICH, repeatedly provided the Office of the Chief of Police, Internal Affairs, SDPD supervisors, and other CITY officials with detailed oral and written notice of the challenged practices, the constitutional injuries they were causing, and the continuing likelihood of recurrence.

485. SDPD supervisors, including Sergeant DUNCAN, reviewed or approved reports and dispositions reflecting the challenged practices. Internal Affairs received and reviewed BLAZEVICH's complaints concerning those practices and closed them without requiring corrective action.

486. After the CHIEF became Chief of Police, BLAZEVICH provided him and Internal Affairs with direct written notice of the challenged practices and requested corrective action. No corrective action followed, and substantially similar conduct thereafter continued through July 2026. The recurrence of substantially similar conduct after command-level

notice supports a reasonable inference that the challenged practices were knowingly retained or permitted as CITY policy, custom, or deliberate inaction rather than resulting from isolated employee error.

**C. FAILURE TO TRAIN OR SUPERVISE**

487. In the alternative, and without withdrawing or limiting the preceding factual allegations, to the extent the challenged conduct is determined not to have resulted from an express CITY policy or settled custom, the CITY is liable for its deliberately indifferent failure adequately to train and supervise SDPD personnel. Responding to reported crimes arising in ownership or occupancy disputes, addressing private arrests and possessory disputes, and responding to citizens seeking supervisory review are usual and recurring situations that SDPD personnel confront.

488. PLAINTIFFS allege that the CITY failed adequately to train and supervise SDPD personnel concerning the constitutional and statutory limits on implementing the challenged policy of categorically treating reported criminal conduct against residential landlords as exclusively "civil matters," including the distinction between (a) an officer's discretion whether to exercise governmental arrest authority and (b) a private person's independent statutory authority to make a lawful arrest under California law. The CITY's training and supervision were inadequate to prevent SDPD personnel from implementing the challenged policy by:

a. intentionally denying equal police services because a crime victim is a San Diego residential landlord;

b. interfering with, terminating, or preventing the lawful completion of private arrests through commands, threats, detention, or coercion;

c. affirmatively causing, facilitating, or maintaining private dispossessions without constitutionally adequate process;

d. unreasonably interfering with protected possessory interests;

e. retaliating against or intimidating persons because they report crimes, submit complaints, state an intent to effect, attempt to effect, or effect lawful private arrests, maintain custody of private arrestees, or seek governmental or judicial review; or

f. through affirmative acts, placing a person in an actual and particularized danger of private violence that the person otherwise would not have faced, with deliberate indifference to a known or obvious risk.

489. The CITY had actual or constructive notice of the need for corrective training, supervision, and procedural safeguards through the repeated incidents alleged herein; BLAZEVICH's written complaints and communications; supervisory and Internal Affairs reviews; WEEDEN's acknowledgment of the policy; and the continued occurrence of substantially similar violations through July 2026. Despite that notice, the CITY deliberately failed to provide adequate corrective training, supervision, or safeguards, and the resulting constitutional violations were the known or obvious consequence of the CITY's deliberate choices rather than merely negligent administration or isolated employee error.

**D. CAUSATION, INJURY, AND RELIEF**

490. The CITY policies, customs, and deliberately indifferent omissions alleged above were the moving force behind, and the actual and proximate causes of, the corresponding violations of PLAINTIFFS' First, Fourth, and Fourteenth Amendment rights alleged in the First through Fourth Claims for Relief.

491. As a direct and proximate result, each Plaintiff sustained the injuries personally suffered by that Plaintiff and attributable to the municipal practices alleged in this Claim and to the constitutional violations alleged in the Claims for Relief to which that Plaintiff is a party. The retaliation and danger-creation theories alleged above concern injuries to BLAZEVICH only.

492. The challenged policies and practices remain operative. LAFON continues to own the 1920 Woden House; BLAZEVICH and CRUZ JOYA remain authorized to manage and sell that property on his behalf; and CRUZ JOYA remains personally liable for water, sewer, and refuse charges generated there. The property remains subject to the unauthorized occupation, entries, and related offenses alleged within this Complaint.

493. In July 2026, BLAZEVICH informed Detective ARVELO that persons inside the 1920 Woden House included persons whom he had previously privately arrested and whose custody SDPD officers had terminated, as well as additional occupants whom he

intended to arrest for felonies that had in fact been committed and whom he had reasonable cause to believe had committed those felonies. BLAZEVICH requested ARVELO's aid in effecting those arrests and expressly delegated to her the physical act of taking the identified persons into custody. ARVELO refused the requested aid, declined to accept the delegated task of taking those persons into custody, and told BLAZEVICH that he would not be allowed to arrest the occupants himself. Officer BENNETT thereafter told BLAZEVICH that he could not go to the house. BLAZEVICH refrained from personally taking the identified persons into custody or otherwise effecting those arrests because of those directives and because officers had, on earlier occasions alleged in this Complaint, threatened him with arrest or vehicle impoundment when he stated his intent to effect private arrests, effected private arrests, maintained custody of private arrestees, or, after officers refused to accept custody, attempted to take his arrestees before a magistrate pursuant to California law.

494. BLAZEVICH intends to report future offenses concerning the 1920 Woden House, request police assistance and supervisory review, and effect private arrests when statutory conditions are satisfied, and would do so but for the challenged policies and the directives and threats issued pursuant to them. He therefore remains subject to a real and immediate threat that the challenged practices will again interfere with those activities and subject him to threats of arrest or vehicle impoundment. CRUZ JOYA, as an authorized manager of the property who remains personally liable for utility charges generated there, and LAFON, as its owner, likewise intend to report future offenses and request police assistance and supervisory review, directly or through their authorized managers, and remain subject to a real and immediate threat that the challenged practices will again interfere with those efforts and with their respective interests in the property.

495. PLAINTIFFS seek compensatory and nominal damages against the CITY. BLAZEVICH, CRUZ JOYA, and LAFON additionally seek appropriate prospective declaratory and injunctive relief. PLAINTIFFS seek reasonable attorneys' fees and costs as permitted by law and such other relief as set forth in the Prayer for Relief. PLAINTIFFS do not seek punitive damages against the CITY.

## SEVENTH CLAIM FOR RELIEF

**VIOLATION OF THE BANE ACT – INTERFERENCE BY THREAT, INTIMIDATION, OR COERCION**
**California Civil Code Section 52.1**

(By Plaintiff BLAZEVICH against Officer COATS and Sergeant CHRISTMAN, in their individual capacities, and against Defendant CITY OF SAN DIEGO under Government Code section 815.2.)

496. BLAZEVICH incorporates by reference the preceding allegations concerning the incident at 1920 Woden Street on April 26, 2025, Defendants' knowledge and conduct during that incident, and the resulting injuries alleged herein. Other preceding allegations are incorporated only to the extent relevant to Defendants' notice, knowledge, intent, the context of the challenged conduct, or the basis for prospective relief, and not as separate bases for damages under this Claim.

497. At the relevant time, BLAZEVICH possessed rights secured by the Constitution and laws of the United States and California, including the rights to be free from unreasonable seizure of his person and property; to report suspected crimes and petition governmental authorities without retaliation; to make and maintain a private arrest as authorized by Penal Code sections 834 and 837; to summon necessary aid in making an arrest under Penal Code section 839; and, after making a private arrest, to perform the custody-and-presentment process prescribed by Penal Code section 847(a), including by delivering the arrestee to a peace officer or taking the arrestee before a magistrate.

498. This Claim arises from COATS's and CHRISTMAN's affirmative use of official on-scene police authority, including threatened seizure and impoundment of BLAZEVICH's automobile, coercive commands, and compelled submission, to interfere with BLAZEVICH's exercise and enjoyment of the rights identified above.

499. On April 26, 2025, at 1920 Woden Street, BLAZEVICH reported that GALINDO and her accomplice had entered the property without authorization, informed responding officers that he had privately arrested them pursuant to Penal Code section 837, and requested that the officers accept custody and permit the statutory custody-and-presentment process to proceed.

500. BLAZEVICH had positioned the automobile he was using so that GALINDO and her accomplice could not drive away. COATS ordered BLAZEVICH to move the automobile and permit them to leave and threatened to cause the automobile to be towed and impounded if BLAZEVICH did not comply.

501. COATS did more than merely express an opinion or warning. Acting as an on-scene peace officer exercising official authority over the encounter, COATS directed the movement of BLAZEVICH's automobile, backed that command with threatened towing and impoundment, possessed the actual and apparent authority to cause the threatened seizure, and used that authority to compel BLAZEVICH's immediate compliance.

502. CHRISTMAN was present as the on-scene supervisor. He knew that BLAZEVICH had reported suspected criminal conduct and private arrests, knew that BLAZEVICH was maintaining custody and requesting completion of the statutory custody-and-presentment process, heard or was informed of COATS's command and threatened towing and impoundment, possessed authority to countermand that conduct, and instead affirmatively backed, adopted, and enforced COATS's course of conduct.

503. In submission to COATS's and CHRISTMAN's coercive exercise of police authority, BLAZEVICH moved the automobile, whereupon GALINDO and her accomplice departed. Defendants thereby meaningfully interfered with BLAZEVICH's possession and use of the automobile, terminated the physical restraint by which he was maintaining custody of the arrestees, prevented him from continuing the custody-and-presentment process, and prevented him from seeking governmental and magisterial action upon the reported offenses and arrests. The compelled termination of custody also left the arrestees at liberty and facilitated the resulting interference with possession, use, and control of 1920 Woden Street alleged above.

504. COATS and CHRISTMAN acted intentionally and with specific intent to interfere with BLAZEVICH's exercise and enjoyment of the identified constitutional and statutory rights. Before compelling his submission, BLAZEVICH expressly informed them of the private arrests, the material facts supporting those arrests, the custody he was

maintaining, and the custody-and-presentment process he was attempting to pursue. Notwithstanding that knowledge, COATS and CHRISTMAN deliberately used threatened property seizure and coercive police authority to compel BLAZEVICH to relinquish custody and cease that process.

505. By the foregoing threats, intimidation, and coercion, COATS and CHRISTMAN interfered with, or attempted to interfere with, BLAZEVICH's exercise and enjoyment of rights secured by the Constitution and laws of the United States and California, in violation of Civil Code section 52.1.

506. At all relevant times, COATS and CHRISTMAN were employees of the CITY and acted within the course and scope of their employment. The CITY is vicariously liable under Government Code section 815.2(a) for the injuries proximately caused by their violations of Civil Code section 52.1.

507. As a direct and proximate result of COATS's and CHRISTMAN's conduct during the foregoing incident, BLAZEVICH suffered interference with his constitutional and statutory rights; interference with and loss of possession, use, and control of real and personal property; termination of his custody-and-presentment efforts; chilling of protected petitioning activity; economic and consequential losses resulting from the incident and its foreseeable consequences; fear, anxiety, emotional distress; and other damages according to proof. Defendants' conduct was a substantial factor in causing those injuries.

508. BLAZEVICH seeks damages and other relief authorized by Civil Code section 52.1; punitive damages solely against COATS and CHRISTMAN pursuant to Civil Code section 3294 upon proof of malice, oppression, or fraud; reasonable attorneys' fees and costs as authorized by law; and, against the CITY, appropriate declaratory and injunctive relief to the extent the requirements for prospective equitable relief are established, together with such other relief as set forth in the Prayer for Relief.

**EIGHTH CLAIM FOR RELIEF**
**INTERFERENCE WITH INALIENABLE RIGHTS TO POSSESS AND PROTECT PROPERTY**
**California Constitution, Article I, Section 1**
(By Plaintiffs LAFON, BLAZEVICH, and CRUZ JOYA, each only as to his or her own rights and property interests, against Defendant CITY OF SAN DIEGO for declaratory and injunctive relief.)

509. Plaintiffs LAFON, BLAZEVICH, and CRUZ JOYA, incorporate by reference the preceding allegations concerning the challenged CITY policies and practices, their continuing interests in and responsibilities concerning 1920 Woden Street, and the CITY's past and recent applications of the challenged practices to those interests. Earlier incidents are incorporated to the extent relevant to the existence, operation, and repeated application of the challenged practices, the CITY's notice and knowledge, and the likelihood of future recurrence.

510. Article I, section 1 of the California Constitution recognizes the inalienable rights of all people to acquire, possess, and protect property. This Claim is based solely upon the CITY's alleged affirmative interference with PLAINTIFFS' exercise and enjoyment of their own legally cognizable property, possessory, and management interests. PLAINTIFFS do not predicate this Claim upon a governmental duty to provide police protection or other affirmative protective services.

511. As alleged above, CITY police personnel, acting pursuant to the policies, practices, and customs identified in the Sixth Claim for Relief, have affirmatively used official police authority—including detention or physical restraint, commands, threatened arrest, threatened towing or impoundment, and enforced exclusion—to prevent PLAINTIFFS from entering, controlling, securing, possessing, or protecting property in which they hold ownership, possessory, management, or personal-property interests.

512. The challenged conduct was not limited to neutral police presence or a refusal to provide assistance. CITY personnel affirmatively compelled PLAINTIFFS to surrender or refrain from exercising control they were otherwise legally entitled to exercise, prevented them from excluding persons alleged to lack lawful possessory rights,

and threatened adverse police action if they attempted to restore possession, maintain control, or protect the property through otherwise lawful means.

513. LAFON remains the owner of 1920 Woden Street. BLAZEVICH and CRUZ JOYA remain authorized to perform property-management functions there on LAFON's behalf, including entering the property, inspecting and maintaining it, controlling access, addressing unauthorized occupancy, and communicating with law enforcement concerning activity at the property. BLAZEVICH continues to perform those functions and to seek to secure the property. Persons previously identified to the CITY as lacking lawful possessory rights continue to occupy or enter the property. The challenged CITY policies and practices remain operative, and their repeated application, including the CITY's most recent conduct in July 2026, establishes a real and immediate threat that CITY personnel will again use official authority to interfere with PLAINTIFFS' exercise of their respective ownership, possessory, access, and management interests at 1920 Woden Street.

514. An actual controversy therefore exists concerning whether the CITY may, pursuant to the challenged policies and practices, affirmatively use official police commands, threats, detention, physical restraint, or threatened seizure or impoundment of property to prevent PLAINTIFFS from exercising legally cognizable rights to enter, possess, control, secure, or protect 1920 Woden Street without a warrant, writ, court order, exigent circumstance, or other independent lawful authority for such interference.

515. PLAINTIFFS seek a declaration that the CITY may not, through the challenged policies and practices, affirmatively employ police authority to compel them to surrender or refrain from exercising legally cognizable possession, access, management, or control of 1920 Woden Street absent a warrant, writ, court order, exigent circumstance, or other independent lawful authority authorizing the challenged interference.

516. PLAINTIFFS further seek prospective injunctive relief prohibiting the CITY from enforcing the challenged policies or practices by using, or directing SDPD personnel to use, threats of arrest, detention, physical restraint, commands backed by threatened enforcement action, or threatened towing or impoundment to compel PLAINTIFFS to

surrender or refrain from exercising legally cognizable possession, access, management, control, or protection of 1920 Woden Street, absent a warrant, writ, court order, exigent circumstance, or other independent lawful authority for such interference.

517. PLAINTIFFS do not seek through this Claim an order requiring the CITY or its personnel to arrest, prosecute, remove, or evict any third party, to provide any particular level of police protection, or to adjudicate competing private claims to possession. They seek only declaratory and prospective injunctive relief against the CITY's affirmative use of governmental authority to interfere with PLAINTIFFS' own legally cognizable property-related interests in the circumstances alleged herein.

## NINTH CLAIM FOR RELIEF
## FORCIBLE DETAINER
## California Code of Civil Procedure § 1160(a)(1)

(By Plaintiffs BLAZEVICH and CRUZ JOYA against Officer CARDENAS and Sergeant CHARLOT, in their individual capacities, and against Defendant CITY OF SAN DIEGO under Government Code section 815.2.)

518. BLAZEVICH and CRUZ JOYA incorporate by reference the preceding allegations concerning the August 12, 2024 DUTRA incident at 3859 Birch Street, CARDENAS's on-scene conduct, CHARLOT's subsequent supervisory conduct and threatened arrest, Plaintiffs' possessory interests in the premises, and the resulting injuries alleged herein. Other preceding allegations are incorporated only to the extent relevant to notice, context, causation, or damages and not as separate bases for liability under this Claim.

519. At all relevant times, BLAZEVICH and CRUZ JOYA were entitled to possession of 3859 Birch Street within the meaning of Code of Civil Procedure section 1172. The property was their residence and contained their household and personal property. BLAZEVICH possessed the keys, exercised actual control over the premises, and was present inside the residence when the incident alleged below occurred. In acting to exclude DUTRA and restore control of the residence, BLAZEVICH was acting to protect BLAZEVICH's and CRUZ JOYA's shared possession and property interests.

520. On August 12, 2024, BLAZEVICH discovered DUTRA inside the residence without permission and took physical custody of him. When CARDENAS and other officers arrived, CARDENAS assumed official control of the encounter, separated BLAZEVICH from DUTRA, prevented BLAZEVICH from continuing to maintain physical control over or remove DUTRA, and exercised police authority in a manner that compelled BLAZEVICH to submit while DUTRA remained in possession of the residence.

521. CARDENAS's conduct was not merely a refusal to investigate, make an arrest, accept or retain DUTRA in police custody, or provide police assistance. Through the affirmative exercise of official authority, including his control of the scene and the show of force inherent in enforcing his on-scene disposition, CARDENAS prevented BLAZEVICH from restoring possession and control without risking physical enforcement or arrest. No warrant, writ of possession, court order, or other judicial process authorized CARDENAS to exclude BLAZEVICH from exercising control over the premises or to maintain possession for DUTRA's benefit.

522. While DUTRA remained in possession and the resulting exclusion remained ongoing, BLAZEVICH requested supervisory intervention from CHARLOT. BLAZEVICH informed CHARLOT that DUTRA had entered without permission, that responding officers had displaced BLAZEVICH's physical custody and left DUTRA in possession, and that the continuing loss of possession and use of the residence threatened substantial economic loss, including foreclosure of the property.

523. When BLAZEVICH informed CHARLOT that he intended to retake physical custody of DUTRA and restore possession, CHARLOT expressly threatened to have BLAZEVICH arrested for battery and false imprisonment if he did so. CHARLOT possessed supervisory authority and the apparent and practical ability to cause subordinate officers to carry out that threat. In submission to CHARLOT's threat of official force, BLAZEVICH refrained from retaking DUTRA and restoring possession and control of the residence.

524. Through the foregoing affirmative exercise of police authority and threatened arrest, CARDENAS and CHARLOT exercised exclusionary control over 3859 Birch Street and caused possession of the premises to remain withheld from BLAZEVICH and CRUZ JOYA for DUTRA's benefit. By using official force or menace to prevent restoration of Plaintiffs' possession without judicial authorization, CARDENAS and CHARLOT unlawfully held and kept possession within the meaning of Code of Civil Procedure section 1160(a)(1).

525. This Claim is not predicated upon Defendants' failure to arrest DUTRA, accept or retain DUTRA in police custody, investigate reported offenses, or furnish police protection. It is based solely upon CARDENAS's and CHARLOT's affirmative use of official authority, exclusionary control, and threatened arrest to compel BLAZEVICH's submission and prevent BLAZEVICH and CRUZ JOYA from exercising and restoring possession to which they were entitled, without judicial or other lawful process authorizing their exclusion.

526. CARDENAS's and CHARLOT's affirmative conduct was a substantial factor in causing 3859 Birch Street to remain withheld from BLAZEVICH and CRUZ JOYA and in preventing them from entering, controlling, securing, using, and restoring possession of the residence.

527. At all relevant times, CARDENAS and CHARLOT were employees of the CITY and acted within the course and scope of their employment. To the extent their conduct gives rise to liability under Code of Civil Procedure section 1160(a)(1), the CITY is vicariously liable under Government Code section 815.2(a) for the injuries proximately caused by that conduct.

528. As a direct and proximate result of the affirmative forcible-detainer conduct alleged herein, BLAZEVICH and CRUZ JOYA suffered loss of possession, use, access, and enjoyment of 3859 Birch Street; loss of reasonable rental or occupancy value; loss of and damage to personal property and consequential economic losses to the extent proximately caused by the forcible detainer; emotional distress personally sustained and

recoverable under applicable law; and other damages according to proof. BLAZEVICH and CRUZ JOYA do not seek under this Claim damages for injuries caused solely by any failure to arrest DUTRA, retain him in police custody, investigate reported offenses, or provide police protection.

529. BLAZEVICH and CRUZ JOYA seek actual damages occasioned by the forcible detainer as authorized by Code of Civil Procedure section 1174(b); statutory damages of up to $600 under section 1174(b), to the extent available in this action and upon proof of malice; punitive damages solely against CARDENAS and CHARLOT pursuant to Civil Code section 3294 upon proof of malice, oppression, or fraud; costs and prejudgment interest to the extent permitted by law; and such other relief as set forth in the Prayer for Relief.

**<u>TENTH CLAIM FOR RELIEF</u>**
**CONVERSION**
**California Common Law**
(By Plaintiffs BLAZEVICH and CRUZ JOYA, each only as to personal property that he or she owned or had the immediate right to possess, against Officer CARDENAS and Sergeant CHARLOT, in their individual capacities, and against Defendant CITY OF SAN DIEGO under Government Code section 815.2)

530. BLAZEVICH and CRUZ JOYA incorporate by reference the preceding allegations concerning the August 12, 2024 DUTRA incident at 3859 Birch Street, CARDENAS's on-scene conduct, CHARLOT's subsequent supervisory conduct and threatened arrest, Plaintiffs' interests in the personal property located at the premises, and the resulting injuries alleged herein. Other preceding allegations are incorporated only to the extent relevant to notice, context, causation, or damages and not as separate bases for liability under this Claim.

531. At all relevant times, BLAZEVICH and CRUZ JOYA owned or held the immediate right to possess specifically identifiable personal property located inside the residence and attached garage at 3859 Birch Street, including household goods, furniture, family photographs, heirlooms, tools, computer hard drives, records, and other personal

belongings identified in the Statement of Facts. Each Plaintiff asserts this Claim only as to property that he or she owned or had the immediate right to possess.

532. On August 12, 2024, BLAZEVICH discovered DUTRA inside the residence without permission and took physical custody of him. When CARDENAS and other officers arrived, BLAZEVICH informed them of his and CRUZ JOYA's possessory interests in the premises and personal property, demonstrated that he possessed the keys, informed them that substantial personal property remained inside the residence and attached garage, and sought to restore control of the premises and property.

533. CARDENAS assumed official control of the encounter, separated BLAZEVICH from DUTRA, prevented BLAZEVICH from continuing to maintain physical control over or remove DUTRA, and exercised police authority in a manner that prevented BLAZEVICH from restoring control of the premises and obtaining access to and possession of the personal property located there. CARDENAS thereafter departed while DUTRA remained in practical control of the residence and Plaintiffs remained deprived of possession and control of their personal property.

534. CARDENAS's conduct was not merely a refusal to investigate, arrest DUTRA, accept or retain DUTRA in police custody, or provide police assistance. Through his affirmative exercise of official authority and control over the encounter, CARDENAS prevented BLAZEVICH from exercising his and CRUZ JOYA's immediate right to access, possess, remove, and control their personal property. That affirmative interference caused the property to remain beyond Plaintiffs' practical possession and control without their consent.

535. Thereafter, while DUTRA remained in possession of the residence and Plaintiffs' deprivation of access to and control over their personal property remained ongoing, BLAZEVICH requested supervisory intervention from CHARLOT. BLAZEVICH informed CHARLOT of CARDENAS's disposition, DUTRA's continuing possession, the personal property remaining at the premises, and the continuing interference with Plaintiffs' possession and control.

536. BLAZEVICH informed CHARLOT that he intended to retake physical custody of DUTRA and restore control of the premises. CHARLOT expressly threatened to have BLAZEVICH arrested for battery and false imprisonment if he retook custody of DUTRA. CHARLOT possessed supervisory authority and the apparent and practical ability to cause subordinate officers to carry out that threat. In submission to that threat of official force, BLAZEVICH refrained from retaking DUTRA and restoring control of the premises, and Plaintiffs' exclusion from possession and control of their personal property continued.

537. Through their foregoing affirmative acts, CARDENAS and CHARLOT wrongfully interfered with BLAZEVICH's and CRUZ JOYA's dominion over their personal property and prevented them from exercising their immediate rights of possession, access, removal, use, and control. Their conduct constituted a wrongful exercise of dominion over the personal property inconsistent with Plaintiffs' ownership and immediate right to possession and thereby constituted conversion.

538. The conversion substantially deprived BLAZEVICH and CRUZ JOYA of the possession, use, and benefit of their personal property. After Defendants had prevented Plaintiffs from exercising possession and control, substantial portions of the property were removed, disposed of, destroyed, or otherwise lost and have not been recovered.

539. This Claim is not predicated upon Defendants' failure to arrest DUTRA, accept or retain DUTRA in police custody, investigate reported offenses, prevent subsequent criminal acts by third persons, or provide police protection. It is based upon CARDENAS's and CHARLOT's own affirmative exercise of official authority to interfere with and prevent Plaintiffs' possession, access, removal, use, and control of their personal property.

540. At all relevant times, CARDENAS and CHARLOT were employees of the CITY and acted within the course and scope of their employment. The CITY is therefore vicariously liable under Government Code section 815.2(a) for injuries proximately caused by their conversion of Plaintiffs' personal property.

541. As a direct and proximate result of the conversion alleged herein, BLAZEVICH and CRUZ JOYA suffered loss of possession, use, and value of their personal property; loss of property that was thereafter removed, destroyed, disposed of, or otherwise not recovered, to the extent such loss was the natural, reasonable, and proximate result of the conversion; expenses reasonably incurred in locating, recovering, reproducing, or replacing the property; and other damages according to proof.

542. BLAZEVICH and CRUZ JOYA seek the value of the converted property at the time of conversion with interest, or damages sufficient to indemnify them for the natural, reasonable, and proximate losses caused by the conversion, together with fair compensation for the time and money properly expended in pursuit of the property, as authorized by Civil Code section 3336; punitive damages solely against CARDENAS and CHARLOT pursuant to Civil Code section 3294 upon proof of malice, oppression, or fraud; costs of suit; and such other relief as set forth in the Prayer for Relief.

## ELEVENTH CLAIM FOR RELIEF
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
**California Common Law Claim**

(By Plaintiff LAFON against Officer COATS and Sergeant CHRISTMAN, in their individual capacities, and against Defendant CITY OF SAN DIEGO under Government Code section 815.2)

543. LAFON incorporates by reference the preceding allegations concerning his ownership and authorized marketing of 1920 Woden Street, the prospective sale relationships existing at the time of the April 26, 2025 incident, COATS's and CHRISTMAN's knowledge and conduct during that incident, and the resulting economic injuries alleged herein. Other preceding allegations are incorporated only to the extent relevant to notice, context, independent wrongfulness, causation, or damages and not as separate bases for liability under this Claim.

544. At all relevant times, LAFON owned 1920 Woden Street and maintained specific existing economic relationships with identified prospective purchasers that carried a reasonable probability of producing an economic benefit to him. Those relationships

included pending purchase offers or concrete negotiations in which prospective purchasers, directly or through real-estate professionals, had requested a walk-through or inspection of the property before completing or finalizing the proposed purchase.

545. On April 26, 2025, real-estate professional Jexsi Grey and another person arrived at 1920 Woden Street for a previously scheduled showing or inspection in furtherance of the proposed sale. BLAZEVICH, acting as LAFON's authorized agent, informed COATS and CHRISTMAN that the property was being marketed for sale and that Grey and the other person were present in connection with that process. COATS and CHRISTMAN thereby knew of the existing prospective sale relationships and the probable economic benefit they presented to LAFON.

546. Notwithstanding that knowledge, COATS stated, in substance, that the woman now identified as GALINDO had established residency, ordered BLAZEVICH to move the automobile preventing GALINDO and her accomplice from departing following their private arrests, and threatened to cause the automobile to be towed and impounded if BLAZEVICH did not comply. CHRISTMAN, acting as the on-scene supervisor with knowledge of the material circumstances, affirmatively approved, adopted, and enforced COATS's command and threat.

547. The independently wrongful conduct supporting this Claim is not Defendants' refusal to investigate, arrest GALINDO or her accomplice, accept or retain either person in police custody, or provide police protection. It is COATS's and CHRISTMAN's affirmative, threat-backed exercise of official police authority to compel BLAZEVICH, while acting as LAFON's agent, to remove the physical restraint maintaining control of the encounter and to relinquish his effort to secure and restore control of LAFON's property, constituting the independently unlawful seizure, coercion, and interference alleged in the preceding Claims for Relief.

548. COATS and CHRISTMAN intentionally engaged in the foregoing conduct after being informed that the scheduled showing or inspection was then occurring in furtherance of a pending sale process. Under those circumstances, they knew that

disruption of LAFON's existing prospective economic relationships was certain or substantially certain to result from their conduct.

549. Although the unauthorized entry had interrupted the scheduled showing, LAFON, through BLAZEVICH, was attempting to restore control and secure the property so that the showing and sale process could proceed. COATS's and CHRISTMAN's affirmative conduct prevented that immediate restoration of control, compelled the release of the persons then being restrained, and facilitated their departure and subsequent continued interference with the property. Their conduct caused the scheduled showing or inspection to be abandoned or prevented it from being completed, caused one or more prospective purchasers to suspend, withdraw, or decline to finalize pending offers or negotiations, and materially delayed further marketing and sale of the property.

550. As a direct and proximate result, LAFON suffered economic harm, including loss of the economic benefit of one or more probable sales to the extent established with reasonable certainty; diminution in the obtainable sale price to the extent caused by Defendants' interference; additional carrying, marketing, security, maintenance, and property-related expenses attributable to the resulting delay; and other economic losses according to proof. COATS's and CHRISTMAN's conduct was a substantial factor in causing those losses.

551. At all relevant times, COATS and CHRISTMAN were employees of the CITY and acted within the course and scope of their employment. To the extent their conduct gives rise to liability for intentional interference with prospective economic relations, the CITY is vicariously liable under Government Code section 815.2(a) for the injuries proximately caused by that conduct.

552. LAFON seeks compensatory damages according to proof; punitive damages solely against COATS and CHRISTMAN pursuant to Civil Code section 3294 upon proof of malice, oppression, or fraud; prejudgment interest and costs to the extent permitted by law; and such other relief as set forth in the Prayer for Relief.

## TWELFTH CLAIM FOR RELIEF
## AFFIRMATIVE MISFEASANCE; ALTERNATIVELY, SPECIAL RELATIONSHIP AND NEGLIGENT UNDERTAKING
### California Common Law; Civil Code Section 1714 Government Code Sections 820(a) and 815.2(a)

(By Plaintiffs BLAZEVICH, CRUZ JOYA, BUDENZ, and LAFON, each only as to injuries to his or her own legally protected interests and only as to the Defendants whose conduct caused those injuries, against Officer CARDENAS, Sergeant CHARLOT, Officer COATS, Sergeant CHRISTMAN, and Detective ARVELO, each in his or her individual capacity, and against Defendant CITY OF SAN DIEGO under Government Code section 815.2(a))

553. Plaintiffs BLAZEVICH, CRUZ JOYA, BUDENZ, and LAFON incorporate by reference the preceding allegations concerning their respective personal, possessory, property, and economic interests; the affirmative conduct of the Defendants identified below; and the resulting injuries, to the extent relevant to this Claim for Relief. Each Plaintiff asserts this Claim only as to injuries personally sustained or to legally protected interests held by that Plaintiff. This Claim is pleaded in the alternative to Plaintiffs' intentional-tort claims.

**A. Affirmative Malfeasance**

554. On August 12, 2024, after BLAZEVICH privately arrested DUTRA and was maintaining physical custody and control over him at 3859 Birch Street, CARDENAS affirmatively assumed control of the encounter, separated BLAZEVICH from DUTRA, and prevented BLAZEVICH from continuing the custody and control by which he was attempting to secure the residence and the personal property located there. CARDENAS thereby affirmatively altered the existing circumstances and caused BLAZEVICH to submit to a disposition under which DUTRA remained in possession.

555. Thereafter, while the resulting deprivation of possession and control remained ongoing, BLAZEVICH informed CHARLOT of CARDENAS's conduct, DUTRA's continuing possession, the property remaining at the premises, and the resulting risk of loss. When BLAZEVICH stated that he intended to retake custody of DUTRA and restore control, CHARLOT affirmatively threatened to have BLAZEVICH arrested for battery and false imprisonment if he did so. BLAZEVICH submitted to that threat and refrained from retaking custody and restoring control.

556. Following the SWAT operation at 3859 Birch Street, ARVELO was informed that BLAZEVICH had previously arrested DUTRA and WALDON and intended to retake custody and continue the statutory custody-and-presentment process. ARVELO characterized his intended conduct, in substance, as causing a disturbance and affirmatively threatened to arrest him if he retook custody or effected another private arrest. BLAZEVICH submitted to that threat and refrained from retaking custody and restoring possession and control.

557. On April 26, 2025, at 1920 Woden Street, after BLAZEVICH privately arrested GALINDO and her accomplice and was maintaining a physical restraint preventing their departure, COATS ordered BLAZEVICH to remove that restraint and threatened to cause the automobile he was using to be towed and impounded if he refused. CHRISTMAN, acting as the on-scene supervisor with knowledge of the material circumstances, affirmatively backed, adopted, and enforced COATS's command and threat. BLAZEVICH submitted, moved the automobile, and the persons he had arrested departed.

558. Through the foregoing affirmative acts, commands, threats, and exercises of official authority, the individual Defendants altered existing conditions, displaced or restricted BLAZEVICH's existing custody, control, access, and protective measures, and caused him to submit to their authority. Having affirmatively exercised their authority in a manner that altered Plaintiffs' existing position, each Defendant owed the Plaintiffs foreseeably affected by that Defendant's conduct a duty to exercise reasonable care so as not to expose them or their property to an unreasonable risk of harm.

**B. Special Relationship and Negligent Undertaking—Alternative Theories**

559. To the extent a special relationship is required, Plaintiffs allege in the alternative that the individual Defendants exercised direct and individualized authority over BLAZEVICH's conduct during the identified encounters, communicated commands or threats specifically directed to him, possessed the immediate ability to enforce those directives through arrest, detention, towing, impoundment, or other official action, and caused BLAZEVICH reasonably and detrimentally to rely upon and submit to that asserted

authority. Under those circumstances, the Defendants owed the Plaintiffs foreseeably affected by their conduct a duty to exercise reasonable care in the control they affirmatively assumed.

560. Plaintiffs further allege in the alternative that, by affirmatively assuming operational control over the identified encounters and undertaking to determine and direct whether BLAZEVICH could maintain existing custody, restraints, access, and control, the individual Defendants undertook those specific functions and were required to exercise reasonable care in performing them.

561. The individual Defendants failed to exercise reasonable care in performing those undertakings by dismantling or preventing existing custody, access, restraints, and property-control measures without reasonable precautions against the foreseeable consequences of doing so. Their conduct increased the risk of harm to persons and property and caused BLAZEVICH reasonably and detrimentally to alter his conduct in reliance upon their exercise of official authority.

**D. Breach, Causation, and Damages**

562. The individual Defendants breached the foregoing duties by affirmatively exercising official authority without reasonable care, including by displacing existing custody and property control, compelling removal of physical restraints, restricting access to affected property, and threatening BLAZEVICH with arrest or property seizure if he attempted to maintain or restore control.

563. Before or during the incidents involving 3859 Birch Street, CARDENAS, CHARLOT, and ARVELO knew or reasonably should have known that their affirmative conduct would interfere with Plaintiffs' possession and control of the residence and property located there and would expose those interests to foreseeable risks associated with continued unauthorized occupation, including loss of use, theft, vandalism, and physical damage.

564. CARDENAS and CHARLOT were also informed that loss of possession and use of 3859 Birch Street impaired Plaintiffs' ability to generate rental income needed in connection with the existing foreclosure and bankruptcy circumstances. They therefore knew

or reasonably should have known that prolonging the loss of possession and control could cause consequential economic harm.

565. During the April 26, 2025 incident at 1920 Woden Street, COATS and CHRISTMAN knew that the property was being secured and marketed for sale and that real-estate professional Jexsi Grey was present for a scheduled sales walk-through or inspection. They therefore knew or reasonably should have known that compelling BLAZEVICH to relinquish the existing restraint and control could interfere with the pending showing, continued marketing, and restoration of control of the property.

566. The subsequent unauthorized occupation, theft, vandalism, physical damage, and interference with use or marketing alleged herein were foreseeable manifestations of the risks against which the existing custody, restraints, access, and property-control measures were directed. Plaintiffs seek recovery only for injuries that were legally and proximately caused by the affirmative negligent conduct of the particular Defendant against whom recovery is sought.

567. This Claim is not predicated upon any Defendant's failure to investigate reported offenses, make an arrest, accept or retain an arrested person in police custody, furnish police protection, prevent criminal conduct by third persons, or provide any particular level of law-enforcement service. It is based upon the individual Defendants' own affirmative use of official authority to alter existing custody, restraints, access, or property control and thereby independently create or increase the risk of the injuries for which recovery is sought.

568. As a direct and proximate result of the foregoing conduct, the affected Plaintiffs suffered, according to their respective legally protected interests and to the extent proximately caused and recoverable under applicable law, loss of possession, access, use, and enjoyment of real and personal property; loss of or physical damage to property; reasonable repair, replacement, security, mitigation, and relocation expenses; lost rental income or other loss-of-use damages; sale-related and carrying expenses; foreclosure-related economic losses; and other consequential damages according to proof. BLAZEVICH

additionally suffered fear, anxiety, emotional distress, and other personal injury to the extent proximately caused and recoverable under applicable law.

569. Plaintiffs incorporate the Government Claims Act compliance allegations set forth above. This Claim seeks damages only for occurrences and injuries for which the applicable claim-presentation requirements have matured and been satisfied as alleged therein.

570. At all relevant times, CARDENAS, CHARLOT, COATS, CHRISTMAN, and ARVELO were employees of the CITY and acted within the course and scope of their employment. To the extent any such employee is liable for the negligence alleged herein, the CITY is vicariously liable for the resulting injuries pursuant to Government Code section 815.2(a).

571. Plaintiffs seek compensatory damages according to proof, allowable costs, prejudgment and postjudgment interest to the extent permitted by law, and such other relief as set forth in the Prayer for Relief.

## THIRTEENTH CLAIM FOR RELIEF
## BREACH OF MANDATORY DUTY
### California Government Code Section 815.6

(By Plaintiffs BLAZEVICH, CRUZ JOYA, and BUDENZ, each only as to his or her own injuries and legally protected interests and only as to the occurrences applicable to that Plaintiff, against Defendant CITY.)

572. Plaintiffs BLAZEVICH, CRUZ JOYA, and BUDENZ incorporate by reference the factual allegations in Sections IV through VIII above to the extent relevant to this Claim for Relief. This Claim seeks damages only for occurrences and injuries for which the applicable Government Claims Act requirements have been satisfied as alleged above.

573. Penal Code section 834 provides that an arrest is the taking of a person into custody, and section 837 authorizes a private person to make an arrest under the circumstances specified therein. Accordingly, when BLAZEVICH effected the private arrests alleged herein, the persons arrested were thereby in his custody.

574. Plaintiffs under this Claim allege three alternative bases for the mandatory duties asserted in this Claim, each as to the occurrences alleged below to which its factual

predicates apply: (i) upon BLAZEVICH's tender or delivery under Penal Code section 847(a) of a person he had already arrested, the correlative duty of the peace officer to accept custody of that person; (ii) upon BLAZEVICH's delegation, pursuant to Penal Code section 839, of the physical act of taking an offender into custody to a summoned peace officer—a delegation that California decisional law recognizes he has a right to make—the correlative duty of the summoned peace officer to accept the delegation and perform the delegated taking; and (iii) upon CITY personnel's acceptance or assumption of custody, displacement of BLAZEVICH's existing custody, or exercise of control over the custody, and the disposition of a completed private arrest, the duty under Penal Code section 849 to make a lawful post-arrest disposition.

**A. Penal Code Section 847(a)—Tender or Delivery**

575. Penal Code section 847(a) requires a private person who has arrested another for a public offense, without unnecessary delay, either to take the person arrested before a magistrate or to deliver that person to a peace officer. Plaintiffs under this Claim allege that the statutory delivery alternative carries a correlative obligation upon a peace officer, when the private arrestor tenders a person already arrested and requests transfer of custody, to accept that custody. The officer in those circumstances receives custody pursuant to an arrest already effected by the private person rather than independently initiating a new arrest.

576. Plaintiffs further allege that the 2002 legislation adding subdivision (c) to Penal Code section 142 removed section 142's special criminal punishment from arrests made pursuant to section 837 but did not repeal section 847(a)'s delivery mechanism or eliminate the correlative acceptance obligation alleged herein. Government Code section 1222 and Penal Code section 19 are alleged as further support for that statutory construction, and not as independent causes of action.

**B. Penal Code Sections 839 and 847(a)—Delegated Physical Taking**

577. Penal Code section 839 authorizes a person making an arrest to summon others to aid in the arrest, and California law recognizes the private arrestor's right to delegate the physical act of taking the identified offender into custody to the persons summoned,

including a summoned peace officer. Read together with Penal Code section 847(a), the private arrestor's statutory delivery obligation may be accomplished through such delegation rather than by requiring the private arrestor personally to accomplish every physical act of restraint and delivery. The delegation may be express or may be manifested by summoning peace officers, reporting the offense, identifying the person to be arrested, communicating that an arrest is being effected, and requesting that the officers take that person into custody.

578. Plaintiffs allege that the statutory right to delegate the physical taking or delivery to a summoned peace officer carries a correlative obligation upon that officer to accept and perform the delegated function when the prerequisites for a lawful private arrest and delegation have been satisfied.

**C. Penal Code Section 849—Disposition After Acceptance, Assumption, Displacement, or Taking Official Control of Custody**

579. Penal Code section 849(a) provides that when an arrest is made without a warrant by a peace officer or private person, the person arrested, if not otherwise released, shall, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the offense is triable, and a complaint stating the charge shall be laid before the magistrate. Section 849(b) identifies circumstances in which a peace officer may release a warrantless arrestee instead of proceeding to presentment. Penal Code sections 849(c), 849.5, and 851.6 prescribe additional duties if a person is released pursuant to Penal Code section 849(b) and are alleged only as part of the statutory post-arrest framework.

580. Plaintiffs allege that CITY personnel assumed responsibility for the disposition of an existing private arrest when they accepted custody pursuant to a tender or delegated taking, or when, through force, commands, threats, or other show of official authority, they displaced BLAZEVICH's existing custody, prevented him from maintaining his custody of the person arrested, and themselves exercised controlling authority over whether that person would remain in custody or be released.

581. Once CITY personnel accepted custody, performed a delegated taking, or assumed, displaced, or took control over existing custody as alleged herein, Plaintiffs under

this Claim allege that Penal Code section 849 governed the disposition of the continuing warrantless arrest. CITY personnel could effect a lawful release authorized by section 849(b) or other applicable law; if the person arrested was not otherwise lawfully released, section 849(a) required presentment without unnecessary delay. Plaintiffs allege that CITY personnel were not authorized instead to displace BLAZEVICH's custody, prevent him from completing his own statutory presentment obligation, cause the person arrested to be freed, and effect no lawful post-arrest disposition.

582. Plaintiffs BLAZEVICH, CRUZ JOYA, and BUDENZ allege that the foregoing custody-transfer and disposition requirements were designed to provide an orderly means of concluding private arrests and, among other purposes, to reduce the risks associated with prolonged or obstructed private restraint and transfer such custody into lawful governmental process. Plaintiffs seek recovery under this Claim only for injuries determined to be within the class of harms the applicable enactments were designed to prevent and proximately caused by the particular breach alleged.

D. Occurrences

583. On August 12, 2024, at 3859 Birch Street, BLAZEVICH had privately arrested DUTRA and was maintaining actual physical custody over him when CARDENAS responded. BLAZEVICH informed CARDENAS of the completed arrest and requested that CARDENAS take DUTRA into peace-officer custody. CARDENAS instead assumed official control of the encounter, separated BLAZEVICH from DUTRA, prevented BLAZEVICH from continuing the restraint by which DUTRA remained in his custody, and caused DUTRA to be freed without a lawful post-arrest disposition as alleged above. This occurrence is alleged under the First and Third Bases and, alternatively, under the Second Basis to the extent BLAZEVICH's request constituted a delegation of the physical taking.

584. On the WALDON occasion alleged above, BLAZEVICH advised responding Officers MORENO and RAYNOR that he was effecting a private arrest of WALDON pursuant to Penal Code section 837, identified WALDON and the grounds for the arrest, and requested that the officers take WALDON into custody. The officers refused the delegated

taking and thereby prevented completion of the private-arrest process. This occurrence is alleged under the Second Basis.

585. On April 26, 2025, at 1920 Woden Street, BLAZEVICH had privately arrested GALINDO and her accomplice and was maintaining actual physical restraint preventing their departure when COATS and CHRISTMAN responded. BLAZEVICH informed them of the completed arrests and requested that CITY personnel take the arrestees into custody. COATS, with CHRISTMAN's approval and enforcement, instead ordered BLAZEVICH to remove the physical restraint and threatened to tow and impound the automobile he was using if he refused. BLAZEVICH submitted to their official authority, the restraint maintaining his custody was removed, and the arrestees departed without a lawful post-arrest disposition as alleged above. This occurrence is alleged under the First and Third Bases and, alternatively, under the Second Basis to the extent BLAZEVICH's request constituted a delegation of the physical taking. BLAZEVICH seeks under this Claim only injuries to his own legally protected interests arising from this occurrence.

**E. Breach, Causation, and Damages**

586. The CITY, acting through the employees charged with performing the statutory functions alleged herein, failed to discharge the asserted mandatory duties under each applicable Basis and did not exercise reasonable diligence to discharge those duties. The foregoing failures were substantial factors in causing the affected Plaintiffs injuries alleged above, but only to the extent each injury was of the kind the enactment or enactments underlying the applicable Basis were designed to prevent and was proximately caused by the particular breach alleged, all according to proof.

587. Each Plaintiff seeks damages only for his or her own injuries and only as to occurrences applicable to that Plaintiff, to the extent authorized by Government Code section 815.6 and otherwise recoverable under applicable law, together with allowable costs, prejudgment and postjudgment interest where permitted, and such other relief as set forth in the Prayer for Relief.

**FOURTEENTH CLAIM FOR RELIEF**

**PRIVATE NUISANCE**
**California Civil Code Sections 3479 and 3481**
(By Plaintiffs BLAZEVICH, CRUZ JOYA, and BUDENZ, each to the extent affected, for damages against Officer CARDENAS, Sergeant CHARLOT, Officer COATS, Sergeant CHRISTMAN, Detective ARVELO, and Defendant CITY OF SAN DIEGO; and by the affected PLAINTIFFS for prospective equitable relief as alleged below.)

588. Plaintiffs under this Claim incorporate incorporate by reference the factual allegations in Sections IV through VIII above to the extent relevant to this Claim for Relief. Allegations contained in other Claims for Relief are not incorporated except where expressly stated.

589. This Claim is based upon Defendants' affirmative creation of, assistance in, and maintenance of the nuisance conditions.

590. At the relevant times, the affected PLAINTIFFS owned, occupied, possessed, or lawfully controlled the Triplex and/or 1920 Woden Street, including through BLAZEVICH's authority to manage, enter, secure, and restore possession of those properties.

591. The continued unauthorized occupation of the properties, exclusion of PLAINTIFFS and their agents, repeated theft and vandalism, unsafe residential use of nonhabitable areas, sewage discharge, and associated threats and criminal activity substantially and unreasonably obstructed PLAINTIFFS' free use and comfortable enjoyment of their properties and constituted private nuisances under Civil Code sections 3479 and 3481.

592. The individual Defendants did not merely fail to investigate crimes, make arrests, or provide police protection. Through the affirmative acts alleged above, CARDENAS and CHARLOT displaced BLAZEVICH's custody and control at 3859 Birch Street and threatened him with arrest if he restored it; ARVELO threatened to arrest him if he retook custody of DUTRA or arrested other unauthorized occupants; COATS and CHRISTMAN compelled him to remove the restraint preventing GALINDO and her accomplice from departing 1920 Woden Street; and, in July 2026, BENNETT used official authority to prevent him from approaching and regaining access to that property. The July 2026 conduct is alleged as evidence of the continuing nuisance conditions and challenged

course of conduct and in support of prospective relief, and not as an independent basis for recovery of money or damages under this Claim.

593. As to the occurrences fairly reflected in Plaintiffs' matured claims presented to the CITY, Defendants' affirmative conduct was a substantial factor in causing or prolonging the loss of possession, access, use, control, and enjoyment suffered by BLAZEVICH, CRUZ JOYA, and BUDENZ, each only to the extent personally injured, and resulting physical property damage, theft, lost rental or occupancy value, repair, security, mitigation, relocation, carrying, sale-related, and foreclosure-related losses, together with annoyance, inconvenience, discomfort, and emotional distress where recoverable, all according to proof.

594. BLAZEVICH, CRUZ JOYA, and BUDENZ seek compensatory damages according to proof, each only for injuries personally sustained and fairly encompassed by an applicable matured CITY claim. The affected PLAINTIFFS additionally seek preliminary and permanent injunctive relief limited to abatement and prevention of continuing nuisance conditions at 1920 Woden Street, allowable costs and interest as permitted by law, and such other relief as set forth in the Prayer for Relief.

## FIFTEENTH CLAIM FOR RELIEF

### PUBLIC NUISANCE

### California Civil Code Sections 3479, 3480, 3493

(By Plaintiffs BLAZEVICH, CRUZ JOYA, and BUDENZ, each to the extent affected, for damages against Officer COATS, Sergeant CHRISTMAN, and Defendant CITY OF SAN DIEGO; and by the affected PLAINTIFFS for prospective equitable relief as alleged below.)

595. Plaintiffs asserting this Claim for Relief incorporate by reference the factual allegations in Sections IV through VIII above to the extent relevant to this Claim for Relief. Allegations contained in other Claims for Relief are not incorporated except where expressly stated. by reference the preceding allegations to the extent relevant to this Claim for Relief.

596. During the relevant period, the unauthorized occupants of the 1920 Woden House used the property as a residence, refuge, and, on information and belief, base from which to coordinate or stage recurring burglaries, unauthorized entries, threats, vandalism, and other dangerous activity at the house and the immediately adjacent Triplex.

597. The resulting neighborhood conditions included GALINDO's threatened use of a trained pit bull against BLAZEVICH; the alleged attempted-murder and armed-threat incident in which JOHN ROE-6 entered the adjacent Triplex with a concealed knife and announced that he was waiting to stab an expected visitor before retreating into the 1920 Woden House; the pursuit by multiple police units of a person called "Oscar" into the house; and the use of the house, on information and belief, to observe, coordinate, or stage the first-degree burglary of the Upstairs Apartment at 1918 Woden Street.

598. Those recurring conditions exposed surrounding owners, residents, workers, visitors, and neighbors to violent confrontations, dangerous animals, burglaries, property damage, police pursuits, and threats of serious bodily injury. Neighbors observed and reported the activity and expressed fear concerning the persons and dangerous conditions associated with the property. The condition therefore affected the surrounding neighborhood and a considerable number of persons and constituted a public nuisance under Civil Code sections 3479 and 3480.

599. The individual Defendants did not merely fail to investigate crimes or provide police protection. On April 26, 2025, after BLAZEVICH attempted to restrain and obtain custody of persons contributing to the condition, COATS and CHRISTMAN used official authority to compel him to remove an existing physical restraint and permit GALINDO and her accomplice to depart. In July 2026, ARVELO refused BLAZEVICH's express delegation of the physical taking of identified occupants, and BENNETT used official authority to prevent BLAZEVICH from approaching the property and completing the private-arrest process after the police perimeter had been removed. The July 2026 conduct is alleged as evidence of the continuing nuisance conditions and challenged course of conduct and in support of prospective relief, and not as an independent basis for recovery of money or damages under this Claim.

600. Defendants had actual notice of the recurring occupation, burglaries, violence, threats, and neighborhood danger alleged above. As to the occurrences fairly reflected in Plaintiffs' matured CITY claims, Defendants affirmatively prevented BLAZEVICH from

continuing measures already undertaken to restrain responsible persons, secure the property, and abate the condition, and their conduct was a substantial factor in maintaining or prolonging the nuisance. The later conduct alleged above further demonstrates the continuing nature of the condition and is alleged in support of prospective relief to the extent otherwise available.

601. The public generally suffered fear, danger, disorder, and exposure to recurring criminal and police activity. As to occurrences fairly reflected in matured CITY claims, BLAZEVICH, CRUZ JOYA, and BUDENZ, each only to the extent personally injured, suffered distinct injury to person or property, including threats of physical injury, loss of possession or control, interference with access or management, theft and physical property damage, loss of use and rental or sale value, mitigation and security expenses, and damage to or loss of interests in the immediately adjacent Triplex, according to proof.

**SIXTEENTH CLAIM FOR RELIEF**
**TAXPAYER ACTION TO RESTRAIN ILLEGAL EXPENDITURE/WASTE**
**California Code of Civil Procedure § 526a**
(By Plaintiff LAFON against the CITY and COUNTY; by Plaintiffs BLAZEVICH and CRUZ JOYA against the CITY; and against the CHIEF and DISTRICT ATTORNEY in their official capacities only as specified below)

602. Plaintiffs LAFON, BLAZEVICH, and CRUZ JOYA (collectively, the "Taxpayer Plaintiffs") incorporate by reference the factual allegations in Sections IV through VIII above to the extent relevant to this Claim for Relief. Allegations contained in other Claims for Relief are not incorporated except where expressly stated.by reference the preceding allegations to the extent relevant to this Claim for Relief.

603. LAFON owns 1920 Woden Street within the jurisdiction of the CITY and COUNTY and, within one year before commencement of this action, was assessed and liable to pay property taxes that fund those local agencies. BLAZEVICH and CRUZ JOYA resided within the CITY and, within one year before commencement of this action, each paid sales and use taxes on taxable retail purchases within the CITY that fund the CITY. Each Taxpayer Plaintiff therefore satisfies the requirements of Code of Civil Procedure section

526a as to the local-agency Defendant or Defendants against whom that Plaintiff asserts this Claim.

604. The CITY expends tax-supported funds and resources to implement and enforce the challenged policies and practices, including paid officer and supervisory time, dispatch and communications resources, police vehicles and operating resources, and CAD, reporting, and recordkeeping resources. Application of the challenged policies has also occasioned additional supervisory call-outs and return officer responses to review, approve, maintain, or enforce challenged dispositions or address conditions allegedly caused or prolonged by them. Those additional deployments entail identifiable and measurable expenditures of public resources attributable to implementation or enforcement of the challenged policies and practices.

605. The COUNTY likewise expends tax-supported funds and resources to maintain and implement the challenged administrative complaint-intake policy, including paid employee and supervisory time and resources devoted to receiving, screening, logging, routing, recordkeeping, and processing submissions concerning alleged public offenses. This Claim challenges the DISTRICT ATTORNEY only with respect to those alleged COUNTY administrative functions and seeks no relief concerning charging, prosecution, or any other function performed on behalf of the State of California.

606. As alleged above, the challenged CITY and COUNTY policies operate together when the CITY declines to recognize or report an alleged offense or request prosecution and the COUNTY consequently excludes the resulting private submission from its ordinary administrative-intake process.

607. Plaintiffs allege that the foregoing expenditures are illegal to the extent they are used to maintain or implement policies or practices adjudged unconstitutional, unlawful, or ultra vires. This Claim challenges the expenditure of public resources on such policies and practices, not merely the wisdom or efficiency of otherwise lawful discretionary decisions.

608. The challenged expenditures and commitments of public resources are ongoing and will continue unless restrained. An injunction prohibiting expenditures to maintain or

implement any challenged policy or practice adjudged unlawful would prevent continued expenditure of CITY and COUNTY public funds for those purposes.

609. This Claim does not seek to compel the arrest, investigation, prosecution, charging, or continued custody of any person, or to dictate any prosecutorial decision. The Taxpayer Plaintiffs seek a declaration that expenditures or commitments of local-agency funds or resources to maintain or implement any challenged policy or practice adjudged unconstitutional, unlawful, or ultra vires constitute illegal expenditures within the meaning of Code of Civil Procedure section 526a; preliminary and permanent injunctive relief restraining the applicable Defendants from making such expenditures; attorneys' fees under Code of Civil Procedure section 1021.5 to the extent incurred and recoverable; allowable costs; and such other equitable relief as the Court deems proper.

## SEVENTEENTH CLAIM FOR RELIEF
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### California Civil Common Law Claim

(By Plaintiff BLAZEVICH against Sergeant CHARLOT and Detective ARVELO, individually, and against Defendant CITY OF SAN DIEGO under Gov't Code § 815.2(a))

610. BLAZEVICH incorporates by reference the preceding allegations to the extent relevant to this Claim for Relief.

611. As alleged above, BLAZEVICH informed CHARLOT that DUTRA had burglarized and remained in possession of 3859 Birch Street and that, unless DUTRA was taken into custody and control of the property restored, BLAZEVICH would lose substantially everything he owned or had worked for. CHARLOT's police report memorialized that warning. Despite that actual knowledge, CHARLOT threatened to arrest BLAZEVICH for battery and false imprisonment if he retook custody of DUTRA or attempted to restore control.

612. Following the ESCHAVES SWAT incident, ARVELO likewise threatened to arrest BLAZEVICH for "causing a disturbance" if he retook custody of DUTRA or privately arrested other unauthorized occupants of 3859 Birch Street.

613. By deliberately using threats of arrest and official coercive authority to compel BLAZEVICH's submission, under the circumstances alleged and despite

CHARLOT's actual knowledge of the catastrophic losses BLAZEVICH was attempting to prevent, CHARLOT and ARVELO engaged in extreme and outrageous conduct. They intended to compel BLAZEVICH's submission and acted with reckless disregard of the probability that their conduct would cause him severe emotional distress.

614. BLAZEVICH submitted to the threats and suffered severe and enduring emotional distress, as alleged above. CHARLOT's and ARVELO's conduct was a substantial factor in causing that distress.

615. This Claim is based on CHARLOT's and ARVELO's affirmative, threat-backed conduct directed personally at BLAZEVICH, not on a generalized failure to investigate, enforce the law, provide police protection, make an arrest, or retain an arrested person.

616. At all relevant times, CHARLOT and ARVELO acted within the course and scope of their CITY employment. The CITY is therefore vicariously liable under Government Code § 815.2(a) to the extent either employee is liable for the conduct alleged in this Claim.

617. BLAZEVICH seeks compensatory damages according to proof, punitive damages against CHARLOT and ARVELO individually, allowable costs and interest, and such other relief as set forth in the Prayer for Relief.

## X. PRAYER FOR RELIEF

**WHEREFORE,** PLAINTIFFS, each only as to the Claims for Relief asserted by that Plaintiff and the injuries personally sustained, respectfully request that the Court enter judgment in their favor and against each Defendant to whom the applicable Claim is directed, and award the following relief, separately or cumulatively to the extent permitted by law, but without duplicative recovery for the same injury:

## A. RELIEF ON THE FEDERAL CLAIMS FOR RELIEF

### AS TO THE FIRST CLAIM FOR RELIEF

**Violation of Equal Protection Clause**

(United States Constitution, Amendment XIV; 42 U.S.C. § 1983)

1. Enter judgment in favor of PLAINTIFFS, each only as to the injuries personally sustained, and against CARDENAS, COATS, MORENO, RAYNOR, CASTILLO, ESAMBOLCHI, ULOVEC, CHARLOT, DUNCAN, CHRISTMAN, KNUTSON, and RODRIGUEZ, each in his or her individual capacity, for compensatory damages according to proof and nominal damages for each violation of a Plaintiff's Fourteenth Amendment rights for which an actual compensable injury is not established or cannot be separately quantified.

2. Enter judgment in favor of BLAZEVICH and against the DISTRICT ATTORNEY, in an official capacity and solely as to the administrative complaint-intake function alleged in this Claim, declaring that the categorical exclusion from neutral intake and consideration of a complaint arising from a private-person arrest, solely because the complaint was submitted by a private person and was not accompanied by a police report containing a peace officer's request for prosecution, denies equal protection of the laws.

3. Issue preliminary and permanent injunctive relief in favor of BLAZEVICH and against the DISTRICT ATTORNEY, in an official capacity and solely as to the administrative complaint-intake function alleged in this Claim, prohibiting the categorical rejection or exclusion of such a complaint on either ground stated in Paragraph 2, and requiring neutral receipt, routing, and individualized intake consideration of the submission, while leaving undisturbed all lawful discretion concerning investigation, charging, prosecution, and disposition.

### AS TO THE SECOND CLAIM FOR RELIEF

**Violation of the Due Process Clause**

(United States Constitution, Amendment XIV; 42 U.S.C. § 1983)

4. Enter judgment in favor of PLAINTIFFS, each only as to that Plaintiff's own protected interests and injuries, and against CARDENAS, MORENO, RAYNOR, COATS, ARVELO, ULOVEC, CHARLOT, DUNCAN, and CHRISTMAN, each in his or her individual capacity, on the procedural-due-process allegations, for compensatory damages according to proof and nominal damages.

5. Enter judgment in favor of BLAZEVICH and against CARDENAS, MORENO, RAYNOR, COATS, ARVELO, ULOVEC, CHARLOT, DUNCAN, CHRISTMAN, and KNUTSON, each in his or her individual capacity, on the state-created-danger allegations, for compensatory damages according to proof and nominal damages.

## AS TO THE THIRD CLAIM FOR RELIEF

### Unreasonable Seizure

(United States Constitution, Amendment IV; 42 U.S.C. § 1983)

6. Enter judgment in favor of PLAINTIFFS, each only as to his or her own property and possessory interests, and against CARDENAS, COATS, ARVELO, ULOVEC, CHARLOT, DUNCAN, and CHRISTMAN, each in his or her individual capacity, for compensatory damages according to proof and nominal damages for the unreasonable seizures of PLAINTIFFS' real and personal property alleged in this Claim.

## AS TO THE FOURTH CLAIM FOR RELIEF

### Violations of First Amendment Rights

(United States Constitution, Amendment I; 42 U.S.C. § 1983)

7. Enter judgment in favor of BLAZEVICH and against CHARLOT, ARVELO, COATS, and CHRISTMAN, each in his or her individual capacity, for compensatory damages according to proof and nominal damages.

## AS TO THE FIFTH CLAIM FOR RELIEF

### Failure to Intervene

(42 U.S.C. § 1983)

8. Enter judgment (a) in favor of BLAZEVICH, CRUZ JOYA, and BUDENZ, each only as to the constitutional violations and injuries personally sustained from the August 12, 2024 conduct at 3859 Birch Street, and against ULOVEC in his individual capacity; and (b) in favor of BLAZEVICH and LAFON, each only as to the constitutional violations and injuries personally sustained from the April 26, 2025 conduct at 1920 Woden Street, and against INGRAM-1994 and CHRISTMAN in their individual capacities, for compensatory damages according to proof and nominal damages, without duplicative recovery for injuries awarded under the Second or Third Claims for Relief.

**AS TO THE SIXTH CLAIM FOR RELIEF**

**Municipal Liability for Unconstitutional Ratified Practices and Customs and Failure to Train / Supervise**

(42 U.S.C. § 1983)

9. Enter judgment in favor of BLAZEVICH, CRUZ JOYA, LAFON, and BUDENZ and against the CITY OF SAN DIEGO for compensatory damages according to proof and nominal damages for the violations of the First, Fourth, and Fourteenth Amendment rights alleged in the First through Fourth Claims for Relief, to the extent asserted by each Plaintiff, that were caused by the CITY's policies, practices, customs, deliberately indifferent omissions, and failures to train or supervise.

10. Enter declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 in favor of BLAZEVICH, CRUZ JOYA, and LAFON and against the CITY OF SAN DIEGO, declaring that the CITY policies, practices, and customs identified in the Sixth Claim for Relief and proven at trial are unlawful and, as presently maintained, violate the federal constitutional rights asserted by each of those Plaintiffs under the First, Fourth, or Fourteenth Amendments, as applicable to that Plaintiff.

11. Issue preliminary and permanent injunctive relief in favor of BLAZEVICH, CRUZ JOYA, and LAFON and against the CITY OF SAN DIEGO, its officers, employees, agents, and all persons otherwise bound under Federal Rule of Civil Procedure 65(d), as applicable to each Plaintiff's ongoing activities and interests, prohibiting the CITY from maintaining or enforcing any policy, practice, or custom that:

   a. classifies reported public offenses as exclusively civil, or withholds police reports, investigation, custody processing, supervisory review, or other ordinarily available police services, because the reporting person is a residential-property owner, residential landlord, or authorized property manager;

   b. refuses to receive or process a private-arrest-related request because the reported conduct arises in a residential-landlord, ownership, or asserted-occupancy context;

   c. uses threatened arrest, detention, towing, impoundment, physical restraint, or coercive command, without an independently lawful basis, to prevent a person from reporting a public offense, seeking supervisory review, maintaining custody of a person lawfully placed under private arrest, delegating the physical act of taking such a person into custody, or invoking an applicable custody-and-presentment procedure; or

   d. uses official authority, without a warrant, writ, court order, exigent circumstance, consent, or other lawful basis, to cause or maintain the dispossession of a person from property in which that person holds a legally cognizable ownership, possessory, residential, personal-property, or management interest.

12. Grant in favor of BLAZEVICH, CRUZ JOYA, and LAFON such narrowly tailored ancillary injunctive relief concerning written policies, training, supervision, or procedures as the Court determines is necessary to effectuate the relief granted under Paragraph 11 and prevent recurrence of the constitutional violations established in this action.

## B. RELIEF ON THE CALIFORNIA CLAIMS FOR RELIEF

## AS TO THE SEVENTH CLAIM FOR RELIEF

### Violation of the Tom Bane Civil Rights Act

(California Civil Code § 52.1)

13. Enter judgment in favor of BLAZEVICH and against COATS and CHRISTMAN, each in his individual capacity, and against the CITY OF SAN DIEGO under Government Code section 815.2, subdivision (a), for actual damages according to proof and all further damages authorized by Civil Code section 52.1, subdivision (c), including the damages provided by Civil Code section 52 to the extent applicable.

14. Award BLAZEVICH reasonable attorney's fees under Civil Code section 52.1 to the extent incurred and recoverable.

15. To the extent the requirements for prospective equitable relief are established, enter appropriate declaratory judgment and preliminary and permanent injunctive relief in favor of BLAZEVICH and against the CITY OF SAN DIEGO under Civil Code section 52.1, subdivision (c), limited to preventing recurrence of the threat-, intimidation-, or coercion-based interference alleged in the Seventh Claim for Relief.

16. Include in any temporary restraining order or preliminary or permanent injunction entered under Civil Code section 52.1 the statement required by subdivision (e) of that section.

## AS TO THE EIGHTH CLAIM FOR RELIEF

### Interference with Inalienable Right to Protect Property

(California Constitution, Art. I, Sec. 1)

17. Enter declaratory judgment in favor of LAFON, BLAZEVICH, and CRUZ JOYA, each only as to his or her own rights and property interests, and against the CITY OF SAN DIEGO, declaring that the CITY may not, through the challenged policies and practices, affirmatively employ police authority to compel them to surrender or refrain from exercising legally cognizable possession, access, management, or control of 1920 Woden Street, absent a warrant, writ, court order, exigent circumstance, or other independent lawful authority authorizing the interference.

18.

19. Issue preliminary and permanent injunctive relief in favor of LAFON, BLAZEVICH, and CRUZ JOYA and against the CITY OF SAN DIEGO prohibiting the CITY from enforcing the challenged policies or practices by using, or directing SDPD personnel to use, threats of arrest, detention, physical restraint, commands backed by threatened enforcement action, or threatened towing or impoundment to compel those Plaintiffs to surrender or refrain from exercising legally cognizable possession, access, management, control, or protection of 1920 Woden Street, absent a warrant, writ, court order, exigent circumstance, or other independent lawful authority for such interference.

**AS TO THE NINTH CLAIM FOR RELIEF**

**Forceable Detainer**

(California Code of Civil Procedure section 1160(a)(1))

20. Enter judgment in favor of BLAZEVICH and CRUZ JOYA and against CARDENAS and CHARLOT, each in his individual capacity, and against the CITY OF SAN DIEGO under Government Code section 815.2, subdivision (a), for the actual damages occasioned by the forcible detainer under Code of Civil Procedure section 1174, subdivision (b), and, upon proof of malice, statutory damages of up to six hundred dollars under that subdivision.

**AS TO THE TENTH CLAIM FOR RELIEF**

**Conversion**

(California Common Law)

21. Enter judgment in favor of BLAZEVICH and CRUZ JOYA, each only as to personal property that he or she owned or had the immediate right to possess, and against CARDENAS and CHARLOT, each in his individual capacity, and against the CITY OF SAN DIEGO under Government Code section 815.2, subdivision (a), for the value of the converted property at the time of conversion with interest from that time, or damages sufficient to indemnify each Plaintiff for the natural, reasonable, and proximate losses caused by the conversion, together with fair compensation for the time and money properly expended in pursuit of the property, as authorized by Civil Code section 3336.

**AS TO THE ELEVENTH CLAIM FOR RELIEF**

**Intentional Interference with Prospective Economic Relations**

(California Common Law)

22. Enter judgment in favor of LAFON and against COATS and CHRISTMAN, each in his individual capacity, and against the

CITY OF SAN DIEGO under Government Code section 815.2, subdivision (a), for compensatory damages according to proof on the Eleventh Claim for Relief; and award punitive damages against COATS and CHRISTMAN only to the extent permitted by Civil Code section 3294.

**AS TO THE TWELFTH CLAIM FOR RELIEF**

**Affirmative Misfeasance; Alternatively, Special Relationship and Negligent Undertaking**

(California Government Code § 815.2)

23. Enter judgment in favor of BLAZEVICH, CRUZ JOYA, BUDENZ, and LAFON, each only as to injuries personally sustained and occurrences for which the applicable Government Claims Act requirements have matured and been satisfied, and against CARDENAS, CHARLOT, COATS, CHRISTMAN, and ARVELO, each in his or her individual capacity and only to the extent that Defendant's conduct caused that Plaintiff's injury, and against the CITY OF SAN DIEGO under Government Code section 815.2, subdivision (a), for compensatory damages according to proof, this Claim being pleaded in the alternative to PLAINTIFFS' intentional-tort Claims and without duplicative recovery.

**AS TO THE THIRTEENTH CLAIM FOR RELIEF**

**Breach of Mandatory Duty**

(California Government Code § 815.6)

24. Enter judgment in favor of BLAZEVICH, CRUZ JOYA, and BUDENZ, each only as to his or her own injuries and legally protected interests and only as to occurrences applicable to that Plaintiff for which the applicable Government Claims Act requirements have matured and been satisfied, and against the CITY OF SAN DIEGO for damages to the extent authorized by Government Code section 815.6 and otherwise recoverable under applicable law, without duplicative recovery for injuries awarded under the Twelfth Claim for Relief.

**AS TO THE FOURTEENTH CLAIM FOR RELIEF**

**Private Nuisance**

(California Civil Code §§ 3479, 3481)

25. Enter judgment in favor of BLAZEVICH, CRUZ JOYA, and BUDENZ, each only for injuries personally sustained and fairly encompassed by an applicable matured CITY claim, and against CARDENAS, CHARLOT, COATS, CHRISTMAN, and ARVELO, each in his or her individual capacity, and against the

CITY OF SAN DIEGO under Government Code section 815.2, subdivision (a), for compensatory damages according to proof.

26. Issue preliminary and permanent injunctive relief in favor of LAFON, BLAZEVICH and CRUZ JOYA and against the CITY OF SAN DIEGO, limited to the abatement and prevention of continuing private-nuisance conditions established at trial concerning 1920 Woden Street, and order such lawful abatement measures within the CITY's authority as are proven necessary and legally permissible.

**AS TO THE FIFTEENTH CLAIM FOR RELIEF**

**Public Nuisance**

(California Civil Code §§ 3479, 3480, 3493)

27. Enter judgment in favor of BLAZEVICH, CRUZ JOYA, and BUDENZ, each only for special injury personally sustained and fairly encompassed by an applicable matured CITY claim, and against COATS and CHRISTMAN, each in his individual capacity, and against the CITY OF SAN DIEGO, for compensatory damages according to proof.

28. In favor of BLAZEVICH and CRUZ JOYA and against the CITY OF SAN DIEGO, order lawful abatement of the continuing public-nuisance conditions concerning 1920 Woden Street and enter such declaratory and preliminary and permanent injunctive relief as is proven necessary and legally permissible, without duplicative relief under Paragraph 25.

**AS TO THE SIXTEENTH CLAIM FOR RELIEF**

**Taxpayer Action to Restrain Illegal Expenditures**

(California Code of Civil Procedure § 526a)

29. Enter declaratory judgment:

a. in favor of LAFON, BLAZEVICH, and CRUZ JOYA and against the CITY OF SAN DIEGO and the CHIEF, in an official capacity, declaring that the expenditure or commitment of CITY funds or resources to maintain or implement any challenged CITY policy or practice adjudged unconstitutional, unlawful, or ultra vires constitutes an illegal expenditure within the meaning of Code of Civil Procedure section 526a; and

b. in favor of LAFON and against the COUNTY OF SAN DIEGO and the DISTRICT ATTORNEY, in an official capacity solely as to the administrative COUNTY complaint-intake function alleged in this Claim, declaring that the expenditure or commitment of COUNTY funds or resources to maintain or implement any challenged COUNTY policy or

practice adjudged unconstitutional, unlawful, or ultra vires constitutes an illegal expenditure within the meaning of Code of Civil Procedure section 526a.

30. Issue preliminary and permanent injunctive relief under Code of Civil Procedure section 526a:

a. in favor of LAFON, BLAZEVICH, and CRUZ JOYA and against the CITY OF SAN DIEGO and the CHIEF, in an official capacity, restraining the expenditure or commitment of CITY funds or resources to maintain or implement any challenged CITY policy or practice adjudged unconstitutional, unlawful, or ultra vires; and

b. in favor of LAFON and against the COUNTY OF SAN DIEGO and the DISTRICT ATTORNEY, in an official capacity solely as to the administrative COUNTY complaint-intake function alleged herein, restraining the expenditure or commitment of COUNTY funds or resources to maintain or implement any challenged COUNTY policy or practice adjudged unconstitutional, unlawful, or ultra vires.

**AS TO THE SEVENTEENTH CLAIM FOR RELIEF**

**Intention Infliction of Emotional Distress**

(California Common Law)

31. Enter judgment in favor of BLAZEVICH and against CHARLOT and ARVELO, each in his or her individual capacity, and against the CITY OF SAN DIEGO under Government Code section 815.2, subdivision (a), for compensatory damages according to proof.

## C. RELIEF COMMON TO ALL CLAIMS FOR RELIEF

32. Award punitive or exemplary damages in favor of the Plaintiff asserting the applicable Claim and against each Defendant sued in an individual capacity against whom punitive damages are requested on the First, Second, Third, Fourth, Fifth, Seventh, Ninth, Tenth, Eleventh, and Seventeenth Claims for Relief:

a. on the federal Claims, under 42 U.S.C. § 1983, upon proof that the Defendant acted with evil motive or intent or with reckless or callous indifference to federally protected rights; and

b. on the California Claims, upon clear and convincing proof of malice, oppression, or fraud as required by Civil Code section 3294.

33. Award damages against individual-capacity Defendants jointly and severally to the extent permitted by law and where the injury caused by their conduct is indivisible.

34. Award reasonable attorney's fees to the extent incurred and recoverable pursuant to 42 U.S.C. § 1988(b), Civil Code section 52.1, Code of Civil Procedure section 1021.5, and any other applicable provision of law.

35. Award PLAINTIFFS their taxable costs of suit pursuant to Federal Rule of Civil Procedure 54(d), 28 U.S.C. § 1920, and any other applicable provision of law.

36. Award prejudgment interest to the extent permitted by applicable federal and California law, and postjudgment interest pursuant to 28 U.S.C. § 1961.

37. Retain jurisdiction as necessary to enforce the declaratory and injunctive relief entered and to grant further necessary or proper relief under 28 U.S.C. § 2202.

38. Award such other and further legal or equitable relief as the Court determines to be just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b) and Civil Local Rule 38.1, PLAINTIFFS demand a trial by jury on all claims and issues so triable.

Respectfully submitted,

04 AUG 2026

PAUL JOSEPH BLAZEVICH, Plaintiff *in propria persona*

8-4-2026

EMERITA CRUZ JOYA, Plaintiff *in propria persona*

8/4/26

ERIC LAFON, Plaintiff *in propria persona*

8/4/26

GEORGE CHARLES BUDENZ II, Plaintiff *in propria persona*